1  ROBBINS GELLER RUDMAN
   & DOWD LLP
2  SHAWN A. WILLIAMS (213113)
   Post Montgomery Center
3  One Montgomery Street, Suite 1800
   San Francisco, CA 94104
4  Telephone: 415/288-4545
   415/288-4534 (fax)
5  shawnw@rgrdlaw.com
        – and –
6  DARREN J. ROBBINS (168593)
   DAVID C. WALTON (167268)
7  655 West Broadway, Suite 1900
   San Diego, CA 92101-3301
8  Telephone: 619/231-1058
   619/231-7423 (fax)
9  darrenr@rgrdlaw.com
   davew@rgrdlaw.com
10
   Attorneys for Plaintiff
11
   [Additional counsel appear on signature page.]
12

13                    UNITED STATES DISTRICT COURT

14                 NORTHERN DISTRICT OF CALIFORNIA

15  CITY OF ROYAL OAK RETIREMENT        )  No.
    SYSTEM, Individually and on Behalf of All )
16  Others Similarly Situated,          )  CLASS ACTION
                                        )
17                     Plaintiff,       )  COMPLAINT FOR VIOLATION OF THE
                                        )  FEDERAL SECURITIES LAWS
18       vs.                            )
                                        )
19  NETFLIX, INC., REED HASTINGS, DAVID )
    B. WELLS, THEODORE A. SARANDOS,     )
20  LESLIE J. KILGORE and NEIL D. HUNT, )
                                        )
21                     Defendants.      )
    _____)  DEMAND FOR JURY TRIAL
22

23

24

25

26

27

28

1

**INTRODUCTION**

2   1.  This is a securities fraud class action on behalf of all persons who purchased the

3 common stock of Netflix, Inc. ("Netflix" or the "Company") between December 20, 2010 and

4 October 24, 2011, inclusive (the "Class Period"). This action is brought against Netflix and certain

5 of its officers and/or directors for violations of the Securities Exchange Act of 1934 (the "1934

6 Act").

7   2.  Netflix is an Internet subscription service that streams television shows and movies.

8 The Company's subscribers can watch unlimited television shows and movies streamed over the

9 Internet to their televisions, computers and mobile devices, and in the United States, subscribers can

10 also have DVDs delivered to their homes.

11

**SUMMARY OF THE ACTION**

12   3.  During the Class Period, defendants issued materially false and misleading statements

13 regarding the Company's business practices and its contracts with content providers. Specifically,

14 defendants concealed negative trends in Netflix's business. As a result of defendants' false

15 statements, Netflix's stock traded at artificially inflated prices during the Class Period, reaching a

16 high of almost $300 per share on July 13, 2011. While Netflix stock was inflated (partially by

17 Netflix buying back its own stock), Company insiders were selling 388,661 shares of their own

18 Netflix stock for proceeds of $90.2 million.

19   4.  On September 15, 2011, Netflix issued a press release announcing an update to its

20 third quarter 2011 guidance. Netflix revealed that it had lost a million subscribers upon its price

21 increases becoming effective. On this news, Netflix stock collapsed nearly $40 per share to close at

22 just under $170 per share on September 15, 2011, a one-day decline of nearly 19% on volume of 21

23 million shares. The stock fell further when defendants were forced to announce on September 19,

24 2011 that, in an effort to offset skyrocketing costs and rapidly defecting customers, the Company

25 would begin charging separately for its two services and had raised prices as much as 60%. The

26 streaming service would retain the Netflix name, while the DVD service would be renamed

27 Qwikster. Netflix stock dropped to $130 per share on this news, a nearly 44% decline from early

28 September 2011.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS    - 1 -

1   5.   Then, on October 24, 2011, Netflix issued its third quarter 2011 shareholder letter in
2   which it reported a net loss of 810,000 U.S. subscribers, translating into a cumulative loss of 5.5
3   million subscribers. The subsequently filed Form 10-Q revealed that Netflix's obligations for
4   content over the coming years had skyrocketed to $3.5 billion, with $2.8 billion due within three
5   years.

6   6.   These disclosures caused Netflix stock to collapse from $118.84 per share on October
7   24, 2011 to $80.86 per share on October 27, 2011, on volume of 76 million shares over three days.
8   The stock has continued to decline since that time.

9   7.   The true facts, which were known by the defendants but concealed from the investing
10   public during the Class Period, were as follows:

11   (a)   Netflix had short-term contracts with content providers and defendants were
12   aware that the Company faced a Hobbesian choice to renegotiate the contracts in 2011 at much
13   higher rates or not renew them at all;

14   (b)   Content providers were already demanding much higher license fees, which
15   would dramatically alter Netflix's business;

16   (c)   Defendants recognized that Netflix's pricing would have to dramatically
17   increase to maintain profit margins given the streaming content costs they knew the Company would
18   soon be incurring; and

19   (d)   Netflix was not on track to achieve the earnings forecasts made by and for the
20   Company for 2011.

21   8.   As a result of defendants' false statements, Netflix stock traded at inflated levels
22   during the Class Period. However, after the above revelations seeped into the market, the
23   Company's shares were hammered by massive sales, sending them down 73% from their Class
24   Period high.

25   **JURISDICTION AND VENUE**

26   9.   Jurisdiction is conferred by §27 of the 1934 Act. The claims asserted herein arise
27   under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.

28

1      10.     Venue is proper in this district pursuant to §27 of the 1934 Act. Many of the false

2 and misleading statements were made in or issued from this district.

3      11.     Netflix maintains its principal executive office at 100 Winchester Circle, Los Gatos,

4 California 95032. Certain of the acts and conduct complained of herein, including the dissemination

5 of materially false and misleading information to the investing public, occurred in this district.

6      12.     In connection with the acts and conduct alleged in this complaint, defendants, directly

7 or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

8 to, the mails and interstate wire and telephone communications.

9 **PARTIES**

10      13.     Plaintiff City of Royal Oak Retirement System purchased the common stock of

11 Netflix during the Class Period as set forth in the certification attached hereto and was damaged as

12 the result of defendants' wrongdoing as alleged in this complaint.

13      14.     Defendant Netflix offers subscription-based services for television shows and movies.

14 These services are provided by mailing DVDs to subscribers' homes or via streaming to subscribers'

15 televisions, computers and mobile devices.

16      15.     Defendant Reed Hastings ("Hastings") is, and at all relevant times has been, the

17 Company's Chairman of the Board, Chief Executive Officer ("CEO") and President. During the

18 Class Period, Hastings sold 190,000 shares of his Netflix stock for proceeds of $43.2 million.

19      16.     Defendant David B. Wells ("Wells") is, and at all relevant times has been, the

20 Company's Chief Financial Officer ("CFO"). During the Class Period, Wells sold 6,196 shares of

21 his Netflix stock for proceeds of $1.5 million.

22      17.     Defendant Theodore A. Sarandos ("Sarandos") is, and at all relevant times has been,

23 the Company's Chief Content Officer and Vice President of Content. During the Class Period,

24 Sarandos sold 25,360 shares of his Netflix stock for proceeds of $5.8 million.

25      18.     Defendant Leslie J. Kilgore ("Kilgore") is, and at all relevant times has been, the

26 Company's Chief Marketing Officer. During the Class Period, Kilgore sold 29,577 shares of her

27 Netflix stock for proceeds of nearly $7.1 million.

28

1    19.    Defendant Neil D. Hunt ("Hunt") is, and at all relevant times has been, the

2 Company's Chief Product Officer.  During the Class Period, Hunt sold 35,589 shares of his Netflix

3 stock for proceeds of $8.3 million.

4    20.    The defendants referenced above in ¶¶15-19 are referred to herein as the "Individual

5 Defendants."

6    21.    The Individual Defendants, because of their positions with the Company, possessed

7 the power and authority to control the contents of Netflix's quarterly reports, press releases and

8 presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*,

9 the market.  They were provided with copies of the Company's reports and press releases alleged

10 herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to

11 prevent their issuance or cause them to be corrected.  Because of their positions with the Company,

12 and their access to material non-public information available to them but not to the public, the

13 Individual Defendants knew that the adverse facts specified herein had not been disclosed to and

14 were being concealed from the public and that the positive representations being made were then

15 materially false and misleading.  The Individual Defendants are liable for the false statements

16 pleaded herein.

17                    **FRAUDULENT SCHEME AND COURSE OF BUSINESS**

18    22.    Defendants are liable for: (i) making false statements; or (ii) failing to disclose

19 adverse facts known to them about Netflix.  Defendants' fraudulent scheme and course of business

20 that operated as a fraud or deceit on purchasers of Netflix common stock was a success, as it: (i)

21 deceived the investing public regarding Netflix's prospects and business; (ii) artificially inflated the

22 price of Netflix common stock; (iii) caused plaintiff and other members of the Class to purchase

23 Netflix common stock at inflated prices; and (iv) permitted the Individual Defendants to sell 286,722

24 shares of their Netflix stock at artificially inflated prices for proceeds of over $65 million.

25    23.    The top officers and directors of Netflix also benefited, as the Company's purportedly

26 favorable operating results contributed to the compensation paid to the top officers during the Class

27 Period, some of whom received as much as $10 million per year.

28

**BACKGROUND**

24.     Netflix is an Internet subscription service that streams television shows and movies. The Company's subscribers can watch unlimited television shows and movies streamed over the Internet to their televisions, computers and mobile devices, and in the United States, subscribers can also receive DVDs delivered to their homes.   The Company is organized into two operating segments: United States and International. The Company obtains content from various studios and other content providers through fixed-fee licenses, revenue sharing agreements and direct purchases. The Company markets its services through various channels, including online advertising and broad-based media, such as television and radio, as well as various partnerships.

25.     Netflix's fastest growing and most important segment was its streaming business. This business depended upon Netflix having an adequate amount of content available for its customers.  In October 2008, Netflix had acquired rights to stream Starz Encore; in July 2010, Netflix obtained the rights to Relativity Media; in August 2010, Netflix had obtained the rights to EPIX; and in September 2010, Netflix obtained the rights to Nu Image/Millenium.  These rights were expensive but insiders knew the rights were about to get a lot more expensive.

26.     At the beginning of the Class Period, Netflix was facing increasing competition for streaming business and content providers were exploring new ways to distribute their content and/or maximize their licensing fees. For example, in early March 2011, Warner Brothers announced it would offer select movies through Facebook, bypassing companies like Netflix altogether.  Cable companies were also dramatically increasing their digital offerings. Obviously, such developments caused investors to be concerned that Netflix would be unable to maintain its profit margins.  Thus, defendants' statements about Netflix's ability to secure content and maintain profit margins were crucial to investors' evaluation of Netflix.  Rather than fully disclose the devastating cost increases which were then threatening Netflix's entire business, defendants talked about its ability to grow.

27.     The defendants frequently referred to Netflix's ***three virtuous cycles*** of subscriber growth:

        –       Increasing numbers of subscribers leads to higher revenue, making it possible
                for Netflix to acquire more content, attracting more subscribers.

1
          &ndash;    Increasing numbers of subscribers leads to more positive word of mouth, leading to more subscribers.

2

3
          &ndash;    Increasing numbers of subscribers leads to higher revenue, making it possible for Netflix to invest more heavily in research and development, improving use experience and attracting more subscribers.

4

5
28.    Moreover, defendants concealed the extent of increasing prices for streaming content,

6
which would have the opposite effect of the "virtuous cycles," either through increased subscription

7
prices to Netflix's customers leading to negative user sentiment and decreased new subscribers or,

8
alternatively, less available content actually reversing one of the "virtuous" cycles.

9
29.    In fact, on December 8, 2010, at the Barclays Capital Global Technology Conference,

10
defendant Hastings stated:

11
We announced an extension and expansion of our ABC relationship with a lot of new content – all the past seven seasons of Lost, Brothers and Sisters, Ugly Betty, 20 or 30 shows, an enormous amount of episodes. So a big expansion. . . . And we are

12
very flexible in our content buying. We will take content that is old, new. We will try to pay the right amount for it. *And I think with the ABC deal, what we are*

13
*showing is we can continue to pay enough money to make it compelling for content owners*.

14
30.    At the beginning of the Class Period, Netflix's stock was trading at approximately

15
$180 per share.

16
**DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

17
**ISSUED DURING THE CLASS PERIOD**

18
31.    On December 20, 2010, defendant Hastings responded to a *Seeking Alpha* article

19
posted by Whitney Tilson. Hastings' response, entitled "Netflix CEO Reed Hastings Responds to

20
Whitney Tilson: Cover Your Short Position. Now," emphasized that Netflix would be able to protect

21
margins while driving "a huge new market," and stated in part:

22
Next in Whitney's catalog is the issue of potentially increasing internet bandwidth costs, given the recent fracas between Level 3 and Comcast. The cost of

23
sending or retrieving a gigabyte of data has fallen every year for at least 30 years. Advances in technology are making all the parts of data transmission cheaper and

24
cheaper, roughly following Moore's Law. The odds that the cost of moving a gigabyte of data materially increase in the next few years are extremely low. It is

25
vastly more likely that the costs continue to fall as component prices fall. There is some chance that consumer ISP networks like Comcast will prevail in their battle to

26
not only charge consumers of data, but also charge suppliers of data (e.g., Google, Netflix, Apple, etc.). This has been an ongoing battle for many years.

27
A valid concern over the long term is how much power the consumer ISP

28
networks will have to charge data suppliers (i.e. content). In the case of ESPN3,

however, it is the reverse: ESPN3 charges consumer ISP networks like Comcast for the privilege of transporting the ESPN3 data to the ISP's consumers (in essence, Comcast and peers are forced to share some of the revenue of the $45 per month broadband package with ESPN3). We don't have any plans to go the ESPN3 route, but *the odds of material negative Netflix P&L impact from broadband pricing trends in 2011 are very low*.

Moving to more interesting angles, Whitney documents our recent decreased FCF conversion due to us paying for content earlier than we had in the past. With this angle, Whitney does draw a little blood. Our new CFO David Wells and our content team are all over our need to get more consistent about pay-by-quarter for content going forward rather than pay-by-year, even if it means we'll pay a little more. We will be working to improve the FCF conversion trend in 2011. On a long term basis, FCF should track net income reasonably closely, as it has in the past, with stock options as an offset against small buildups in PPE and prepaid content. Nearly all of our computing is through Amazon Web Services and CDNs, which are pure opex.

Next in the litany of Whitney threats is market saturation. In 2011, this is unlikely to affect us. Streaming is growing rapidly; it is propelling Hulu, YouTube, Netflix and others to huge growth rates. Streaming adoption will likely follow the classic S curve, and we're still on the first part (acceleration) of the S curve. Since we expanded into streaming, Netflix net subscriber additions have been 1.9m in 2008, 2.9m in 2009, and over 7m this year (estimated). While saturation will happen eventually, given the recent huge acceleration of our business specifically, and streaming generally, saturation seems unlikely to hit in the short term.

\*        \*        \*

Moving on to the widely-discussed issue of increased content costs, it is true that we are paying more for any given piece of content than we were two years ago, and that in two years, we'll pay more than we pay today. Part of our goal as a business is to make money for content producers and to become one of their largest and best revenue sources. *Fortunately, our subscriber base is growing fast enough, and DVD shipments are growing slow enough, that we can afford to pay for the existing streaming content we have, and also get more content*. We try not to comment on specific deals, like the Starz renewal, as that rarely helps us get deals done.

Investors sometimes see the content cost threat as an issue around our margins. But *we have no intention of overspending relative to our margin structure, and there is no specific content that we "must have" at nearly any cost*. In our domestic business we spend 65-70% of revenue on COGS (which is mostly content and postage). So if content costs rose faster than we expected, then in practice we'd have less content than otherwise, rather than less margin. *This would ultimately show up in less subscriber growth than we wanted from a not-as-good-as-it-would-otherwise-be service; it would not likely show up as a sudden hit to margins. Management at Netflix largely controls margins, but not growth*.

Turning to competition, there is a legitimate short thesis in the unknown of who enters directly against us and when. Some offerings like Hulu Plus have some content we do not, but we are making progress on that gap. In the near term, some of our subscribers will also subscribe to Hulu Plus, but very few will quit Netflix because we have lots of streaming content that Hulu Plus does not. For a competitive firm to materially hurt our growth, they have to have some positive differentiator

(price, additional content, integration, etc.), and then they have to market their service effectively. This wild-card of major new competitor offering great content and marketing aggressively is the single best near-term short thesis, but no one knows if it will happen in 2011.

The core competitive barrier for direct competitors is brand/subscriber-evangelism. Our large subscriber base is very happy with Netflix, and tells their friends about Netflix. That means that the cost of acquiring the incremental 1m subscribers is lower for us than for a competitor, and thus our net additions are higher. There are also lots of other smaller competitive barriers, but the happy subscriber base is the big one.

\*       \*       \*

To wrap up, I have to agree with my friend Whitney that there are many risks ahead for Netflix, that our valuation is substantial, and that it is possible that one could make money shorting Netflix today. *But shorting a market leading firm as it is driving a huge new market is a very gutsy call*. On balance, I would rather have my co-philanthropists on the long side of this particular bet.

32.    Following this unusual communication by a CEO, Netflix's stock price jumped, increasing $8.19 per share, or 4% in one day to close at $186.24 per share on December 21, 2010.

33.    On January 26, 2011, Netflix issued a press release announcing its fourth quarter and year-end financial results for the period ended December 31, 2010.  The Company reported net income of $47 million, or $0.87 diluted earnings per share ("EPS") for the fourth quarter of 2010. The Company reported 20 million subscribers and net subscriber additions of 3.08 million for its fourth quarter 2010, and a growth of 7.7 million net subscriber additions for 2010, up from its forecast at the start of 2010 of net additions of 3.6 million.  Regarding the Company's business outlook, the release stated in part:

**Business Outlook**

Going forward we are providing more detail in our guidance for the current quarter by breaking out domestic versus international and by providing operating income guidance. Our business is so dynamic that we will be doing less calendar year guidance than in the past.

Our domestic guidance for Q1 2011 is:

- Subscribers between 21.9 million and 22.8 million

- Revenue between $684 million and $704 million

- Operating Income between $98 million and $116 million

\*       \*       \*

1    Our global guidance for Q1 2011 is:

2    •    Net Income between $49 million and $62 million

3    •    EPS between $0.90 and $1.13

4    For the year 2011:

5    •    We expect to operate domestically at approximately a 14% operating
          margin

6
7    •    We expect domestic subscriber net additions to continue to grow in
          2011

8    •    We expect our Canadian operations to have a positive operating
          margin in Q3

9
10   •    We expect to have approximately $50 million in operating losses in
          international in 2H of 2011 as we expand beyond Canada

11   34.    The release also stated in part:

12        In November last year we introduced our $7.99 per month pure streaming
     plan, and we increased the prices on our combination plans, which include streaming
13   and unlimited DVD rentals. As you can see from our strong Q1 subscriber guidance,
     our pure streaming plan has a great deal of consumer appeal. More than one third of
14   new subscribers are signing up for the pure streaming plan, and we expect that
     percentage to grow over time. The balance of new subscribers primarily takes our
15   $9.99 1-DVD combination plan. Very few of our existing subscribers are
     downgrading to the pure streaming plan.

16
     Our three virtuous cycles of subscriber growth are:
17
     1.    More subscribers means more money to license content with, *which
18         drives more subscriber growth*

19   2.    More subscribers means more word-of-mouth from subscribers to
           those who are not yet subscribers, *which drives more subscriber*
20         *growth*

21   3.    More subscribers means we can increase R&D spend to improve our
           user experience, *which drives more subscriber growth*

22
                         *     *     *
23

**Streaming Content**
24
          We continue to expand our selection of movies and TV shows available to
25   watch instantly. Our Epix deal just completed its first full quarter of current studio
     releases and great catalog movies. We also closed an expansive new deal with
26   ABC/Disney that includes all previous seasons of "Lost," "Desperate Housewives,"
     and "Brothers and Sisters" from ABC and "Phineas and Ferb," "Good Luck Charlie"
27   and a host of other popular shows and original movies from the Disney Channel.

28

Our unique direct deals with independent producers and distributors have made it possible for us to bring all five of the just-announced 2011 Academy Awards-nominated Best Documentary Feature films to our growing streaming library. Two of those films – "Exit Through the Gift Shop" and "Restrepo"– are available to stream now. "Waste Land" is coming on March 29 and "Gasland" and "Inside Job" will be coming soon through existing deals.

Our interest in television shows is high. Our primary strategy is to offer complete previous seasons of shows rather than offering those shows the day of, or a few days after, broadcast, during the critical ratings and revenue window. This is in the best interest of content owners and is consistent with our desire to offer a very low-cost service for consumers. As with theatrical ticket sales, VOD and the 28-day DVD sale window, this allows studios to capture the market for those most interested in seeing content right away. You will occasionally see us offering shows day after broadcast, as we do with "Saturday Night Live," or 15 days after broadcast, as we do with Disney Channel programs, but it doesn't represent a change in our overall TV strategy.

*        *        *

**Operating Margins**

Managing to a target operating margin has proven to be effective for us, and we plan to continue to do so. For the next few quarters we will target a domestic operating margin of about 14%, which we believe is a good balance of growth and earnings. The variable costs of DVD shipments, and the seasonal nature of big DVD releases, contributed to material expense seasonality in the past. While this remains true of DVD, this expense seasonality will smooth out as streaming becomes the majority of our content expense. Seasonality of subscriber growth will remain, but the domestic margin structure going forward should be less seasonal than in the past. Occasionally, we will have the opportunity to close a big streaming content deal, and our margins will dip temporarily, *but most of the streaming deals are less lumpy, and we will be able to manage close to the domestic 14% target*.

35.     After releasing its 2010 fourth quarter and year-end financial results on January 25, 2011, Netflix hosted a conference call with analysts, investors and media representatives, during which defendant Hastings represented the following:

[ANALYST:]  Do you believe it will get harder to acquire incremental films and TV shows from major Hollywood studios?  And, where are you in quantity today and where would you hope to be in a few years?

[HASTINGS:]  Doug, no it's not gotten harder, it's gotten easier as we pay more. Three, four yeas ago, when we couldn't pay much, it was very hard, and, *now because we've got significant dollars to spend, we've got people coming to us and that makes perfect sense*. So, while [sic] *we're feeling great about both our ability to make content owners a lot of money and to get deals done and continue to fill out and improve our selection*.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 10 -

36.     On February 18, 2011, Netflix filed its Form 10-K with the SEC for the year ended December 31, 2010, in which it discussed the impact of possible changes with content distributors. The Form 10-K assured investors about Netflix's margins:

> ***We believe that the streaming content we make available to our subscribers is sufficiently diversified, such that we will not be forced to pay licensing fees for content in excess of our desired operational margins***. We believe that any failure to secure content will manifest in lower subscriber acquisition and retention and ***not in materially reduced margins***. Nonetheless, given the multiple-year duration and largely fixed nature of content licenses, if we do not experience subscriber acquisition and retention as forecasted, our margins may be impacted by these fixed content licensing costs. During the course of our license relationship, various contract administration issues can arise. To the extent that we are unable to resolve any of these issues in an amicable manner, our relationship with the studios and other content distributors or our access to content may be adversely impacted.

37.     This disclosure concealed the extent of the price increases then being demanded by content providers as alternative streaming venues also competed for content.

38.     On April 25, 2011, Netflix issued a press release announcing its first quarter 2011 financial results. The Company reported net income of $60 million, or $1.11 diluted EPS, and revenue of $718 million for the quarter ended March 31, 2011. The Company further reported strong quarterly growth in subscribers of 23.6 million globally. Additionally, Netflix provided its outlook for the second quarter of 2011, stating in part:

**Business Outlook**

**Guidance**

**Domestic Q2 2011**:

| | |
|---|---|
| Subscribers | 24.0m to 24.8m |
| Revenue | $762m to $778m |
| Operating Income | $100m to $116m |

**International Q2 2011:**

| | |
|---|---|
| Subscribers | 900k to 1,050k |
| Revenue | $16m to $20m |
| Operating Loss | -$14m to -$10m |

**Global Q2 2011:**

| | |
|---|---|
| Net Income | $50m to $62m |
| EPS | $0.93 to $1.15 |

39.     The release also stated in part:

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                        - 11 -

**Domestic Streaming Content**

In Q1, we completed several important streaming content deals, bringing in additional first-time partners, extending and expanding relationships with other providers and pioneering some new approaches we believe will help Netflix continue to differentiate itself. The result is that Netflix subscribers can instantly enjoy a wider and better selection of TV shows and movies than ever before.

\* \* \*

As streaming grows, TV shows and feature films are being enjoyed in nearly equivalent volume by our subscribers and our content acquisition team is focusing their attention accordingly. We've recently added lots of new TV episodes, and the profile and completeness of the shows continues to improve. As for movies, we've recently added a large number of core catalog titles from Paramount that are exclusive to Netflix against broadcast, cable and other over-the-top services and titles from Lionsgate and MGM that are exclusive against other over-the-top services.

While the size of these deals and their impact on our P&L is often speculated about in the press, spending typically takes place over multiple years and the amortized cost of these deals is taken into consideration in our 14% target operating margin model.

40. After releasing its first quarter 2011 financial results on April 25, 2011, Netflix hosted a conference call with analysts, investors and media representatives. In response to a question about content spending, defendant Hastings stated:

We'll run the US around 14% operating margin and spend on content in accordance with that.

41. On June 1, 2011, defendant Wells spoke at the Bank of America Merrill Lynch Technology Conference. In response to an analyst question about content spending, Wells stated in part:

[ANALYST:]   With these seemingly large numbers, how are you able to manage your financial goals when you're adding, and manage to a long-term operating margin even as you add so much new spend in a new area that really, until January, you didn't have a direct product for?

[WELLS:]   Well, I'd say that the discipline that we're holding to for this year is to hold to a 14 – around a 14% domestic operating margin target. And the numbers that you see in the press, some accurate, some not, are indicative of the total value of a deal. So if it's a three-year deal or a five-year deal, it's going to be the total value of that deal. It isn't the P&L expense that we would see in any given year or quarter, and so it's going to be a fraction of that. And so to the extent that we're holding to a content budget, the deals that we're making, I can assure you, are still well within the expectations of our operating margin targets.

42. On July 12, 2011, Netflix announced it had raised prices by 60% for U.S. subscribers who want both services, citing the costs to acquire and deliver films and TV shows. Netflix stated:

1    "Given the long life we think DVDs by mail will have, treating DVDs as a $2
     add-on to our unlimited streaming plan neither makes great financial sense nor
2    satisfies people who just want DVDs."

3        43.    On July 13, 2011, Netflix announced it had signed a multi-year agreement renewing

4    and expanding its rights to movies and television shows from NBCUniversal.

5        44.    Despite the severely negative reaction of customers to the price increase, the stock

6    market reacted favorably to these two announcements. On July 13, 2011, Netflix's stock reached its

7    Class Period high, closing at $298.73 per share.

8        45.    On July 25, 2011, Netflix issued a press release announcing its second quarter 2011

9    financial results. The Company reported net income of $68 million, or $1.26 diluted EPS, and

10   revenue of $789 million for the second quarter ended June 30, 2011. The Company further reported

11   over 25 million global subscribers for the second quarter. The release further stated in part:

12           In Q3 we will see only the negative impact of the pricing change, given that
         the announcement was early in the quarter and that the increases won't take effect
13       until late in the quarter (September 15th on average). We expect domestic net
         additions in Q3 to be lower than the previous year Q3, and because of the timing of
14       the price change, revenues will only grow slightly on a sequential basis.

15           In Q4, we expect domestic net additions to return to a pattern of year-over-
         year growth while revenue will reflect a full quarter's impact of the pricing changes,
16       which could result in Q4 being our first billion dollar global revenue quarter, driven
         by strong U.S. performance.
17
             While we expect our revenue to increase in Q4 from this pricing change, we
18       are still targeting a 14% domestic operating margin because we will continue to
         increase our spending on streaming content, ensuring the service remains by far the
19       best value out there when it comes to enjoying instant, on-demand movies and TV
         shows.
20
         46.    After releasing its second quarter 2011 financial results on July 25, 2011, Netflix
21
     hosted a conference call with analysts, investors and media representatives. In discussing the pricing
22
     changes, defendants stated:
23
         [HASTINGS:]    Like any customer-driven organization, we feel bad about having
24       customers upset with us, but we feel great about the amazing new content we're
         going to be able to license in the fourth quarter and next year, which will further
25       propel our growth and our subscriber satisfaction. . . . And it's going to allow us to
         have just fantastic streaming content going forward.
26
                                    *       *       *
27
         [ANALYST:]    Given your relatively modest cash position, relative to the
28       size of checks you're writing for content, and the success you're having with that

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                              - 13 -

content investment, what is the rationale of buying back stock? Given the multiple you get for subs, wouldn't you generate more value by investing in adding subs versus buybacks?

\* \* \*

[WELLS:] So we have three legs, basically, of investment. One is our streaming content investment. One is our marketing. And one is our earnings target, basically putting money towards – back to investors. And setting that 14% operating margin – domestic operating margin target allows us to set basically a content spend and a marketing spend. And so how we thank about cash relative to the buyback is independent of how much we spend on marketing. And I'd say how we approach the buyback is what could we do with that cash as an alternative use? Should we hold it as an insurance policy, or should we return it to shareholders and a buyback is the most efficient way to do that.

47.   On September 1, 2011, following the market close, Starz announced it was pulling its content from Netflix as a result of failed negotiations. Starz had represented some of Netflix's most valuable content.

48.   Netflix's stock dropped $20.16 per share on this news.

49.   On September 15, 2011, Netflix issued a press release announcing an update to its third quarter 2011 guidance. Netflix lowered its third quarter 2011 domestic subscriber estimates, expecting to end the third quarter with 21.8 million domestic streaming subscribers and 14.2 million U.S. DVD subscribers, down from its prior forecast of 22 million and 15 million, respectively. More significantly, Netflix lost a million subscribers almost immediately upon its price increases becoming effective.

50.   On this news, Netflix's stock collapsed $39.46 per share to close at $169.25 per share on September 15, 2011, a one-day decline of nearly 19% on volume of 21 million shares.

51.   The stock dropped even further when the Company announced on September 19, 2011, that it would begin charging separately for the two services and raised prices as much as 60%, a move that was poorly received among subscribers. The streaming service would retain the Netflix name, while the DVD service would be renamed Qwikster

52.   Netflix's stock dropped to $130.03 per share on this news, a nearly 44% decline from early September 2011.

53.   On October 24, 2011, Netflix issued its third quarter 2011 shareholder letter in which it reported a net loss of 810,000 U.S. subscribers, translating into a cumulative loss of 5.5 million

1 subscribers. The subsequently filed Form 10-Q revealed that Netflix's obligations for content over

2 the coming years had skyrocketed to $3.5 billion, with $2.8 billion due within three years.

3      54.    These disclosures caused Netflix's stock to collapse from $118.84 per share on

4 October 24, 2011 to $80.86 per share on October 27, 2011, on volume of 76 million shares over

5 three days.

6      55.    The true facts, which were known by the defendants but concealed from the investing

7 public during the Class Period, were as follows:

8           (a)    Netflix had short-term contracts with content providers and defendants were

9 aware that the Company faced a Hobbesian choice to renegotiate the contracts in 2011 at much

10 higher rates or not renew them at all;

11           (b)    Content providers were already demanding much higher license fees, which

12 would dramatically alter Netflix's business;

13           (c)    Defendants recognized that Netflix's pricing would have to dramatically

14 increase to maintain profit margins given the streaming content costs they knew the Company would

15 soon be incurring; and

16           (d)    Netflix was not on track to achieve the earnings forecasts made by and for the

17 Company for 2011.

18      56.    As a result of defendants' false statements, Netflix's stock traded at inflated levels

19 during the Class Period.  However, after the above revelations seeped into the market, the

20 Company's shares were hammered by massive sales, sending them down 73% from their Class

21 Period high.

22 **LOSS CAUSATION**

23      57.    During the Class Period, as detailed herein, the defendants made false and misleading

24 statements and engaged in a scheme to deceive the market and a course of conduct that artificially

25 inflated the price of Netflix common stock and operated as a fraud or deceit on Class Period

26 purchasers of Netflix common stock by misrepresenting the Company's business and prospects.

27 Later, when the defendants' prior misrepresentations and fraudulent conduct became apparent to the

28 market, the price of Netflix common stock fell precipitously, as the prior artificial inflation came out

1    of the price over time. As a result of their purchases of Netflix common stock during the Class

2    Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the

3    federal securities laws.

### NO SAFE HARBOR

5    58.    Netflix's verbal "Safe Harbor" warnings accompanying its oral forward-looking

6    statements ("FLS") issued during the Class Period were ineffective to shield those statements from

7    liability.

8    59.    The defendants are also liable for any false or misleading FLS pleaded because, at the

9    time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

10   authorized and/or approved by an executive officer of Netflix who knew that the FLS was false.

11   None of the historic or present tense statements made by defendants were assumptions underlying or

12   relating to any plan, projection or statement of future economic performance, as they were not stated

13   to be such assumptions underlying or relating to any projection or statement of future economic

14   performance when made, nor were any of the projections or forecasts made by defendants expressly

15   related to or stated to be dependent on those historic or present tense statements when made.

### CLASS ACTION ALLEGATIONS

17   60.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

18   of Civil Procedure on behalf of all persons who purchased or otherwise acquired Netflix common

19   stock during the Class Period (the "Class"). Excluded from the Class are defendants and their

20   families, the officers and directors of the Company, at all relevant times, members of their

21   immediate families and their legal representatives, heirs, successors or assigns and any entity in

22   which defendants have or had a controlling interest.

23   61.    The members of the Class are so numerous that joinder of all members is

24   impracticable. The disposition of their claims in a class action will provide substantial benefits to

25   the parties and the Court. Netflix has over 52.5 million shares of stock outstanding, owned by

26   hundreds if not thousands of persons.

27

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 16 -

62.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether the 1934 Act was violated by defendants;

(b)     whether defendants omitted and/or misrepresented material facts;

(c)     whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     whether the price of Netflix common stock was artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

63.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

64.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

65.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**COUNT I**

**For Violation of §10(b) of the 1934 Act and Rule 10b-5**
**Against All Defendants**

66.     Plaintiff incorporates ¶¶1-65 by reference.

67.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

68.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

1        (a)     employed devices, schemes and artifices to defraud;

2        (b)     made untrue statements of material facts or omitted to state material facts

3 necessary in order to make the statements made, in light of the circumstances under which they were

4 made, not misleading; or

5        (c)     engaged in acts, practices and a course of business that operated as a fraud or

6 deceit upon plaintiff and others similarly situated in connection with their purchases of Netflix

7 common stock during the Class Period.

8      69.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of

9 the market, they paid artificially inflated prices for Netflix common stock. Plaintiff and the Class

10 would not have purchased Netflix common stock at the prices they paid, or at all, if they had been

11 aware that the market price had been artificially and falsely inflated by defendants' misleading

12 statements.

13 **COUNT II**

14 **For Violation of §20(a) of the 1934 Act**<br>**Against All Defendants**

15

16      70.    Plaintiff incorporates ¶¶1-69 by reference.

17      71.    The Individual Defendants acted as controlling persons of Netflix within the meaning

18 of §20(a) of the 1934 Act. By virtue of their positions with the Company, and ownership of Netflix

19 stock, the Individual Defendants had the power and authority to cause Netflix to engage in the

20 wrongful conduct complained of herein. Netflix controlled the Individual Defendants and all of its

21 employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

22 **PRAYER FOR RELIEF**

23 WHEREFORE, plaintiff prays for judgment as follows:

    A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

24     B.    Awarding plaintiff and the members of the Class damages, including interest;

25     C.    Awarding plaintiff reasonable costs and attorneys' fees; and

26     D.    Awarding such equitable/injunctive or other relief as the Court may deem just and

27 proper.

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS      - 18 -

1

**JURY DEMAND**

2      Plaintiff demands a trial by jury.

3    DATED: January 13, 2012                ROBBINS GELLER RUDMAN
                                              & DOWD LLP
4                                           SHAWN A. WILLIAMS

5

6                                           _____
                                                SHAWN A. WILLIAMS
7
                                            Post Montgomery Center
8                                           One Montgomery Street, Suite 1800
                                            San Francisco, CA 94104
9                                           Telephone: 415/288-4545
                                            415/288-4534 (fax)
10
                                            ROBBINS GELLER RUDMAN
11                                            & DOWD LLP
                                            DARREN J. ROBBINS
12                                          DAVID C. WALTON
                                            655 West Broadway, Suite 1900
13                                          San Diego, CA 92101-3301
                                            Telephone: 619/231-1058
14                                          619/231-7423 (fax)

15                                          VANOVERBEKE MICHAUD &
                                              TIMMONY, P.C.
16                                          MICHAEL J. VANOVERBEKE
                                            THOMAS C. MICHAUD
17                                          79 Alfred Street
                                            Detroit, MI 48201
18                                          Telephone: 313/578-1200
                                            313/578-1201 (fax)
19
                                            Attorneys for Plaintiff
20

21

22   S:\CptDraft\Securities\Cpt Netflix.doc

23

24

25

26

27

28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS            - 19 -

1   CERTIFICATION OF NAMED PLAINTIFF
2   PURSUANT TO FEDERAL SECURITIES LAWS

3   CITY OF ROYAL OAK RETIREMENT SYSTEM ("Plaintiff") declares:

4       1.    Plaintiff has reviewed a complaint and authorized its filing.

5       2.    Plaintiff did not acquire the security that is the subject of this action at the
6   direction of plaintiff's counsel or in order to participate in this private action or any
7   other litigation under the federal securities laws.

8       3.    Plaintiff is willing to serve as a representative party on behalf of the
9   class, including providing testimony at deposition and trial, if necessary.

10      4.    Plaintiff has made the following transaction(s) during the Class Period in
11  the securities that are the subject of this action:

12
13  | Security | Transaction | Date | Price Per Share |
14                      *See* attached Schedule A.

15      5.    Plaintiff has not sought to serve or served as a representative party in a
16  class action that was filed under the federal securities laws within the three-year
17  period prior to the date of this Certification except as detailed below:

18  *City of Royal Oak Retirement System v. Itron, Inc.*, No. 2:11-cv-0077 (E.D. Wash.)
    *City of Royal Oak Retirement System v. Juniper Networks, Inc.*, No. 5:11-cv-04003 (N.D. Cal.)
19
20
21
22
23
24
25
26      6.    The Plaintiff will not accept any payment for serving as a representative
27  party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,
28

NETFLIX

1  | except such reasonable costs and expenses (including lost wages) directly relating to

2  | the representation of the class as ordered or approved by the court.

3  |      I declare under penalty of perjury that the foregoing is true and correct.

4  | Executed this _____ 5 _____ day of _____ J A n _____ , 2012

5  |                          CITY OF ROYAL OAK RETIREMENT

                          SYSTEM

7  |                          By: _John T. Lang_

8  |                          Its: _Chairman_

- 2 -

NETFLIX

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 07/01/2011 | 561 | $266.70 |
| 07/26/2011 | 68 | $255.60 |

**Sales**

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 07/05/2011 | 56 | $287.41 |
| 07/13/2011 | 63 | $297.46 |
| 08/18/2011 | 10 | $215.35 |
| 09/15/2011 | 79 | $170.78 |
| 09/29/2011 | 421 | $111.44 |