United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

In re NETFLIX, INC., SECURITIES
LITIGATION

)   Case No. 12-00225 SC
)
)   ORDER GRANTING MOTION TO
)   DISMISS
)

I.    **INTRODUCTION**

Plaintiffs Arkansas Teacher Retirement System and State-Boston Retirement System ("Plaintiffs") bring this putative securities class action against Netflix, Inc. ("Netflix"); Netflix Co-Founder, Chairman of the Board, and CEO Reed Hastings ("Hastings"); current Netflix CFO David Wells ("Wells"); and Barry McCarthy ("McCarthy"), Netflix's CFO until December 10, 2010 (collectively "Defendants"). Now before the Court is Defendants' Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint ("CCAC"). ECF No. 91 ("MTD"). The motion is fully briefed, ECF Nos. 94 ("Opp'n"), 97 ("Reply"), and is suitable for determination without oral argument, Civ. L.R. 7-1(b). For the reasons set forth below, the Court GRANTS Defendants' Motion to Dismiss and DISMISSES the CCAC with leave to amend.

///

///

**II. <u>BACKGROUND</u>**

Netflix is a public corporation that purports to be the leading Internet subscription service for viewing movies and television shows (collectively "movies"). ECF No. 89 (CCAC) ¶ 20. Netflix currently allows consumers to watch movies either by streaming them over the Internet directly to their televisions, computers, or mobile devices, or by receiving DVDs sent to their homes. <u>Id.</u>

Netflix provided no streaming services -- only DVDs by mail -- from 1999 to 2007. <u>Id.</u> ¶¶ 38-49. In 2007 Netflix began to allow its subscribers to stream movies via the "hybrid plan," the only plan it offered at the time, which allowed subscribers both to stream movies and to receive DVDs. <u>Id.</u>

In November 2010, as part of its plan to develop its streaming services further, Netflix decided to offer its subscribers a standalone streaming plan in addition to the hybrid plan. <u>Id.</u> ¶ 76. The hybrid plan cost $9.99 per month, and the new streaming-only plan cost $7.99 per month. <u>See id.</u> Shortly before this change, in October 2010, Defendants explained the "virtuous cycle" that would drive Netflix's transition to a streaming-focused company: "[A]s Netflix gained subscribers, it could afford to license more streaming content, which would increase its appeal, and therefore, allow [Netflix] to acquire more subscribers, and the cycle would thus continue." <u>Id.</u> ¶ 65. The cycle was important because Netflix's library of streaming content, unlike Netflix's DVD library, demanded continuous licensing negotiations and would require Netflix to continually increase its subscriber base in order to acquire and maintain streaming content. <u>See id.</u> ¶¶ 50-65.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Netflix planned to offset some of the increasing content costs by decreasing DVD-related expenditures.  <u>See</u> <u>id.</u>

From June 2010 to July 2011, Netflix's subscriber count steadily increased each quarter.  <u>Id.</u> ¶ 91.  Its stock price followed suit, rising from a closing price of $153.15 on October 20, 2010 to a high of $298.73 on July 13, 2011.  <u>Id.</u> ¶¶ 70, 73-74.

On July 12, 2011, however, Netflix announced that effective September 1, 2011 for existing subscribers and immediately for new ones, it would no longer offer its hybrid plan.  <u>Id.</u> ¶ 351. Instead, it would offer separate DVD-only and streaming-only plans, both for $7.99 per month.  <u>Id.</u> ¶¶ 351, 407.  Subscribers who previously had access to both DVD and streaming services for $9.99 per month under the hybrid plan would now have to pay $15.98 to subscribe to the new, separate plans.  <u>See</u> <u>id.</u> ¶¶ 350-51. Netflix's subscribers were unhappy, and Netflix experienced a net loss in customers for the first time in years.  <u>Id.</u> ¶¶ 377-78.

Netflix's fortunes fell further in September 2011.  First, on September 2, the cable channel Starz announced that it would not renew its streaming contract with Netflix effective February 28, 2012.  <u>Id.</u> ¶ 372.

Second, on September 15, Netflix reported that it expected to lose one million subscribers during the third quarter of 2011 -- the first quarter in years that would close with a net loss in subscribers.  After the announcement, Netflix's stock price dropped by $39.46 to close at $169.25.  <u>Id.</u> ¶¶ 376-79.  Plaintiffs state that "the investing public understood that the subscriber drop-off was due, in large part, to the price increases in July 2011."  <u>Id.</u> ¶ 378.  Nevertheless, Netflix stood behind its decision as "the

1  right choice." Id. ¶ 380.

2      Third, on September 19, 2011, Netflix announced that it

3  planned to spin off its DVD services into a new subsidiary called

4  "Qwikster." Id. ¶ 152.  Netflix planned to continue to provide

5  streaming services via its own subscription plans and website,

6  separately from the Qwikster subsidiary.  Id.  Netflix's customers

7  again recoiled from this change, and Netflix lost still more

8  subscribers.  ECF No. 93 (Request for Judicial Notice) ("RJN") Ex.

9  3, at 15.[1]  Netflix soon abandoned the Qwikster idea, but continued

10 its planned separation of the DVD-only and streaming-only plans,

11 thereby doing away with the hybrid plan altogether.  CCAC ¶¶ 148,

12 149, 154.

13     Shortly thereafter, on October 24, 2011 in documents related

14 to the fourth quarter of 2011 ("4Q11"), Netflix began to report

15 segmented financial information for the now-entirely-separate DVD-

16 only and streaming-only plans -- information that had previously

17 been unavailable.  Id. ¶ 225.  Before 4Q11, Netflix reported its

18 financial results under the single "Domestic" segment, which

19 included customers on the hybrid plan and those on the newer

20 streaming-only plan, but did not provide segmented financial

21 information for the then-intertwined DVD and streaming services.

22

23 [1] When ruling on a motion to dismiss, a court may consider documents
   whose contents are incorporated by reference in a complaint or upon
24 which a complaint necessarily relies when authenticity is not
   contested, and matters subject to judicial notice. Metzler Inv.
25 GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1061 (9th Cir.
   2008) (citing Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551
26 U.S. 308, 322 (2007)).  The Court takes judicial notice of the
   exhibits attached to the RJN because Plaintiffs refer to the
27 documents included in those exhibits, thereby incorporating them by
   reference, and Plaintiffs did not object to the RJN.
28

**United States District Court**
For the Northern District of California

4

**United States District Court**
For the Northern District of California

1   See id. ¶¶ 149, 151, 407; RJN Ex. 4 at 71.

2       In its 4Q11 reports, Netflix announced that its "contribution
3   margin for domestic streaming [would] be low in 4Q11 at around 8%
4   . . . due to [its] increasing content spend," whereas Netflix's DVD
5   business had a contribution profit of 50-52%.  Id. ¶¶ 382-85.
6   Netflix continued to stand by its decision to offer the DVD and
7   streaming subscription plans as separate services with separate
8   prices, but admitted that it had made the change too quickly,
9   compounding the problem "with [a] lack of explanation about the
10  rising cost of the expansion of streaming content, and steady DVD
11  costs."  Id. ¶ 389.  Netflix stated further that more long-term
12  members canceled their subscriptions in response to the pricing
13  changes than expected, thereby making Netflix's 4Q11 profits and
14  revenues lower than predicted, though Netflix would remain
15  profitable overall.  Id. ¶ 390.  After this announcement, Netflix's
16  stock price fell $41.47 per share to close at $77.37 per share on
17  October 25, 2011.  Id.

18      Plaintiffs, Netflix shareholders, now sue Defendants for
19  alleged violations of the federal securities laws.  Their claims
20  are all based on the theory that, between October 20, 2010 and
21  October 24, 2011, inclusive (the "Class Period"), Defendants misled
22  investors about the prospects of the new streaming-focused model,
23  thereby artificially inflating Netflix's stock price and leading to
24  a stock drop of almost 67 percent after the alleged falsity of
25  those statements was revealed.  See id.

26      Plaintiffs allege that all Defendants violated Section 10(b)
27  of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and
28  Securities Exchange Commission ("SEC") Rule 10b-5; that the

1 | individual Defendants violated Section 20(a) of the Act; and that
2 | Hastings violated Section 20A of the Act.  Id. ¶¶ 418-23.

3 |
4 | **III.  <u>LEGAL STANDARD</u>**

5 |       **A.   <u>Motion to Dismiss</u>**

6 |       A motion to dismiss under Federal Rule of Civil Procedure
7 | 12(b)(6) "tests the legal sufficiency of a claim." <u>Navarro v.</u>
8 | <u>Block</u>, 250 F.3d 729, 732 (9th Cir. 2001).  "Dismissal can be based
9 | on the lack of a cognizable legal theory or the absence of
10 | sufficient facts alleged under a cognizable legal theory."
11 | <u>Balistreri v. Pacifica Police Dep't</u>, 901 F.2d 696, 699 (9th Cir.
12 | 1988).  "When there are well-pleaded factual allegations, a court
13 | should assume their veracity and then determine whether they
14 | plausibly give rise to an entitlement to relief." <u>Ashcroft v.</u>
15 | <u>Iqbal</u>, 556 U.S. 662, 679 (2009).  However, "the tenet that a court
16 | must accept as true all of the allegations contained in a complaint
17 | is inapplicable to legal conclusions.  Threadbare recitals of the
18 | elements of a cause of action, supported by mere conclusory
19 | statements, do not suffice." Id. (citing <u>Bell Atl. Corp. v.</u>
20 | <u>Twombly</u>, 550 U.S. 544, 555 (2007)).  A court's review is generally
21 | "limited to the complaint, materials incorporated into the
22 | complaint by reference, and matters of which the court may take
23 | judicial notice." <u>Metzler</u>, 540 F.3d at 1061 (citing <u>Tellabs</u>, 551
24 | U.S. at 322).

25 |       **B.   <u>Section 10(b)</u>**

26 |       Section 10(b) of the Exchange Act makes it unlawful "[t]o use
27 | or employ, in connection with the purchase or sale of any security
28 | registered on a national securities exchange . . . any manipulative

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1  or deceptive device or contrivance in contravention of such rules

2  and regulations as the [Securities and Exchange] Commission may

3  prescribe . . . ."  15 U.S.C. § 78j(b).  One such rule prescribed

4  by the Commission is Rule 10b-5, which states that "[i]t shall be

5  unlawful for any person . . . [t]o engage in any act, practice, or

6  course of business which operates or would operate as a fraud or

7  deceit upon any person, in connection with the purchase or sale of

8  any security."  17 C.F.R. § 240.10b-5(c).  Plaintiffs must plead

9  five elements to establish a violation of Rule 10b-5: "(1) a

10  material misrepresentation or omission of fact, (2) scienter, (3) a

11  connection with the purchase or sale of a security, (4) transaction

12  and loss causation, and (5) economic loss."  In re Daou Sys., 411

13  F.3d 1006, 1014 (9th Cir. 2005).

14      Plaintiffs must also meet the heightened pleading standards of

15  Federal Rule of Civil Procedure 9(b) and the Private Securities

16  Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4.  The

17  PSLRA requires plaintiffs to "specify each statement alleged to

18  have been misleading [and] the reason or reasons why the statement

19  is misleading."  15 U.S.C. § 78u-4(b)(1).  Additionally, the

20  complaint must "state with particularity facts giving rise to a

21  strong inference that the defendant acted with the required state

22  of mind."  Id. § 78u-4(b)(2).  The "required state of mind" for

23  establishing securities fraud is the knowing, intentional, or

24  deliberately reckless disclosure of false or misleading statements.

25  See Daou, 411 F.3d at 1014-15.  "The stricter standard for pleading

26  scienter naturally results in a stricter standard for pleading

27  falsity, because falsity and scienter in private securities fraud

28  cases are generally strongly inferred from the same set of facts,

and the two requirements may be combined into a unitary inquiry under the PSLRA." Id. at 1015 (internal quotation marks omitted).

## IV. DISCUSSION

### A. Plaintiffs' Section 10(b) Claim

Plaintiffs allege that Defendants made materially false and misleading statements about (1) Netflix's accounting practices, (2) the virtuous cycle, (3) streaming's profitability relative to that of the DVD business, (4) Netflix's statements about its price changes, and (5) Defendants' statements to the SEC. Defendants argue that Plaintiffs have failed to adequately plead falsity or scienter. The Court agrees that Plaintiffs have failed to show that Defendants' statements were materially false or misleading, and accordingly need not address the issue of scienter.

#### 1. Defendants' Alleged Accounting Fraud

Plaintiffs allege that Defendants materially misstated Netflix's financial statements in violation of Generally Accepted Accounting Principles ("GAAP") and SEC disclosure rules. See, e.g., CCAC ¶¶ 41-56, 283, 331, 360. Defendants argue that they were not required to implement segment reporting until 4Q11, when they began to do so. MTD at 8.

##### a. GAAP

Plaintiffs state that the GAAP rule governing segment reporting, Accounting Standards Codification § 280 ("ASC 280"), requires a business component to be considered a separate operating segment for financial reporting purposes if:

> "(a) it engages in business activities from which it may generate revenues and incur expenses . . . (b) its operating results are regularly reviewed by the Company's upper

**United States District Court**
For the Northern District of California

1            management . . . in order to assess the
             segment's performance and make decisions about
2            resources to be allocated to the segment . . .
             and (c) its discrete financial information is
3            available."

4    Id. ¶ 191.

5            Plaintiffs allege that Defendants violate GAAP by failing to

6    provide segment reporting before 4Q11.  See id. ¶¶ 193-221.  This

7    allegation is not plausible because there is no indication that

8    Netflix had discrete financial information for its streaming and

9    DVD components until 4Q11.  Plaintiffs claim that streaming

10   generated "its own revenues and incurred its own expenses separate

11   and apart from those of the DVD business," but in doing so

12   Plaintiffs massage the fact that the "DVD business" at that time

13   was financially inseparable from the streaming component of the

14   hybrid plan -- therefore this information was not "discrete."  See

15   CCAC ¶¶ 194-195.  Defendants may have had information about the

16   prospects of streaming generally, or the performance of the

17   streaming-only subscription plan, but this is not the same as

18   having information about streaming as a discrete component of

19   Netflix's overall service offerings.

20           Confronting this fact, Plaintiffs "formulate approximations"

21   of their own devising of how the DVD and streaming components of

22   the hybrid plan could have been financially separated, which

23   Plaintiffs say "strongly suggest[s]" that discrete financial

24   information was available to satisfy ASC 280.  See id. ¶¶ 212-14.

25   Plaintiffs' allocation is premised on their estimation that

26   Netflix's streaming revenue must have been $7.99, because that was

27   the price of the streaming-only plan after Netflix split its plans.

28   See id. ¶ 211-212 & nn. 6, 7.  This kind of hypothesized allocation

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  does not plausibly show that Defendants actually had discrete

2  financial information available to them, because Plaintiffs do not

3  show that such an allocation was required or even possible given

4  the hybrid plan's unity of services and Netflix's statement that

5  until 4Q11, "revenues were generated and marketing expenses were

6  incurred in connection with the subscription offerings as a whole."

7  RJN Ex. 4 at 71.

8      Plaintiffs' argument that Netflix should have reported

9  segments in its domestic financial reports because it did so abroad

10  is also unavailing.  Plaintiffs' pleadings do not explain what

11  kinds of plans Netflix offered abroad, which is a critical fact in

12  determining whether Netflix's domestic accounting practices were

13  inappropriate relative to what it did elsewhere.  The Court cannot

14  agree that Netflix erred in not reporting its United States and

15  international financial data in the same way without evidence that

16  the facts were the same in the United States and abroad.

17      The Court finds that Plaintiffs have not pled any false or

18  misleading statements related to Defendants' accounting under GAAP.

19              **b.**   **SEC Regulation S-K Item 303**

20      Plaintiffs also argue that Netflix violated SEC Regulation S-K

21  Item 303, which requires companies to "describe any other

22  significant components of revenues or expenses that . . . should be

23  described in order to understand the registrant's results of

24  operations."  CCAC ¶ 222 (citing 17 C.F.R. § 229.303(a)(3)(i)-

25  (ii)).  These disclosures include "any known trends or

26  uncertainties that have had or that the registrant reasonably

27  expects will have a material favorable or unfavorable impact on net

28  sales or revenues or income from continuing operations."  Id.

**United States District Court**
For the Northern District of California

1    Plaintiffs' allegations on this point are not plausible.  "It

2   is well established that violation of an exchange rule will not

3   support a [Section 10(b) or Rule 10b-5] claim."  In re VeriFone

4   Holdings, Inc. Secs. Litig., 11 F.3d 865, 870 (9th Cir. 1993).  In

5   any event, Plaintiffs' pleadings do not actually show that

6   Defendants withheld information about a known trend or uncertainty

7   in the streaming market, since Defendants repeatedly stated that

8   success in the streaming market depended on multiple factors,

9   especially Netflix's ability to keep its subscriber base large and

10   happy.  See, e.g., RJN Ex 1 at 16; Ex. 5 at 27; Ex. 16 at 24.

11   Plaintiffs' allegations regarding Item 303 are therefore

12   insufficient to state a claim for a violation of Section 10(b) or

13   Rule 10b-5.

14            **2.    The Virtuous Cycle**

15    According to Defendant Hastings: "[By way of the virtuous

16   cycle, Netflix would] acquire more streaming content, which helps

17   grow [Netflix's] subscriber base and lessen[s] [Netflix's] DVD-by-

18   mail expense, which in turn provides [Netflix] with greater

19   financial resources to acquire more streaming content, improve the

20   user interface, and continue to grow the subscriber base."  CCAC ¶

21   64.

22    In December 2010, defendants Hastings and McCarthy stated

23   further:

24            [Defendant  Hastings:]  [W]e  are  on  that
             virtuous cycle of more subscribers . . . .

25            It means that we can write bigger checks and
             get  more  content,  and  that,  in  turn,

26            attracts more subscribers. And we are going
             round and round that loop as we go . . . .

27            [Defendant  McCarthy]:  And  so  to  be
             explicitly clear, the benefit of paying less

28            on DVD is not higher profit margins. In the
             alternative,  it  creates  an  opportunity  for

                                11

**United States District Court**
For the Northern District of California

> us to re-task that money with our studio partners in the licensing of streamed content, which accelerates the virtuous cycles that we had already spoke about.

Id. ¶¶ 293-94.  On other occasions, Netflix made similar statements affirming its reliance on the virtuous cycle to drive its business growth, so long as Netflix's subscriber base continued to grow and decreases in DVD-related expenditures allowed Netflix to offset some of the increases in streaming-related costs.  See, e.g., id. at ¶¶ 293-94, 303-05, 325-26.  Indeed, the virtuous cycle seemed to work as Netflix had planned until, for the first time in years, Netflix posted a loss in subscribers after its announcement that it would increase prices.  See id. ¶¶ 163, 377-78.

Plaintiffs allege that Defendants touted Netflix's turn toward a streaming focus as a positive development, even though Defendants allegedly knew that shifting to a streaming-focused model would be unprofitable and unsustainable, thereby rendering Defendants' explanations of and statements about the virtuous cycle false or misleading.  See, e.g., id. ¶¶ 277, 279.  Defendants argue that Plaintiffs' allegations do not prove that any statement about the virtuous cycle was false or misleading.  See MTD at 17.

The Court agrees with Defendants.  The statements that Plaintiffs allege to have been false or misleading appear to be accurate descriptions of a business model that worked exactly as Netflix said it would, until Netflix began to lose subscribers after announcing its price increases and DVD-business spinoff.  See CCAC ¶ 377-78.  Plaintiffs do not show, for example, that when Defendants made public statements about the virtuous cycle, any of the Defendants knew that the virtuous cycle was unsustainable but

**United States District Court**
For the Northern District of California

pursued it as a strategy anyway; that any of Defendants' other actions negatively impacted the virtuous cycle's operation; that Defendants misrepresented the strength of the virtuous cycle at any point; or that any of these statements did anything but confirm Netflix's reliance on a model that worked as Defendants described and failed due to circumstances Netflix had warned investors about in earlier disclosures.  For example, on February 18, 2011, Netflix warned its investors of the virtuous cycle's reliance on subscriber growth: "We must continually add new subscribers . . . If too many of our subscribers cancel our service, or if we are unable to attract new subscribers in numbers sufficient to grow our business, our operating results will be adversely affected."  RJN Ex. 5 at 4. This statement and others like it showed that Netflix warned investors about the virtuous cycle's reliance on subscriber growth.

Accordingly, the Court finds that Plaintiffs have failed to plead that any of Defendants' statements about the virtuous cycle were materially false or misleading.[2]

### 3.   Profitability

Plaintiffs also allege that Defendants' statements about the prospects of the streaming business were materially false or misleading because Defendants hid facts about streaming's disparately low profitability relative to Netflix's DVD component, and because Defendants misrepresented the prospects of streaming for the future of Netflix's business.

Defendants made several statements in SEC filings and

---

[2] Defendants also argue that their statements were non-actionable statements of optimism or forward-looking statements.  Since the Court finds the challenged statements are not false, it need not and does not address this argument.

13

1   conference calls indicating that Netflix would shift its business

2   focus to streaming.  See, e.g., CCAC ¶¶ 62, 267, 277, 279.  For

3   example, Netflix stated in a press release on October 20, 2010 that

4   it had become "by every measure . . . primarily a streaming company

5   that also offers DVD by mail."  Id. ¶ 62.  Further, during an

6   earnings call on that same day, defendant Hastings said that

7   "[Netflix's] evolution to a streaming company has just been

8   phenomenal," based on year-over-year subscriber growth of 52

9   percent and rising, more content, more device partnerships, and

10  Netflix's entry into Canada.  Id. ¶ 66.

11      Hastings also told investors that increasing costs associated

12  with acquiring streaming content would be offset by the declining

13  costs of the DVD business (e.g., postage for DVDs), and that

14  "[Netflix] would like to keep [the long-term margin structure]

15  between 30% and 35% gross margin."  Id. ¶ 278.  McCarthy confirmed

16  this principle, stating that the target margins could be sustained

17  by new content deals replacing postage.  Id. ¶ 279.  Plaintiffs

18  characterize these statements as being part of a discussion about

19  "relative profitability" of DVD and streaming segments.  See id. ¶¶

20  278-79.  However, as Defendants note, Hastings specifically refused

21  to speculate about comparative long-term margins without more

22  knowledge of future market competitiveness.  RJN Ex. 7 at 8.

23      Plaintiffs' main contention as to these statements and others

24  like them is that Defendants misled investors as to the

25  profitability of its streaming component, because after Netflix

26  began segment reporting for the separate streaming and DVD plans in

27  4Q11, it revealed that the separate streaming plan had a

28  contribution profit of only about 8 percent compared to the DVD

**United States District Court**
For the Northern District of California

plan's 50-52 percent.  CCAC ¶¶ 275-370, 384-385.  Plaintiffs allege
that Defendants knew the streaming business would be less
profitable than Netflix's DVD component, but concealed this from
their investors, and, further, that Defendants had an obligation to
reveal such discrete data once they had emphasized streaming's
importance to Netflix's future business goals.  See id. ¶¶ 281,
315, 328, 356.

Defendants argue that Plaintiffs fail to plead a false or
misleading statement regarding the streaming service's
profitability, because "Plaintiffs do not allege facts reflecting
that Netflix ever made an affirmative public statement regarding
streaming's profitability," and because Plaintiffs do not plead
"any facts reflecting that the allegedly-omitted information was
known to Defendants at the time of the challenged statements."  MTD
at 14-16.  Plaintiffs respond: "That Defendants did not explicitly
reference the streaming segment's profitability [in its SEC
disclosures and other statements about its shift to streaming] is
beside the point."  Opp'n at 10.  Plaintiffs cite to Matrixx
Initiatives, Inc. v. Siricusano, 131 S. Ct. 1309, 1321-22 (2011),
and Brody v. Transitional Hospitals Corp., 280 F.3d 997, 1006 (9th
Cir. 2002), for the proposition that disclosure is required where
failure to disclose would render statements misleading in light of
the circumstances in which they were made.  See Opp'n at 1-2, 10-
11.  Contrary to Plaintiffs' suggestions, Matrixx and Brody do not
hold that a defendant's statement is misleading merely because it
is complete or because a defendant could have said more.  See
Matrixx, 131 S. Ct. at 1321-22; Brody, 280 F.3d at 1006.

In the instant matter, Plaintiffs have not shown that

**United States District Court**
For the Northern District of California

Defendants possessed information at odds with the state of affairs they presented to investors, such that restatement or additional disclosure was required.  For Defendants' statements about profitability to have been misleading, Defendants must have actually known specific information about the allegedly disparate profit margins of separate DVD and streaming segments.  They did not until 4Q11, because streaming was never wholly separate from the DVD component until that point.  Further, Plaintiffs' allegation that Defendants touted the profitability of the streaming business is not convincing: the statements quoted by Plaintiffs do not actually refer to the profitability of streaming, but rather the interrelationship of the streaming and DVD businesses contributing to one overall margin.  See CCAC ¶¶ 278-79.

Further, Defendants made clear throughout the Class Period that the success of a streaming-focused business model was contingent on other factors, primarily the growth and retention of Netflix's subscriber base, suggesting that Defendants did not omit any information or warnings in a way that would be misleading under Rule 10b-5.  See, e.g., RJN Decl. Ex 1 at 16; Ex. 5 at 27; Ex. 16 at 24; Ex. 5 at 27.

None of what Plaintiffs plead therefore shows that Defendants made any false or misleading statements about the profitability of the streaming business.

### 4.    Defendants' Communications with the SEC

Plaintiffs further argue that Defendants made false or misleading statements in a series of letters exchanged between Defendants and the SEC.  See CCAC ¶¶ 341-47.

Plaintiffs point first to July 2009 correspondence between

United States District Court
For the Northern District of California

Netflix and the SEC in which the SEC urged Netflix to discuss the "types of plans that [it offers], the price per plan, the cost per plan, [and] the total revenues by plan type." Id. ¶ 116. Netflix did not supply that information in its response or subsequent filings. Id.

Later, on April 28, 2011, the SEC asked Netflix to provide more information about its changing business, "such as the number of subscription streaming-only plans, streaming and DVD by mail plans, and DVD by mail only plans," so that investors could observe and analyze that data. Id. The SEC also requested that Netflix consider adding "any other operating statistics that [it believed] would be useful to investors, which may include rates of churn or any other statistics that would better enable investors to understand [Netflix's] business." Id. ¶ 343. Netflix responded on May 20, 2011, that though it did not think some of this information would help, it would add more disclosures, giving the following paragraph as an example:

> We believe that the DVD portion of our service will be a fading differentiator given the rapid growth of streaming, and that in order to prosper in streaming we must concentrate on having the best possible streaming service. As a result, we are beginning to treat them separately in many ways. Nonetheless, we believe that the evolution of our business model in this manner does not change, except as otherwise disclosed in this MD&A, our expectations in terms of impact or trend to our operating results. As we continue to focus on streaming, we expect to continue to grow our number of subscribers, revenues, operating income and free cash flows. Specifically in fiscal 2011, we expect our domestic operating margin to increase as compared to fiscal 2010.

1   Id. ¶ 346.  However, in its subsequent SEC filing, Netflix omitted

2   the portion of that paragraph beginning "Nonetheless . . . ."  Id.

3   ¶ 347.  In that same letter, Netflix also stated that it would

4   cease to provide certain operating metrics in 2012, namely gross

5   subscriber additions, subscriber acquisition costs, and churn (a

6   measurement of customer cancellations).  Id. ¶¶ 117, 344.  In June

7   2011, the SEC again wrote to Netflix asking it to reconsider its

8   decision not to provide these metrics, but Netflix did not do so.

9   Id. ¶ 118.  In none of these letters did the SEC specifically ask

10  for segmented financial information.  Id. ¶¶ 117-18, 344.

11      Plaintiffs allege that Netflix's choice not to include some

12  requested information in its public filings, as well as the

13  information that it did disclose in response to the SEC, prove that

14  these statements were misleading.  Id. ¶¶ 341-49.  Defendants

15  respond that Netflix's choice not to include certain information is

16  irrelevant because the exchanges between the SEC and Netflix are

17  public.  Defendants reason that they put the public on notice as

18  soon as the letters were published regardless of whether Netflix

19  repeated their contents in subsequent statements.  MTD at 18-19.

20  Defendants also point out that the SEC's 2009 correspondence with

21  Netflix could not possibly have concerned a streaming-only plan, as

22  none existed at that time.  Id. at 9 (citing CCAC ¶ 76).

23      The Court agrees with Defendants that the exchange between

24  Netflix and the SEC in 2009 does not show that Defendants'

25  statements about streaming were false or misleading.  The SEC asked

26  about metrics like subscriber information for Netflix's different

27  plans and other operating statistics, not about specific segmented

28  financial information for DVDs and streaming segments.  See CCAC ¶¶

341-45.  Moreover, Netflix did not offer standalone streaming plans when the SEC sent its 2009 letters.  The 2009 correspondence is therefore irrelevant to Plaintiffs' claims and appears to serve only as innuendo relating to Defendants' dealings with the SEC.

Further, since Defendants' correspondence with the SEC was public, Plaintiffs' allegation that Netflix somehow hid information from investors while simultaneously filing these letters with the SEC hold no weight.  Netflix's decision not to reiterate the same statements it made to the SEC in subsequent filings does not indicate that Defendants misled investors.  Plaintiffs do not otherwise allege that Netflix misled the SEC.

The Court finds that Netflix's statements to the SEC do not support a 10b-5 claim.

### 5.    Defendants' Statements About Price Increases

In July 2011, Netflix posted on its official blog that it would begin to offer a DVD-only plan in addition to its streaming-only plan, but would phase out the hybrid plan.  CCAC ¶ 351.  Both new plans, the streaming-only and DVD-only plans, would be $7.99 per month -- $15.98 for both -- effective immediately for new subscribers and September 1, 2011 for current ones.  Id. ¶¶ 350-51, 407.  Netflix explained the reasoning behind these changes: "Given the long life we think DVDs by mail will have, treating DVDs as a $2 add-on to our unlimited streaming plan neither makes great financial sense nor satisfies people who just want DVDs.  Creating an unlimited DVDs by mail plan (no streaming) at our lowest price ever, $7.99, does make sense and will ensure a long life for our DVDs by mail offering."  Id. ¶ 351.

Plaintiffs argue that Netflix's announcement about price

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

changes was false and misleading because "it failed to disclose
and/or misrepresented the reason that Netflix increased its prices,
namely, that Netflix was suffering from decreased liquidity and was
unable to afford the growing costs associated with its businesses."
Id. ¶ 352.  Defendants' primary response is that Plaintiffs'
allegation about decreased liquidity is unfounded because Netflix
had more than $375 million in liquid assets as of June 2011.
Plaintiffs did not respond to these arguments in their opposition.

The Court finds that the blog post about price increases was
not false or misleading.  Plaintiffs do not plead specific facts
indicating that the real reason Netflix changed its prices had to
do with decreased liquidity or other concerns related to what
Plaintiffs claim is a faulty business model.  They state only a
conclusory allegation that Netflix lied about its reason for
changing its pricing structures and subscription plans.  In the
same documents on which Plaintiffs rely in their CCAC, Netflix
disclosed its cash, cash equivalents, and short-term investments as
of June 30, 2011.  Plaintiffs do not point to any of those numbers
or other disclosures as indications of Netflix's lack of liquidity.
See RJN Decl. Ex. 1 at 4.

**B.   Plaintiffs' Remaining Claims**

Absent an underlying violation of the Exchange Act, there
can be no control person liability under Section 20(a).  Paracor
Fin., Inc. v. Gen. Elec. Capital Corp., 96 F.3d 1151, 1161 (9th
Cir. 1996).  Because Plaintiffs have not pled a violation of
Section 10(b), their control person claim is also DISMISSED.  See
Shurkin v. Golden State Vinters, Inc., 471 F. Supp. 2d 998, 1027
(N.D. Cal. 2006).  Likewise, there can be no insider trading

20

1  liability under Section 20A without an underlying violation of

2  Section 10(b).  See In re VeriFone, 11 F.3d at 872.  Plaintiffs'

3  Section 20A claim is therefore DISMISSED.

4

5  **V.    CONCLUSION**

6      For the foregoing reasons, the Court GRANTS Defendants Reed

7  Hastings, David Wells, Barry McCarthy, and Netflix, Inc.'s Motion

8  to Dismiss.  Plaintiffs Arkansas Teacher Retirement System and

9  State-Boston Retirement System's Consolidated Class Action

10 Complaint is DISMISSED WITH LEAVE TO AMEND.  Plaintiffs may file an

11 amended complaint within thirty (30) days of this Order's signature

12 date.  Failure to do so will result in dismissal of this action

13 with prejudice.

14

15     IT IS SO ORDERED.

16

17 Dated: February 13, 2013

18                                    UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California