LABATON SUCHAROW LLP
JONATHAN M. PLASSE (*pro hac vice*)
STEPHEN W. TOUNTAS (*pro hac vice*)
SERENA HALLOWELL (*pro hac vice*)
140 Broadway, 34th Floor
New York, NY 10005
Telephone: 212/907-0700
212/818-0477 (fax)
jplasse@labaton.com
stountas@labaton.com
shallowell@labaton.com

Lead Counsel for Lead Plaintiffs and the Class

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
AELISH M. BAIG (201279)
EKATERINI M. POLYCHRONOPOULOS (284838)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
abaig@rgrdlaw.com
kpolychronopoulos@rgrdlaw.com

Of Counsel for Lead Plaintiffs and the Class

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re NETFLIX, INC., SECURITIES LITIGATION | ) ) ) |
| | ) |
| This Document Relates To: | ) ) |
| ALL ACTIONS. | ) ) ) ) ) |

No. 3:12-cv-00225-SC

<u>CLASS ACTION</u>

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

<u>DEMAND FOR JURY TRIAL</u>

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION .................................................................................1

II.   JURISDICTION AND VENUE ..........................................................................7

III.  PARTIES ...............................................................................................................7

    A.    Lead Plaintiffs.............................................................................................7

    B.    Defendant Netflix.......................................................................................9

    C.    The Individual Defendants..........................................................................9

IV.   SUBSTANTIVE ALLEGATIONS ....................................................................11

    A.    Background................................................................................................11

        1.    Netflix Is Established as an Online DVD Rental Service..........................11

        2.    Netflix Introduces Instant Streaming in 2007............................12

        3.    By 2010, Netflix Begins Its Transition from DVD to Streaming.............13

    B.    Netflix Changes Its Core Strategy to Become "Primarily a Streaming Company" and Fraudulently Conceals Streaming's Disparate Profitability ........14

    C.    The SEC Demands that Netflix Disclose Material Information About Its Streaming Business; Netflix Declines ..................................................19

    D.    Defendants Track and Monitor the Profitability of Netflix's Streaming Segment.....................................................................................................20

        1.    Netflix's Public Statements and SEC Filings Concede that Defendants Were Tracking and Monitoring the Profitability of the Company's Streaming Segment...............................................20

        2.    CW Allegations Support That Netflix Tracked and Monitored Discrete Segment-Specific Information.......................................23

        3.    Defendants' Business Decisions Support a Plausible Inference that They Were Separately Tracking and Monitoring the Profitability of Netflix's Streaming Segment ...............................................26

    E.    Defendants Ultimately Reveal that Streaming Only Carried an 8% Contribution Profit Margin .....................................................................28

V.    DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ...................................................................32

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC

1

2                                                                                                      **Page**

3        A.      Defendants Made False and Misleading Statements Touting the Shift to
                 Streaming While Concealing that Streaming's Relative Profitability Was
4                Minimal ............................................................................................................. 32

5                1.      The October 20, 2010 Press Release and the 2010 Third Quarter
                         Results .................................................................................................. 32
6
                 2.      The December 8, 2010 Barclays Capital Global Technology
7                        Conference Call .................................................................................... 34

8                3.      The December 20, 2010 Response to a *Seeking Alpha* Article:
                         "Netflix CEO Reed Hastings Responds to Whitney Tilson: Cover
9                        Your Short Position.  Now." .................................................................. 35

10               4.      The January 26, 2011 Form 8-K and Earnings Conference Call .............. 37

11               5.      The February 18, 2011 Disclosure of Fourth Quarter and Year-End
                         Results for 2010 ................................................................................... 38
12
                 6.      The April 25, 2011 Disclosure of First Quarter 2011 Results .................. 39
13
                 7.      The July 25, 2011 Disclosure of Second Quarter 2011 Results ............... 43
14
         B.      As the Truth Begins to Emerge, Defendants Continue to Conceal
15               Streaming's Low Profitability ................................................................................. 46

16               1.      The September 1, 2011 Partial Disclosure ............................................... 46

17               2.      The September 15, 2011 Partial Disclosure with Third Quarter
                         2011 Results .......................................................................................... 48
18
                 3.      The September 21, 2011 Goldman Sachs Communacopia
19                       Conference Call .................................................................................... 49

20       C.      The October 24, 2011 Disclosures Finally Reveal the Disparate
                 Profitability of Streaming and DVD ........................................................................ 49
21
         D.      The False and Misleading Certifications During the Class Period ........................ 51
22
23  VI.  DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING
         STATEMENTS AND OMISSIONS WITH SCIENTER .................................................. 53

24       A.      Confidential Witness Allegations Coupled with Defendants' Own
                 Admissions Support that Defendants Were Tracking and Monitoring the
25               Profitability of Streaming During the Class Period ............................................. 53

26       B.      Defendants Earned Huge Profits Through Massive Insider Sales While
                 Simultaneously Causing Netflix to Suffer Huge Losses Through Massive
27               Buy Backs ............................................................................................................. 55

28

1

2                                                                                           **Page**

3          1.   The Timing of Defendants' Increased Personal Stock Sales,
                Coinciding with Their Causing the Company to Initiate Major
4               Stock Buybacks Supports a Strong Inference of Scienter ........................56

5          2.   Insider Stock Sales by Hastings, McCarthy, and Wells During the
                Class Period Were Highly Unusual and Suspicious ................................61
6
7          3.   The Dollar Amount of Shares Sold by Defendants During the Class
                Period Was Suspiciously High....................................................................64

8               a.   Hastings............................................................................66

9               b.   McCarthy ..........................................................................68

10              c.   Wells .................................................................................69

11              d.   10b5-1 Plans Under Scrutiny .........................................70

12         4.   Defendants Generated Unusual and Suspicious Abnormal Profits
                on their Sales of Netflix Stock ....................................................................72
13
       C.   Defendants' Refusals to Comply with SEC Regulation S-K Item 303 and
14          the SEC's Express Requests for Streaming Disclosures Required by Item
            303 Support a Strong Inference of Scienter ........................................................77
15
       D.   Imputed Knowledge of Facts Critical to Core Operations....................................79
16
17   VII.   POST-CLASS PERIOD REVELATIONS FURTHER DEMONSTRATE
            FINANCIAL RISK PRESENTED BY SHIFT FROM HIGH-PROFIT DVD TO
18          LOW-PROFIT STREAMING ........................................................................80

19   VIII.  LOSS CAUSATION/ECONOMIC LOSS ........................................................81

20   IX.    CLASS ACTION ALLEGATIONS ................................................................85

21   X.     LEAD PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE ..........87

22   XI.    THE SAFE HARBOR PROVISION IS INAPPLICABLE.............................................88

23   XII.   CAUSES OF ACTION ....................................................................89

24

25

26

27

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE          - iii -
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC

1    Lead Plaintiffs Arkansas Teacher Retirement System and State-Boston Retirement System

2    (together, "Lead Plaintiffs"), individually and on behalf of all other persons and entities who

3    purchased or acquired the common stock of Netflix, Inc. ("Netflix" or the "Company") during the

4    period between October 20, 2010 and October 24, 2011, inclusive (the "Class Period"), and who

5    were damaged thereby, hereby allege the following based upon personal knowledge as to themselves

6    and their own acts, and upon information and belief as to all other matters.

7    Lead Plaintiffs' allegations are based on Lead Counsel's investigation, which included,

8    among other things: (i) a review and analysis of Netflix's public filings with the U.S. Securities and

9    Exchange Commission ("SEC"); (ii) a review and analysis of research reports issued by financial

10   analysts concerning Netflix; (iii) a review and analysis of other publicly available information

11   concerning Netflix and its senior officers and directors, including Reed Hastings, David Wells and

12   Barry McCarthy (collectively, the "Individual Defendants"); (iv) interviews with former Netflix

13   employees on a confidential basis, each of whom has specific, personal knowledge of the facts

14   alleged herein; and (v) discussions with and analyses prepared by consulting experts.  Many of the

15   facts supporting Lead Plaintiffs' allegations are known only by Netflix and the Individual

16   Defendants (collectively, "Defendants"), or are exclusively within their custody and control.  Lead

17   Plaintiffs believe that substantial additional evidentiary support will be revealed after a reasonable

18   opportunity for discovery.

19   **I.    NATURE OF THE ACTION**

20   1.    This securities class action arises from material misstatements and omissions

21   concerning the disparate profitability between Netflix's streaming business – which Defendants

22   touted as its "core" business strategy – and the Company's legacy DVD business, which was

23   supposedly nothing more than a "fading differentiator."  For Netflix, the conversion from DVD to

24   streaming represented a major shift in its core business strategy.  Netflix was not merely branching

25   out from its core competency (distributing DVDs by mail) but rather reinventing itself as a whole

26   new and dramatically different company having little in common with its predecessor.

27   2.    The real question posed by the transformation, but which Defendants glossed over,

28   was how the new Netflix planned to make money, especially given streaming's enormous costs of

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                              - 1 -

1   licensing content and relatively small contribution to profit – a fact fraudulently concealed by

2   Defendants throughout the Class Period.  Netflix's success as a streaming company was solely

3   dependent on the major movie studios signing distribution deals to stream more of their library.

4   Netflix was burning through money to execute these astronomically expensive streaming deals, but

5   refused to say on record how much its streaming business cost or earned.  Once Netflix did finally

6   reveal these break-out numbers, investors were shocked to learn the streaming business carried a

7   mere 8% contribution profit,[1] and the stock plummeted nearly 35% in a single day.

8          3.      Netflix purports to be the world's leading internet subscription service for viewing

9   TV shows and movies, and has offered subscription plans to (i) "stream" such content over the

10  Internet to subscribers' TVs, computers and media devices, (ii) rent standard definition DVDs and

11  high definition blue-ray disks (collectively, "DVDs") that are delivered and returned by mail, and

12  (iii) a combination thereof.

13         4.      On October 20, 2010, the first day of the Class Period, Hastings proclaimed that

14  Netflix was "***by every measure . . . primarily a streaming company that also offers DVD-by-mail.***"

15  Moreover, Hastings represented that "by any measure" Netflix's "***evolution to a streaming company***

16  ***has just been phenomenal***."

17         5.      Throughout the Class Period, Defendants continued to tout Netflix's transformation

18  from DVD to Streaming while concealing from investors the material fact that streaming contributed

19  only minimally (*i.e.*, 8%) to the Company's overall profits.  For example, on December 8, 2010,

20  Hastings declared that "***98% of . . . management time [was] on streaming and growing streaming***

21  ***and 2% on DVD***," and assured investors that this shift away from DVD posed "***no material***

22  ***financial risk***."  He further stated, when asked if the shift would "tank [Netflix's] margins," "no, we

23  manage the margins" and assured that streaming's content cost was "not going to ***ever*** manifest itself

24

---

25  [1]      Contribution profit is defined as revenue less cost of revenues and marketing expenses.

26  Netflix describes the usefulness of "contribution profit" as follows: "Management believes that
    contribution profit is useful in assessing the relative contribution to operating income of each

27  segment by eliminating any allocation of Technology & Development and G&A expenses that apply
    across these segments."

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                              - 2 -

1   as margin risk."  On April 25, 2011, Defendants stated in a Form 8-K that they "believe[d] that ***DVD***

2   ***will be a fading differentiator*** given the ***explosive growth of streaming***."  On June 2, 2011, they

3   went even so far as to say they were "***willing to kill [the] existing business to move to the next one***."

4   On July 25, 2011, they assured they had "***gained increasing confidence over the last two years***

5   ***about the viability and strength of a pure streaming*** plan," explaining "the reason we felt confident

6   about doing it now, is ***the strength of streaming-only***, really we got convinced that ***we can thrive on***

7   ***streaming-only*** and with the great new content we're going to be able to get with this pricing

8   change, the timing, the best timing was now."

9        6.    Investors and analysts relied on these misrepresentations to their detriment.  The

10  public was so convinced by Defendants' false statements that on July 26, 2011, for example, J.P.

11  Morgan advised it was clear that streaming could stand alone: "***after 3 quarters of strong streaming***

12  ***only growth it became clear that this business could stand alone*** . . . ***[m]argins continued to***

13  ***benefit from a shift toward streaming***."  Nothing could have been further from the truth; streaming

14  could not stand alone, but rather was completely dependent on DVD to subsidize it, and it was

15  contributing very little to margins.

16        7.    Contributing to a strong inference of scienter are the Confidential Witness ("CW")

17  allegations confirming that Netflix was in fact capable of tracking the profitability of streaming

18  within the hybrid plan, determining a profit margin target for purposes of determining separate

19  streaming pricing, and calculating what the streaming profit margin needed to be.  Indeed, according

20  to CW3, Netflix was even performing Return on Investment ("ROI") analyses to determine the

21  profitability of packages of streaming content, and it was because of these analyses that Netflix was

22  able to, for example, determine that the dollar amount that Starz was demanding exceeded the Starz

23  content's profitability.  Thus, Netflix decided not to renew its Starz contract.  This is consistent with

24  Defendants' own admission that they were using "regression and other math valuation models" to

25  determine "the relative value of [a] group of titles [to] come up with a . . . reservation price for that

26  deal."  Certainly, if Defendants could determine the profitability of streaming content, right down to

27  a given film or package of films, they could extrapolate from that the relative profitability of

28  streaming as a whole.

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                    - 3 -

8.      Also contributing to a strong inference of scienter is the fact that the Individual Defendants profited handsomely by ***selling*** over $85 million of their Netflix stock while simultaneously causing the Company to ***buy back*** massive amounts of the stock.  The buyback program allowed the Company's stock price to remain inflated while Hastings (and others) reaped $1 to $1.5 million per week via  aggressive stock sales.  As noted by Janney Capital Markets, "***[Netflix was] buying stock to offset the dilution from its large issuance of equity to its management team***, which has aggressively sold the stock with many options priced as low a[s] $1.50 per share."  Further noted by *Reuters Business* and *Financial News* quoting *The Wall Street Journal* was the "curious coincidence" presented by the fact that Hastings' stock-sale profits ($41m) were about the same as investors' losses resulting from the Company's buy backs ($47m):

> Even as the once-beloved red envelope that perfectly symbolized the convenience of Netflix's video service is reduced to tatters in its customers' eyes, ***Wall Street pundits have begun sounding alarms about CEO Reed Hastings' profit-taking windfall***.

> As the Wall Street Journal pithily remarked about the service's now-shrinking consumer base, "***If the CEO of Netflix Inc. were in a movie, the townspeople would be chasing him with torches and pitchforks***."

> To adopt that metaphor to Wall Street's view of recent Netflix history, the most knowledgeable townspeople are holding a lantern close to Hastings' . . . ***discouraging practice of regularly unloading chunks of his own Netflix holdings – and apparently finding some witchcraft afoot.  What was once just scuttlebutt – complaints about the CEO's profit-taking when the company's share price was still elevated***, before the most dismaying announcements – is now the stuff of articles in places like the Journal and the web site Seeking Alpha.

> . . . ***Shareholders who have been riding out the more recent tumble might wish they'd been part of the regular dumping plan***.

> At the same time, ***the company has been buying back its own stock in recent months***.  Depending on underlying circumstances, ***that could increase shareholder confidence or look like putting lipstick on a pig***.

*The Wall Street Journal*'s Brett Arends noted precisely who benefited by the Company's stock buyback plan:

> ***In the first two quarters of this year, Netflix spent $160 million of stockholders' cash buying in shares at an average price of $222.  So far investors have lost $47 million on that deal.  Who benefited? Anyone selling stock during that period.  Prominent among them is Reed Hastings*** . . . according to an analysis of public filings by InsiderScore, he's cashed out about $41 million since, at an average price of $236.  In other words, by curious coincidence, the profits he's made selling this stock are almost as much as the company has lost buying it.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                    - 4 -

9.    Tony Wible, an analyst with Janney Montgomery Scott, framed it this way: "***Reed is selling options on a weekly basis.  You have to ask yourself, i[f] these are the smartest guys in the room, why doesn't the co-founder own any shares?***"

10.    Finally, it is simply not plausible that Defendants were unaware of the extreme pressure on margins presented by the touted shift away from the significantly lower-cost, higher-profit DVD business to the higher-cost, lower-profit streaming business, as Defendants had already designed a system to closely track the profitability of streaming content.  In April 2011, Defendants admitted that they were already "***beginning to treat [DVD and streaming] separately in many ways***," that they already had a way to measure the profit and loss ("P&L") of DVD separately ("we haven't marketed [DVD] much in the last couple of years, but ***by now, having it as a division within Netflix, we've got a way to measure the P&L***") and that they had "***focused on streaming [and] proved it out***."  Moreover, the basic fact that streaming's contribution to overall profits was so minimal compared to DVDs presented a material financial risk to its core business that was so obvious that Defendants must have been aware of it.  However, rather than disclose the risk posed by this complete overhaul of the business, they chose instead to tell investors just the opposite, that there was "***no material financial risk***."

11.    Also contributing to a strong inference of scienter, is the fact that Defendants substantially ignored two letters from the SEC, dated April 28, 2011 and June 24, 2011, demanding, in accordance with SEC Regulation S-K, Item 303, greater transparency into Netflix's public disclosures.  The SEC demanded that Netflix add disclosure of separate financial metrics for the Company's DVD and streaming segments.  Tracking language from SEC Regulation S-K, Item 303, the SEC asked Netflix to provide the additional information, expressly directing:

> ***[E]xpand your disclosure to completely and clearly discuss the reasons, including any known uncertainties or trends, for this change in business model strategy as well as how you reasonably expect this change in direction will specifically impact future operating results (i.e., revenues, direct costs and gross profit) and cash flows.***

Despite the SEC's request for this critical information on how the shift to streaming was impacting the business, Defendants declined.  Rather than comply with the SEC's request and Item 303, Defendants kept streaming's minimal contribution to profits secret by continuing to aggregate the

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                    - 5 -

1  reported financial data for Netflix's streaming and DVD segments – including their costs and

2  revenues, and failing to inform investors of streaming's disparate profitability.

3       12.    Fueled by the material misstatements touting streaming and omitting that streaming's

4  contribution to overall profits was minimal, Netflix's stock price soared to all-time highs, nearly

5  *doubling in price* between the first day of the Class Period and July 2011, when it closed at $298.73

6  per share.  In fact, just one day into the Class Period, Netflix's stock price increased from $153.15

7  per share to $172.69 per share upon Defendants' announcement that Netflix was "*by every measure*

8  *primarily a streaming company*" and that, "*by any measure*," this "*evolution . . . has just been*

9  *phenomenal*."  In turn, securities analysts issued a series of highly positive reports that characterized

10 Netflix's streaming segment as "compelling," and highlighted the benefits that the Company was

11 purportedly deriving from the shift to streaming.

12      13.    Investors learned the truth about the disparate profitability between Netflix's

13 streaming and DVD segments between September 1, 2011 and October 25, 2012.  When Defendants

14 ultimately disclosed that Netflix anticipated that streaming would provide a mere 8% to Netflix's

15 third quarter 2011 contribution profits, the market was shocked.  Analysts commented on the failing

16 model, and downgraded their ratings of Netflix.  On October 25, 2011, Janney Capital Markets

17 commented on the significantly lower profit margins of the streaming business:

18      ***The new baseline of sub metrics is troubling, management credibility has
        crumbled, international adoption is weak (as we suspected), content costs are***
19      ***mounting, and it[] is clearer that the DVD business accounts for the vast majority***
        ***of profits.***
20
21      14.    Similarly, Sterne Agee analysts also expressed surprise on October 25, 2011

22 regarding the markedly disparate profitability of the two segments:

23      ***The other surprise was the disclosure that the DVD business currently generates***
        ***80%+ of the company's profits (even though it is only about 40% of revenue).***
24      ***Overall, visibility on the company's earnings has further deteriorated***.

25      15.    The same day Gabelli & Company noted that "[i]nvestors are now seriously

26 questioning the 'virtuous cycle' (more subscribers=more content=more subscribers) that Netflix has

27 long celebrated."

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                    - 6 -

16.     In total, Netflix's stock price plummeted from $233.27 per share on September 1, 2011 to $77.37 per share on October 25, 2011, representing an aggregate decline of almost 67%. The stock never fully recovered.

## II.     JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to §§10(b), 20(a) and 20A of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§78j(b), 78t(a) and 78t-1(a)) and Rule 10b-5 promulgated under §10 of the Exchange Act (17 C.F.R. §240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C §78aa).  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §1331.

19.     Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).  Netflix resides and transacts business in this District, and maintains its principal executive offices in this District at 100 Winchester Circle, Los Gatos, CA 95032.  Many of the acts that constitute the violations of law complained of herein, including the preparation and public dissemination of materially false and misleading statements, occurred in substantial part in this District.

20.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications and the facilities of the national securities markets, including NASDAQ.

## III.     PARTIES

### A.     Lead Plaintiffs

21.     On April 27, 2012, this Court appointed Arkansas Teacher Retirement System ("Arkansas Teacher") and State-Boston Retirement System ("State-Boston") to serve as Lead Plaintiffs for the Class in this consolidated class action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

22.     Arkansas Teacher is a cost-sharing, multiple-employer defined benefit pension plan that provides retirement benefits to public school and other public education related employees in the

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                              - 7 -

1   State of Arkansas.  Arkansas Teacher was established by Act 266 of 1937, as an Office of Arkansas

2   State government, for the purpose of providing retirement benefits for employees of any school or

3   other educational agency participating in the system.  Arkansas Teacher had approximately $11.7

4   billion in net assets held in trust for pension benefits, and includes more than 113,291 members as of

5   May 1, 2011.  As set forth in its PSLRA certification attached to the Consolidated Class Action

6   Complaint for Violations of the Federal Securities Laws (Dkt. No. 89) ("Consolidated Complaint"),

7   Arkansas Teacher purchased a total of 8,273 shares, and sold 523 shares of Netflix common stock on

8   the open market during the Class Period and suffered damages as a result of the securities law

9   violations alleged herein.

10         23.     As set forth in its certification filed on June 26, 2012 with the Consolidated

11   Complaint in this action, Arkansas Teacher purchased Netflix securities contemporaneously with

12   Defendant Hastings' sales of Netflix stock during the Class Period.  Specifically, on March 10, 2011,

13   and August 25, 2011, Arkansas Teacher purchased 1,440 shares and 2,510 shares of Netflix common

14   stock, respectively.  On each of those same dates, Hastings sold 5,000 shares of Netflix common

15   stock.  On two other occasions, Arkansas Teacher purchased stock within a day of Hastings' sale of

16   Netflix common stock.

17         24.     State-Boston is an institutional investor that provides retirement benefits for the

18   employees of the City of Boston, Massachusetts.  It had approximately 37,000 active and retired

19   participants, representing approximately $4.4 billion in assets as of August 1, 2011.  As set forth in

20   its PSLRA certification  attached to the Consolidated Complaint, State-Boston purchased a total of

21   10,400 shares, and sold 7,600 shares of Netflix common stock on the open market during the Class

22   Period and suffered damages as a result of the securities law violations alleged herein.

23         25.     As set forth in its certification filed on June 26, 2012 with the Consolidated

24   Complaint in this action, State-Boston purchased Netflix securities contemporaneously with

25   Defendant Hastings' sales of Netflix stock during the Class Period.  Specifically, on March 24, 2011,

26   September 15, 2011 and September 22, 2011, State-Boston purchased 500 shares, 900 shares, and

27   2,300 shares, respectively.  On each of those same dates, Hastings sold 5,000 shares of Netflix

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                    - 8 -

1   common stock.  On five other occasions, State-Boston purchased Netflix common stock within two

2   days of Hastings' sale of Netflix common stock.

3         **B.**    **Defendant Netflix**

4         26.    Netflix purports to be the world's leading internet subscription service for viewing

5   TV shows and movies.  Subscribers can instantly watch unlimited available TV shows and movies

6   by "streaming" the content over the Internet to their TVs, computers and mobile devices.

7   Subscribers can also receive DVDs to their homes.  Netflix is incorporated in Delaware and

8   maintains its principal place of business and principal executive offices at 100 Winchester Circle,

9   Los Gatos, CA 95032.  The Company's common stock is publicly traded on NASDAQ.

10        **C.**    **The Individual Defendants**

11        27.    Defendant Reed Hastings ("Hastings") has served as Netflix's Chief Executive

12   Officer ("CEO") since September 1998 and as its Co-Founder and Chairman of the Board since the

13   Company's inception.  Hastings signed and certified Netflix's false and misleading Form 10-K for

14   fiscal 2010, as well as its false and misleading Forms 10-Q for the quarterly periods ending

15   September 30, 2010, March 31, 2011 and June 30, 2011.  Hastings also made false and misleading

16   statements on Netflix Earnings Conference Calls ("Earnings Calls") on October 20, 2010, January

17   26, 2011, April 25, 2011, July 25, 2011 and during the December 8, 2010 Barclays Capital Global

18   Technology Conference (the "Barclays Conference").  Further, Hastings made false and misleading

19   statements in the October 20, 2010 Form 8-K and in a December 20, 2010 article appearing in an

20   online blog, *Seeking Alpha*.  Hastings fraudulently knew that these statements were materially false

21   and misleading at the time they were made.

22        28.    Hastings sold more than 187,432 shares of Netflix stock during the Class Period,

23   reaping gross proceeds in excess of  $43 million.

24        29.    Defendant David Wells ("Wells") has served as Netflix's Chief Financial Officer

25   ("CFO") since December 2010 and its Vice President of Financial Planning & Analysis from August

26   2008 to December 2010.  He held the position of Director of Operations Planning & Analysis from

27   March 2004 to August 2008.  Wells signed and certified Netflix's false and misleading Form 10-K

28   for fiscal 2010, as well as its false and misleading Forms 10-Q for the quarterly periods ending

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC       - 9 -

1  March 31, 2011 and June 30, 2011. In addition, Wells signed Netflix's materially false and

2  misleading Forms 8-K dated January 26, 2011, April 25, 2011, July 25, 2011, September 15, 2011

3  and October 24, 2011. Wells also made materially false and misleading statements in the July 25,

4  2011 Earnings Call and the September 11, 2011 Goldman Sachs Communicopia Conference Call.

5       30.    Wells sold more than 6,100 shares of Netflix common stock during the Class Period,

6  reaping gross proceeds in excess of $1.5 million.

7       31.    Defendant Barry McCarthy ("McCarthy") served as the Chief Financial Officer of

8  Netflix from April 1999 until December 10, 2010. McCarthy signed and certified Netflix's false and

9  misleading Form 10-Q for the quarterly period ending September 30, 2010. McCarthy also signed

10  Netflix's false and misleading Form 8-K dated October 20, 2010. McCarthy also made false and

11  misleading statements and material omissions during an Earnings Call on October 20, 2010 and

12  during an investor conference on December 8, 2010. McCarthy fraudulently knew that these

13  statements were materially false and misleading at the time they were made.

14       32.    McCarthy sold more than 228,000 shares of Netflix common stock during the Class

15  Period, reaping gross proceeds in excess of $41.7 million.

16       33.    Facts that are critical to Netflix's "core operations" are presumably known by its key

17  officers, including each of the Individual Defendants. In addition, the Individual Defendants, by

18  virtue of their positions as Netflix's senior executive officers, directly participated in the

19  management of Netflix, and were directly involved in the day-to-day operations of Netflix at the

20  highest levels, and were privy to confidential proprietary information concerning the Company and

21  its business, operations, growth, financial statements, and financial condition, as alleged herein.

22       34.    Moreover, the Individual Defendants were involved in drafting, producing, reviewing

23  and/or disseminating the false and misleading statements, information and omissions alleged herein,

24  were aware of, or recklessly disregarded, the fact that the false and misleading statements and

25  omissions were being issued by the Company, and approved or ratified these statements, in violation

26  of the federal securities laws.

27       35.    As officers and controlling persons of a publicly-held company whose shares are

28  registered with the SEC and traded on NASDAQ, the Individual Defendants had a duty to

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC          - 10 -

1   disseminate prompt, accurate and truthful information with respect to Netflix, and to correct any

2   previously issued statements that had become materially misleading or untrue, so that the market

3   price of the Company's common stock would be based upon truthful and accurate information. The

4   Individual Defendants each violated these specific requirements and obligations during the Class

5   Period.

6       36.     The Individual Defendants are liable as participants in a fraudulent scheme and

7   course of business that operated as a fraud or deceit on purchasers of Netflix's common stock by

8   disseminating materially false and misleading statements and/or concealing material adverse facts

9   with respect to the statements concerning the profitability of Netflix's streaming segment and ability

10  to afford the costs associated therewith, as alleged herein. The scheme: (i) deceived the investing

11  public regarding Netflix's business, operations, management and the intrinsic value of Netflix's

12  common stock; (ii) permitted the Individual Defendants to exercise stock options and engage in

13  insider sales during a period of stock inflation; (iii) materially misrepresented and concealed the

14  profitability of Netflix's streaming segment, *i.e.*, the Company's core business, and ability to afford

15  the costs associated therewith; (iv) caused Lead Plaintiffs and other members of the Class to

16  purchase Netflix common stock at artificially inflated prices; and (v) caused Lead Plaintiffs to suffer

17  damages when Netflix finally disclosed the truth about the low profitability of its streaming segment

18  to investors.

19  **IV.      SUBSTANTIVE ALLEGATIONS**

20          **A.      Background**

21                  **1.      Netflix Is Established as an Online DVD Rental Service**

22      37.     Defendant Hastings co-founded Netflix in 1997. The Company was established to be

23  an online entertainment rental company.

24      38.     In September 1999, Netflix launched the rental subscription service that put it on the

25  map. In exchange for a monthly fee, members could rent unlimited movies from Netflix, via

26  Netflix's website, and have those movies shipped directly to their homes ("DVD Business").

27      39.     Netflix customers would select the titles they would like to rent from a list on

28  Netflix's web site to create a queue, and Netflix would mail DVDs to the member, starting with the

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                    - 11 -

1    titles at the top of the list.  Once finished viewing the title, the subscriber would use Netflix's self-

2    addressed, postage-paid envelopes to return the DVD.  Upon receipt, Netflix would ship the

3    subscriber the next title in the queue.

4         40.     When Netflix launched the subscription service, it offered a standard subscription

5    plan by which members could receive unlimited DVDs, with four out at a time for $15.95, with an

6    option for a fifth DVD for an additional $3.98.  As early as May 2002, Netflix was offering a variety

7    of different plans at varying prices, with the price determined by the number of DVDs subscribers

8    could keep out at any given time.  Netflix's DVD rental business grew rapidly.  The Company made

9    its initial public offering of 5,500,000 shares at $15.00 per share on NASDAQ under the ticker

10   "NFLX" on May 22, 2002.  According to Netflix's website, between 2002 and the end of 2006,

11   Netflix's subscriber base grew from 857,000 members to 6.3 million members.

12                        **2.      Netflix Introduces Instant Streaming in 2007**

13        41.     In 2007 – ten years after its launch – Netflix added a "streaming" feature to its plans,

14   which allowed subscribers to the DVD service to instantly view certain movies and television shows

15   directly through their personal computers and media devices (the "Streaming Business").  However,

16   the breadth of the streaming library was significantly less expansive than its DVD counterpart.

17   These limitations have persisted to date.

18        42.     According to its filings with the SEC, Netflix obtains content for the DVD Business

19   and the Streaming Business in two main ways: (i) "DVD direct purchases"; and (ii) "DVD and

20   streaming revenue sharing agreements with studios, distributors and other suppliers."

21        43.     Netflix could purchase DVDs either directly through the studios (without packaging),

22   or on the open market.  Because of a doctrine known as the First Sale Doctrine, Netflix could

23   purchase the DVDs and then rent and re-rent them, without ever paying additional fees above the

24   original purchase price.

25        44.     However, streaming cost accounting was very different.  To acquire "distribution

26   rights" to stream TV shows and movies ("content") to subscribers, Netflix would have to enter into

27   agreements with program owners and distributors – primarily the major studios.  Content licensing

28   agreements provided for a period of time during which Netflix could license and stream the content,

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                              - 12 -

1    typically on a fixed-fee basis.  Because of the limited number of program owners and distributors

2    licensing content, and the exclusivity of their services, these owners and distributors were able to

3    demand increasingly high content licensing fees, particularly if the deal contemplated exclusive

4    rights to license the content.  Periodically, these licenses would require renewal.

### 3.    By 2010, Netflix Begins Its Transition from DVD to Streaming

6        45.    By 2010, Netflix had accumulated information on the purported success of its

7    Streaming Business, and in turn, began investing more heavily into it.  On a July 21, 2010 Earnings

8    Call held for investors, Defendant Hastings said: "We have been investing more in streaming content

9    quarter after quarter, year after year, as we get revenue growth and confirmation that the streaming

10   content investment is a smart one . . . ."  On the same call, Hastings commented that streaming

11   seemed to be "substituting for DVD."

12       46.    Based on Hastings' positive reports on its new business, the market grew excited

13   about the prospects of streaming.  A J.P. Morgan analyst report commented on July 22, 2010 that

14   "[Netflix's] [m]argins [had] benefited from the shift toward streaming."  The same day a Merriman

15   Curhan Ford analyst report similarly commented that "[s]treaming [was] becoming a major driver"

16   for Netflix.  Netflix continued to invest in its Streaming Business and, in September 2010, it

17   introduced a streaming-only plan in Canada.  This was Netflix's first international market.  The

18   following timeline demonstrates Netflix's evolution from DVD to streaming setting forth when each

19   of the various plans was offered:

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC

**B.    Netflix Changes Its Core Strategy to Become "Primarily a Streaming Company" and Fraudulently Conceals Streaming's Disparate Profitability**

47.    On October 20, 2010, the first day of the Class Period, Netflix issued a press release stating unequivocally that it had become "by every measure . . . primarily a streaming company that also offers DVD-by-mail."

48.    After the market closed on October 20, 2010, Netflix filed with the SEC a Form 8-K which attached the press release.  In the Company's October 20, 2010 Form 8-K, Hastings attributed Netflix's revenue growth and earnings per share ("EPS") growth to "the strength of [Netflix's] consumer streaming offering."

49.    Hastings also characterized the declining consumer interest in DVDs as a benefit to the Company: "In terms of the economics of this evolution, our revenue in Q3 grew about 30% but our disc shipments only grew about 10%, which has allowed us to take up our streaming spend.  We plan to continue to drive this trend with more streaming content spend, consistent with our operating margins goals."

50.    The Form 8-K also quoted Hastings touting the business model that would supposedly enable Netflix to succeed in its transition to a streaming company through the decline of the DVD Business: "acquire more streaming content which helps grow [Netflix's] subscriber base and lessen[s] [Netflix's] DVD-by-mail expense, which in turn provides [Netflix] with greater financial resources to acquire more streaming content, improve the user interface and continue to grow the subscriber base."

51.    Netflix termed this business model its "virtuous cycle," meaning that as Netflix gained subscribers, it could afford to license more streaming content, which would increase its appeal, and therefore, allow the Company to acquire more subscribers, and the cycle would thus continue.

52.    During an Earnings Call held on October 20, 2010, Hastings commented:

> There is a lot to talk about this quarter, the year-over-year subscriber growth at 52% and accelerating, more content, more device partnerships, our entry into Canada.  ***By any measure, our evolution to a streaming company has just been phenomenal.***  I think you'll see that evolution even more clearly when we report our fourth quarter results and look forward to talking with you then.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                    - 14 -

53.     The market reacted favorably to Netflix's positive comments about its transition to streaming and its potential to improve margins through the decline of the DVD Business.  For example, an analyst with Oppenheimer commented on October 21, 2010 that:

> "***Streaming only***" US subscription likely to be unveiled in 4Q which ***would benefit long-term margins***.  We believe the majority of new subscribers join Netflix to access streaming content.  However, as the $8.99 monthly subscription includes unlimited "free" discs, one-at-a-time, we believe new subscribers are participating, even if they aren't actually watching the discs (speaking from experience). If Netflix offers a $7.99 streaming-only service, we believe most people would choose this, and the company would save on shipping and DVD expenses.

54.     By this time, Netflix claimed to have nearly 17 million subscribers.  Netflix reported that this number grew to as high as 23 million subscribers during the Class Period.

55.     On October 20, 2010, Netflix's stock price closed at $153.15/share.  The following day, on Netflix's news about its transition to streaming, Netflix's stock price spiked, closing at nearly 20 points higher at $172.69/share.

56.     This was not an aberration.  Throughout the Class Period, Defendants held out streaming as the focus and the future of Netflix, and the market reacted positively to Defendants' comments about the transition.

57.     With almost three months' worth of data from Canada, in November 2010, Netflix launched a streaming-only plan in the United States for $7.99.  The monthly subscription for this plan cost two dollars less than the hybrid DVD plus streaming offering.

58.     After this launch, Hastings told investors during the December 8, 2010 Barclays Conference, "98% of [Netflix's] management time is on streaming and growing streaming and 2% on DVD."

59.     Despite these purportedly positive developments in streaming, in December 2010, Defendant McCarthy announced his resignation, exercising the vast majority of his remaining holdings for abnormally high profits.

60.     Netflix quelled any concerns that the shift to streaming would not be profitable.  On December 16, 2010, Whitney Tilson described T2 Partners LLC's bet against Netflix, a short position: "[W]e think the valuation is extreme and that the rapid shift of its customers to streaming content (vs. mailing DVDs to customers) isn't the beginning of an exciting, highly-profitable new

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                              - 15 -

1   world for Netflix, but rather the beginning of the end of its incredible run."  Tilson went on to

2   express concern that Netflix's streaming model was not better than its competitors and that Netflix

3   could not sustain its profitability under a streaming-centric model, in large part because Netflix's

4   content was not competitive and content was expensive.  Tilson further questioned Netflix's

5   representations that "savings on postage and fulfillment costs due to fewer subscribers having DVDs

6   mailed to them" would result in sufficient savings to "offset the additional costs of streaming

7   content."

8         61.  Hastings responded directly to Tilson, emphasizing that Netflix did not need to

9   improve content to attract new subscribers, representing that the "huge subscriber growth to date

10   [was] built on . . . 'weak content.'"  Further, Hastings falsely insisted that the shift to streaming and

11   attendant cost of streaming content would not impact margins:

12         Investors sometimes see the content cost threat as an issue around our margins. ***But
          we have no intention of overspending relative to our margin structure, and there is***

13         ***no specific content that we "must have" at nearly any cost.***  In our domestic
          business we spend 65-70% of revenue on COGS (which is mostly content and

14         postage). So if content costs rose faster than we expected, then in practice we'd have
          less content than otherwise, rather than less margin. ***This would ultimately show up***

15         ***in less subscriber growth than we wanted from a not-as-good-as-it-would-
          otherwise-be service; it would not likely show up as a sudden hit to margins.***

16         Management at Netflix largely controls margins, but not growth.

17         62.  Netflix released its 2010 fourth quarter ("4Q10") results in a Form 8-K filed with the

18   SEC on January 26, 2011.  The Form 8-K announced that "[m]ore than one third of [Netflix's] new

19   subscribers" were signing up for the streaming-only plan.  In the same filing, Netflix stated that

20   "streaming [was] much bigger for [Netflix] than DVD, in hours of entertainment delivered."

21         63.  As a result of Netflix's announcement and its quarter-end results Netflix stock price

22   climbed from a close of $183.03 on January 26, 2011 to $210.87 the following day.

23         64.  As Netflix continued to herald the success of its shift to a streaming-centric business

24   throughout the Class Period, the market reacted positively.  Netflix stock price closed as high as

25   $298.73 on July 13, 2011, nearly double the value of the stock at the start of the Class Period.  And

26   the stock continued to trade at over $200/share through the middle of September 2011, when

27   Defendants' fraud began to unravel.

28

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC         - 16 -

1      65.    Netflix's Form 10-K annual report, filed with the SEC for the fiscal year 2010 on February 18, 2011 (the "2010 Form 10-K") reaffirmed the marked change in the fundamental direction of the Company.  The 2010 Form 10-K proclaimed that Netflix's "core strategy" was to "grow [its] streaming subscription business within the United States and globally."

66.    While Netflix was increasing its emphasis on streaming, it was simultaneously de-emphasizing its DVD Business.  In its 2010 Form 10-K, Netflix noted that: "Streaming hours are currently growing faster than DVD hours and while DVD shipments have grown 9.7% in 2010, we expect shipments will be flat to declining in future periods."

67.    By April 2011, in a Form 8-K and accompanying Letter to Shareholders, Netflix stated that "DVD will be a fading differentiator given the explosive growth of streaming."  Netflix admitted that it was already treating the businesses "separately in many ways."

68.    In the same letter, Netflix noted that its website was now entirely focused on streaming: "Already, if you look at our signup page for non-members, it is all about streaming."

69.    The Form 10-Q for the first quarter of 2011 ("1Q11") also marked the first time the Company commenced historical reporting on the Canadian (international) streaming-only business as a separate segment.

70.    Netflix had begun guiding to discrete data for its domestic and international segments in January 2011 when it issued its Form 8-K reporting its 4Q10 results.  Despite debuting both the domestic and the Canadian streaming-only plans in that same quarter, Netflix only reported segment information for the international streaming-only business and did not provide any financial information for domestic streaming, not even for the domestic streaming-only business.

71.    Indeed, despite introducing a domestic streaming-only plan at the end of 2010 and heralding the Company's shift to streaming throughout the Class Period, Netflix failed to disclose any revenue break-down for the Streaming and DVD Businesses.  Stating in its 2010 Form 10-K that it "derive[s] substantially all of [its] revenues from monthly subscription fees," Netflix provided only an aggregate number for its revenues: $2,162,625,000, without revealing the source of that revenue – streaming or DVD/hybrid offerings.  Because of streaming's increasing role, by the end of 2010, accurate financial information for the Streaming Business was of growing importance to investors.

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC      - 17 -

72.     As with subscribers and revenues, Netflix also provided only aggregated information with respect to its costs.  Netflix reported its "Cost of Revenue" in its SEC filings.  "Cost of Revenue" was broken down into two parts: "Subscription" and "Fulfillment Expenses."

73.     Netflix provided aggregated numbers for its Cost of Subscription, totaling the values for both streaming and DVD.  "Cost of Subscription" included expenses "related to the acquisition and licensing of content, as well as content delivery costs related to providing streaming content and shipping DVDs to subscribers."  In essence, all costs related to the shipping of DVDs, the delivery of streaming content, and acquisition for all content, both streaming and DVD, were included and commingled in the "Cost of Subscription" figures.

74.     Netflix also provided aggregated numbers for Fulfillment Expenses.  "Fulfillment Expenses" represented "expenses incurred in content processing, including operating and staffing . . . shipping centers, as well as receiving, encoding, inspecting and warehousing . . . content library."  Also included in this line item were "operating and staffing [of] customer service centers and credit card fees."

75.     Netflix provided no financial information on its domestic streaming-only plan, which existed as a separate plan from November 2010 forward, and which would have allowed investors to see the existing profitability of streaming-only as compared to the hybrid plan.

76.     At the end of the 1Q11, Netflix provided additional information about its streaming and DVD content library costs as represented on its Balance Sheet, but withheld a further break-down of costs between the two businesses, and the revenues generated from each.

77.     Netflix also provided only limited disclosures about the break-down of costs and revenues – disclosures replete with language modifiers and generalities – which made it virtually impossible to understand the true costs of each business.

78.     For example, in Netflix's Form 10-Q for 1Q11, Netflix explained the changes to its "cost of subscription" (year over year for the quarter ended March 31, 2011) as follows:

> The $117.4 million increase in cost of subscription revenues [year over year for the quarter ended March 31, 2011] was due to the following factors:

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                          - 18 -

- Content acquisition and licensing expenses increased by $110.5 million primarily attributable to licensing of streaming content partially offset by decreases in DVD content acquisition costs; and

- Content delivery expenses increased $6.9 million primarily due to an increase in costs associated with streaming content over the Internet resulting from an increase in the total number of hours of streaming content viewed by our subscribers.

79.     Netflix provided little information by which the public could assess the profitability of streaming or the importance of the DVD Business, yet in Netflix's Forms 10-Q for the first and second quarters of 2011, Netflix maintained that its "core strategy" was to "grow [its] streaming subscription business domestically and globally."  By all accounts, Netflix had become a Streaming Business.  Its DVD Business was a "fading differentiator."

**C.      The SEC Demands that Netflix Disclose Material Information About Its Streaming Business; Netflix Declines**

80.     The subscriber metrics that Netflix provided in its SEC filings failed to include critical information – the break-down of these metrics on a business-by-business basis.  This blurring of its business segments provided Netflix with an opportunity to fraudulently conceal that the Streaming Business was significantly less profitable than the DVD Business.   Without this information, the reported metrics were materially misleading.

81.     By letter dated April 28, 2011 ("SEC Comment Letter"), the SEC noted the "significant change in the direction of the company" and demanded Netflix revise its 2010 Form 10-K to provide more segment-level data for investors:

> *We believe you should provide operating statistics*, such as the number of subscription streaming only plans, streaming and DVD by mail plans, and DVD by mail only plans to your disclosure of selected financial data *so that investors can observe and analyze such data for your most recent five years of operations*.

82.     The SEC also requested that Netflix:

> [E]xpand [its] disclosure to completely and clearly *discuss the reasons, including any known uncertainties or trends, for this change in business model strategy as well as how [the Company] reasonably expect[ed] this change in direction [would] specifically impact future operating results (i.e., revenues, direct costs and gross profit) and cash flows*.

83.     On May 20, 2011, Netflix publicly filed a response in which it largely ignored the SEC's requests for added disclosure.  The Company noted that the SEC had requested similar

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                    - 19 -

1  operating metric information on July 15, 2009.  Netflix's responses in 2009 and 2010 were similar –

2  the Company did not say that it did not have the information – Netflix just failed to provide it.

3      84.  Despite the truth about the disparate profitability of its Streaming Business in

4  comparison to its DVD Business, Netflix advised the SEC:

5      We believe that the DVD portion of our service will be a fading differentiator given
the rapid growth of streaming, and that in order to prosper in streaming we must

6  concentrate on having the best possible streaming service.  As a result, *we are
**beginning to treat them separately in many ways.*  Nonetheless, *we believe that the*

7  ***evolution of our business model in this manner does not change***, except as
otherwise disclosed in this MD&A, ***our expectations in terms of impact or trend to***

8  ***our operating results.  As we continue to focus on streaming, we expect to continue***
***to grow our number of subscribers, revenues, operating income and free cash***

9  ***flows***.  Specifically in fiscal 2011, we expect our domestic operating margin to
increase as compared to fiscal 2010.

10

11      85.  Netflix also compounded the lack of transparency the SEC complained of by

12  informing the SEC that it would cease providing other metrics in 2012 – gross subscriber additions,

13  subscriber acquisition costs, and "churn" (a measurement of customer cancellations).

14      86.  As discussed below, Netflix's response forced the SEC to write Netflix again in June

15  2011, asking the Company to reconsider its decision to cease providing these metrics.  Netflix again

16  refused.

17      87.  This refusal prompted an analyst with Janney Capital Markets to comment on

18  September 19, 2011 regarding management's decision to conceal ***very important information***:

19      *[M]anagement seems intent to provide less information to investors just as its*
*business model faces unprecedented risk. . . . [Netflix] continues to aggressively*

20  *fight the SEC on the matter.  This effort to hide useful information should be seen*
*by investors as yet another red flag.*  For the record . . . churn, gross sub, additions,

21  free sub, and SAC are all very important metrics, especially as *the company's*
*accounting seems aggressive and insider sales are troubling*.

22      **D.**    **Defendants Track and Monitor the Profitability of Netflix's**
**Streaming Segment**

23

24          **1.**    **Netflix's Public Statements and SEC Filings Concede that**
**Defendants Were Tracking and Monitoring the Profitability of**
**the Company's Streaming Segment**

25      88.  Although Netflix withheld discrete financial data related to the profitability of its

26  Streaming Business from the market, the Company's SEC filings support the plausible inference that

27  Netflix was internally reviewing, tracking and monitoring the operating metrics for the DVD and

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC        - 20 -

Streaming Businesses before and during the Class Period and was aware of the disparate profitability of the two businesses.

89.     For example, in a Form 8-K filed with the SEC on April 25, 2011, Netflix admitted that it was calculating the P&L impact of streaming content deals to ensure that the Company would meet its operating margin targets:

> *While the size of these deals and their impact on our P&L is often speculated about in the press, spending typically takes place over multiple years and the amortized cost of these deals is taken into consideration in our 14% target operating margin model*.

90.     In that same Form 8-K, Netflix stated to the public that Netflix was "working on solutions to make sure *DVD continues to be a profitable* business for us in the years ahead," yet assured that DVD was "*not core to winning in streaming at this point*."  Knowing whether such proposed solutions would ensure the continued profitability of DVD would require information about the profitability of the DVD Business apart from the Streaming Business.

91.     On July 25, 2011, the Company filed another Form 8-K with the SEC in which Netflix represented that it was "directing savings generated from declining DVD demand into additional streaming content and marketing," showing that Netflix was tracking streaming content and marketing costs separately.

92.     On the July 25, 2011 Earnings Call, Defendant Hastings admitted that the Company was measuring DVD profitability:

> It is true that *we haven't marketed [DVD]* much in the last couple of years, *but by now*, *having it as a division within Netflix, we've got a way to measure the P&L,* and we think it will be a smart investment in its growth and sustainability.

93.     On July 25, 2011, Hastings assured investors that Netflix had "*gained increasing confidence over the last two years about the viability and strength of a pure streaming* plan," explaining "the reason we felt confident about doing it now, is *the strength of streaming-only*, really we got convinced that *we can thrive on streaming-only*."  To determine that Netflix could "thrive" on streaming alone would require an evaluation of the profitability of both streaming and DVD.

94.     With regard to streaming content deals, during the September 21, 2011 Goldman Sachs Communacopia Conference, Wells disclosed that Netflix used "*regression and other math*

1   *valuation models to predict . . . the relative value of [a] group of titles* [and] come up with . . . a

2   reservation price for that deal."

3       95.    Defendant Wells also stated on the call that the Company was looking at the earnings

4   stream of its DVD Business:

5       So 12 months to a substantial percentage of broadband household is going to break
    even, it's pretty encouraging to us in terms of our international opportunity. And I'd

6       say beyond that, *it is the preservation in the long-term earnings stream from a
    DVD division*. *So looking at operating profit, and we will be continuing to segment*

7       *that out*.

8       96.    Even earlier in the Class Period, Netflix referred to the separate nature and

9   profitability of streaming. In the 2010 10-K, Netflix commented on the purported expected

10   profitability of the Streaming Business, and referred to the "Streaming Business" as "one segment"

11   of its business:

12       We believe delivery of entertainment video over the Internet will be a very large
    global market opportunity, and that *our focus on one segment* of that market –

13       consumer-paid, commercial-free streaming subscription of TV shows and movies –
    *will enable us to continue to grow rapidly and profitably*.

14

15       97.    Additionally, in the 2010 Form 10-K, Netflix demonstrated that it was closely

16   tracking and monitoring the growth of its Streaming Business: "[i]n 2010, [the Company] passed a

17   significant milestone with the majority of [its] subscribers viewing more of their TV shows and

18   movies via streaming than by DVD." Also in the 2010 Form 10-K, Netflix stated *it treated the

19   Streaming and DVD Businesses "separately in many ways*."

20       98.    Likewise, on December 8, 2010, Hastings assured investors that this shift away from

21   DVD posed "*no material financial risk*." It is not plausible that Hastings made such a statement

22   without information about the relative profitability of streaming and DVD.

23       99.    In addition to these specific statements raising a plausible inference that Defendants

24   tracked and monitored this specific segment information, generally, Netflix provided in its SEC

25   filings just enough information about the break-down of costs and revenues to demonstrate that it

26   was separately tracking and monitoring this information, but not enough information to disclose the

27   vastly disparate profitability of the two businesses.

28

100.    For example and as discussed, *infra*, ¶184, in Netflix's Form 10-Q for 1Q11, Netflix explained the changes to its "cost of subscription" (year over year for the quarter ended March 31, 2011) as follows:

> The $117.4 million increase in cost of subscription revenues [year over year for the quarter ended March 31, 2011] was due to the following factors:
>
> ·    Content acquisition and licensing expenses increased by $110.5 million primarily attributable to licensing of streaming content partially offset by decreases in DVD content acquisition costs; and
>
> ·    Content delivery expenses increased $6.9 million primarily due to an increase in costs associated with streaming content over the Internet resulting from an increase in the total number of hours of streaming content viewed by our subscribers.

101.    Netflix's disclosures throughout the Class Period were replete with similarly vague, but telling, statements.  The disclosures did not provide discrete segment information.  However, they demonstrate that Netflix was tracking and monitoring the data internally since Netflix could not have made these statements without separately accounting for the streaming and DVD costs and revenues.

102.    Similarly, Netflix's disclosures unequivocally demonstrate that it was tracking and monitoring the number of subscribers to each plan.  In a Letter to Shareholders attached to a Form 8-K filed with the SEC on April 25, 2011, Netflix explained that "[d]uring the quarter, new subscribers embraced the pure streaming and hybrid plans in roughly equal numbers."  Netflix updated this information in a Letter to Shareholders attached to a Form 8-K filed with the SEC on July 25, 2011: "nearly 75% of our new subscribers" signed up for the streaming-only plan.

## 2.    CW Allegations Support That Netflix Tracked and Monitored Discrete Segment-Specific Information

103.    CW1 is a former employee of Netflix who worked as the Director of Product Management from April 2008 to July 2009.  CW1 reported directly to Neil Hunt, Chief Product Officer.  As Director of Product Management, CW1 led efforts to deliver an effective and easily understood website experience to improve customer satisfaction and reduce customer service costs.  As part of CW1's responsibilities, s/he attended Netflix's quarterly meetings in Los Gatos,

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                        - 23 -

1   California, which were attended by Hastings, McCarthy, Andrew Rendich (who later became

2   Netflix's Chief Service and Operations Officer) and other executive level employees.

3        104.   CW1 stated that *Netflix was very much a metrics-driven company and that it*

4   *tracked the streaming and DVD segments of the business separately*.  Specifically, s/he stated that

5   Netflix *tracked the usage of  streaming content to the minute as well as streaming's rate of*

6   *growth*, and that this information was presented in reports called "metric dashboards" and discussed

7   at the quarterly meetings.

8        105.   CW2 is a former employee of Netflix who worked as a Manager of Content

9   Acquisition for Netflix from March 2005 through November 2010.  In this capacity, CW2 reported

10   to three separate Vice Presidents of Content Acquisition: Erin Ruane, Cindy Holland, and Lisa

11   Mishinura.  CW2's responsibilities included personally attending weekly content acquisition

12   meetings referred to as "Buy Meetings" with members of the Financial Planning and Analysis

13   ("FP&A") team.  During these Buy Meetings, CW2 personally observed key streaming and DVD

14   metrics being discussed, including the *number of hours viewed and the cost per hour for*

15   *streaming*.

16        106.   CW2 stated that weekly key metrics reports were also generated within Netflix and

17   circulated every Monday by email on Excel spreadsheets.  These reports contained the same

18   information discussed at the weekly content acquisition meetings.  CW2 recalled seeing Hastings's

19   name on the distribution list for such reports.

20        107.   CW2 stated that the *key metrics generated for streaming were the number of hours*

21   *viewed and the cost per hour*.  *Those numbers were put into a database which generated an*

22   *expected number of hours viewed for similar types of movies.  The figures were precise enough to*

23   *show the most viewed titles on a daily or weekly basis*.

24        108.   CW2 further stated that s/he was *not at all surprised to learn of the low profitability*

25   *figure disclosed for streaming in October 2011 because s/he had already received information at*

26   *the key metrics meetings about the pending streaming deals, their cost, and the dollar amounts*

27   *that would have to be shifted from DVD content to streaming, in order to execute the deals for*

28   *streaming content*.

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC        - 24 -

109.   CW2 reported that information related to the profitability of streaming versus DVD would have been discussed by the FP&A group.[2]

110.   CW3 is a former employee of Netflix who worked as a Manager of Content Planning and Analysis from June 2011 to July 2012.  In this capacity s/he reported to the VP of Content Planning and Analysis, David Burt who reported directly to CFO Defendant Wells.  CW3 was responsible for choosing content and working with the business development group along with legal to execute content contracts.  CW3 regularly met with Defendant Wells since his/her team reported to him.  S/he stated s/he regularly attended meetings discussing internal metrics (at least once a month) as s/he was "very involved" in quarterly guidance.

111.   CW3 confirmed that Netflix had the visibility to examine the business on a granular level and that it was in fact monitoring all aspects of the business including the costs for and profitability of streaming content and the number of subscribers using the streaming services.

112.   CW3 stated that the decision to split the streaming and DVD businesses was made prior to June 2011.

113.   *CW3 also stated that Netflix performed ROI analyses to measure the profitability of streaming content and that Netflix did not execute the deal with Starz because the results of the ROI analysis on the Starz content showed that the dollar amount that Starz was demanding exceeded the content's profitability.*

114.   CW3 further stated that *even for Netflix's hybrid plan, profitability was tracked by consumption of content and referred to as "cost efficiency*."  Consumption was tracked by deal with a particular vendor (or studio).  The content was tracked by usage and then used by the CFO's office to calculate profitability.  S/he further confirmed that Netflix tracked profitability of content piece by piece even before the hybrid plan was separated into two different plans (DVD and streaming).

---

[2]     Defendant Wells was the Vice President of FP&A from August 2008 to December 2010.

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                          - 25 -

115.    CW3 also confirmed that *streaming was a fixed cost business* which was different from DVD.  Thus, s/he explained that *streaming's profitability was based almost entirely on the fixed cost of content streaming because streaming's functionality feature costs were negligible.*

116.    CW3 also stated based on her/his experience and knowledge of the Company that the *Planning and Analysis Group* that reported to the CFO had the capability *to perform an analysis and to come up with a streaming profit margin target to determine pricing* for the separate streaming plan.  CW3 further stated that the Planning and Analysis Group had the capability to calculate what Netflix needed the streaming profit margin to be using a blended average of the two business segments (DVD and streaming) based on subscriber numbers.  Those numbers could then be used to determine pricing.  It was CW3's understanding that these numbers were being run by the marketing analytics team within the Planning and Analysis Group.

117.    These CW statements are consistent with Defendants' own admission on September 21, 2011 that they were already using "regression and other math valuation models" to determine "the relative value of [a] group of titles [to] come up with a . . . reservation price for that deal."  Certainly, if they could determine the profitability of streaming content right down to a given film, they could determine the relative value of streaming as a whole.

### 3. Defendants' Business Decisions Support a Plausible Inference that They Were Separately Tracking and Monitoring the Profitability of Netflix's Streaming Segment

118.    Throughout the Class Period, Netflix made changes to its plan offerings which would have been virtually impossible without a separate tracking and monitoring of segment information.  Netflix could not have made decisions of such magnitude and prominence without those in its highest levels of management reviewing segment information for the Streaming Business.

119.    For example, in November 2010 Netflix introduced a domestic streaming-only plan, assigning a value to the plan of $7.99.  Netflix's hybrid plan cost subscribers an additional two dollars.  The varied values assigned to the plans indicate that Netflix was internally tracking and monitoring their distinctive values and expected profitability.  Moreover, once the domestic streaming-only plan was established, it is inconceivable that Netflix would not monitor the financial performance of that standalone business on an ongoing basis.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                    - 26 -

120. Further, according to a July 11, 2012 *CNet* article entitled "Netflix's lost year: The inside story of the price-hike train wreck," based on interviews with current and former employees, including employees who attended the meeting in which Hastings first announced the division of Netflix's Streaming and DVD Businesses, the research and planning necessary to reach the decision to eliminate Netflix's DVD Business was *complete* by spring 2011 when Hastings "held a meeting with his management team and outlined his blueprint to jettison Netflix's DVD operations." At that meeting, Hastings also told employees about an expected price adjustment, which would eliminate the hybrid plan in favor of separate DVD- and streaming-only plans each for $7.99 a month.

121. According to *CNet*, Hastings presented the plan to spin off Netflix's DVD Business in March 2011, and the DVD operations were almost immediately "split off from the [C]ompany." In fact, the DVD operations were moved out of Netflix's offices to a separate space a few blocks away, Netflix management no longer discussed DVDs and the executives at the DVD business stopped attending Netflix management meetings. With 100% of their time devoted to the streaming business, it is not plausible that Defendants were not aware of the profitability of streaming at that time.

122. On July 12, 2011 Netflix announced to the public the DVD-only plan and the commensurate price increase that Hastings had discussed internally in spring 2011. The DVD-only plan would be $7.99, and customers who wanted both DVD and streaming services would have to pay $15.98 for two plans, DVD and streaming, as of September 2011.

123. The decisions surrounding the separation of Netflix's core business and the creation and pricing of these new plans were so fundamental to Netflix's business – which derived "substantially all of [its] revenues" from such plans – that a strong inference can be drawn that these dramatic changes were not made without the highest levels of management being informed of the core operating metrics supporting the separate businesses.

124. In mid-2011, Netflix both created a DVD-only plan, and announced publicly a "dedicated DVD division," led by Netflix executive, Andrew Rendich, to maintain the DVD-only plan and "focus on running a successful DVD by mail service in the U.S. for a long time."

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                    - 27 -

125.   Then, on September 19, 2011, Hastings announced that Netflix was spinning-off its DVD division, and that its DVDs would be accessible only through a service called "Qwikster," which would require a separate subscription through Qwikster rather than Netflix.  In fact, even the website for renting DVDs would change from Netflix.com to Qwikster.com.

126.   Notably, while Qwikster was announced in September 2011, publicly-available records reflect that Netflix registered the internet domain name "qwikster.com" with Network Solutions in *May 2010*, creating a strong inference that Defendants had long-anticipated and considered this critical business decision.

127.   Although Netflix was ultimately forced by wide consumer discontent to reverse course from the spin-off to Qwikster, its original announcement that the Company was undergoing such a major separation of its business segments raises a strong inference that (i) the Company was internally tracking the operating metrics of the two segments separately; and (ii) that, as Hastings himself emphasized, the Company's streaming and DVD segments were actually "two quite different businesses, with very different cost structures [and] different benefits that need[ed] to be marketed differently."

128.   It is inconceivable that Netflix would undertake to critically modify its business without the involvement of the highest levels of management reviewing the separate and discrete information for the Streaming and DVD Businesses.

**E.     Defendants Ultimately Reveal that Streaming Only Carried an 8% Contribution Profit Margin**

129.   On September 1, 2011, the concealed risks regarding the touted shift to streaming began to materialize for the first time.  On that date, Starz issued a press release announcing that it had ceased streaming contract renewal negotiations with Netflix.  Once the contract expired in February 2012, Starz would no longer provide streaming content to Netflix:

> Starz Entertainment has ended contract renewal negotiations with Netflix.  When the agreement expires on February 28, 2012, Starz will cease to distribute its content on the Netflix streaming platform.

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                          - 28 -

130.     Apparently, according to CW3, Netflix had pulled the plug because it had determined that the Starz streaming content was not profitable at the price requested based on the Company's analysis of its consumption of content.  Starz announced:

> This decision is a result of our strategy to protect the premium nature of our brand by preserving the appropriate pricing and packaging of our exclusive and highly valuable content.  With our current studio rights and growing original programming presence, the network is in an excellent position to evaluate new opportunities and expand its overall business.

131.     The loss of the Starz contract revealed the cracks in Netflix's business model.  Even having raised prices and having grown its subscriber base, Netflix still did not have the cash to justify its renewal of the popular Starz contract, *i.e.*, streaming content.  Analysts and investors began to grow concerned about the ability of Netflix to deliver on its model.  Without streaming content, Netflix would not be able to grow its subscriber base and revenues and continue to expand its content.

132.     For example, on September 2, 2011, a Wedbush analyst report commented that while Netflix had been a "subscriber growth story" that "managed to maintain a delicate balance between its content quality, spending and subscriber acquisition in order to keep subscriber growth high," the analyst was concerned that the Starz announcement "upset[] that delicate balance, and reveal[ed] a chink in Netflix's armor."

133.     Others, too, commented that the loss of Starz "tested" Netflix's model.   On September 2, 2011, a Morgan Keegan analyst report asked: "If Netflix pays up, will other studios play hardball? If Netflix lets Starz walk, can it keep subscribers engaged?"

134.     Still, some analysts remained positive in part, viewing Netflix's walk-away as demonstrating financial discipline and restraint in managing margins.  For example, Caris & Company commented:

> While the stock is certain to be under pressure at the outset of trading activity this morning, we believe investors should applaud NFLX for exercising a great deal of financial discipline in refusing to bend to Starz' demands (assuming that's what actually happened, and assuming that yesterday's announcement wasn't a negotiating tactic).

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                          - 29 -

135.     Nevertheless, the market was jarred, exhibiting a loss of confidence in Netflix's new streaming-focused business model.  On this news, Netflix stock price dropped 8.64%, from $233.27 to $213.11 by September 2, 2011.

136.     On September 15, 2011, Defendants revealed another "chink in its armor."  In a Form 8-K and attached Letter to Shareholders, Netflix revealed that it expected to lose one million subscribers by the end of the third quarter of 2011.  This would mark the first time in years Netflix closed a quarter with a loss in subscribers.

137.     On this news, Netflix's stock price dropped $39.46 per share to close at $169.25 per share, a one-day decline of nearly 19% on extremely high volume of 21 million shares.

138.     For the first time, the falsity of Netflix's statements was coming into focus.  Investors were beginning to realize that the shift to streaming and the dramatically increasing costs associated therewith had forced Netflix to raise prices, which, in turn, caused subscriber numbers to fall.  Without subscribers, Netflix could not license content, and without additional content, Netflix could not grow its subscriber base.

139.     Notwithstanding this news, Netflix continued to emphasize that it "remain[ed] convinced" that its strategy was the right choice.  The strategy included, inter alia, "to enable [Netflix], with the growth in revenue, to license more streaming content and thereby improve [its] streaming service even more."  This "strategy" was nothing more than Defendants' misleading public affirmation that streaming was profitable enough to support Netflix's rising content costs without the continued revenues from the DVD Business.

140.     While these false assurances tempered the market's reaction, certain analysts remained "wary."  For example, an analyst with Janney Capital Markets commented on September 15, 2011 that: "*we continue to be wary of the insider selling*, large increase in content obligations, and the risks to sub growth that could create a negative virtuous cycle whereby less content drives a loss of subs that leads to the loss of more content."

141.     Then, finally on October 24, 2011, the proverbial "other shoe" dropped and the full truth was revealed.  Defendants filed a Form 8-K attaching a Letter to Shareholders that stunned the

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                          - 30 -

1    markets.  The Letter revealed that the DVD Business was, by far, more profitable than the streaming

2    Business, and that Netflix's transition to streaming had severely hurt the Company.

3           142.   Netflix disclosed: "[t]he contribution margin for domestic streaming will be low in

4    Q4, at around 8% . . . due to our increased streaming content spend."  Indeed, the 4Q11 guidance for

5    the contribution profit for domestic streaming presented a range from about 6.4% to 8.8%.  By stark

6    contrast – the DVD Business had a guided contribution profit range of 50% to as high as 52%.  In

7    other words, DVD revenues accounted for the vast majority of Netflix's profits.

8           143.   Netflix also announced a net loss of 810,000 subscribers.

9           144.   The information Netflix had fraudulently concealed for so long suddenly became

10   inescapable:

11          (a)     the Streaming Business faced financial challenges that the DVD Business did

12   not, and as a result, the DVD segment was contributing disproportionately to operating results; and

13          (b)     the so-called "virtuous cycle" was simply not sustainable because streaming's

14   profitability could not support the increasing content costs without support from the "fading" DVD

15   Business.

16          145.   The unsustainability of Netflix's business model shocked the market, and following

17   the release of the October 24, 2011 Form 8-K, Netflix's shares declined $41.47 per share or nearly

18   *35%*, to close at $77.37 per share on October 25, 2011.

19          146.   The market was now suddenly aware of what Netflix later made  unequivocally clear

20   in a Letter to Shareholders that it attached to a Form 8-K filed with the SEC on January 25, 2012:

21          While contribution profit from domestic streaming will grow sequentially, it will not
             be sufficient to offset the sequential decline in DVD profits (~$50 million), and the
22          sequential increase in our international losses (~$50 million), as well as cover our
             global G&A and Technology & Development costs.
23
24          147.   Analysts were "surprise[d]" by the disclosure that the Streaming Business was so

25   significantly less profitable than the DVD Business.

26          148.   On October 25, 2011, a Sterne Agee analyst report expressly called out investors'

27   surprise over the disparate profitability of the DVD and streaming businesses and the

28   "deteriorat[ing]" visibility of the Company's earnings: "*[t]he other surprise was the disclosure that*

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                    - 31 -

1    *the DVD business currently generates 80%+ of the company's profits (even though it is only about*

2    *40% of revenue). Overall, visibility on the company's earnings has further deteriorated*."

3    149. As a Morgan Keegan analyst report noted:

4    [T]his was the first quarter in which Netflix provided financial details for the
     contribution margin (defined as revenue – cost of revenue – marketing) of streaming

5    and DVD plans. ***For Q4, streaming is expected to be ~7%-9% contribution margin
     while DVD is expected to be ~50%-52%***.

6
     150. Netflix could no longer escape the reality of the significant disparity between the

7    profitability of streaming and DVD.

8    **V.    DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING**

9         **STATEMENTS AND OMISSIONS**

10        **A.    Defendants Made False and Misleading Statements Touting the Shift
              to Streaming While Concealing that Streaming's Relative Profitability**

11             **Was Minimal**

12             **1.    The October 20, 2010 Press Release and the 2010 Third
                    Quarter Results**

13
     151. On October 20, 2010, the first day of the Class Period, the Company issued a press

14
     release announcing its financial results for the quarter ended September 30, 2010 ("3Q10"). In the

15
     press release Hastings announced that:

16
     Q3 represents our fourth consecutive quarter of more than one million net subscriber

17   additions. This growth is clearly driven by the strength of our streaming offering. ***In
     fact, by every measure, we are now primarily a streaming company*** that also offers

18   DVD-by-mail," said Reed Hastings, Netflix co-founder and CEO.

19   152. The Company attached the October 20, 2010 press release as an exhibit to a Form

20   8-K which was filed with the SEC on that same day and signed by Defendant McCarthy. In another

21   exhibit to the Form 8-K, Hastings led investors to believe that there was no erosion of margins

22   presented by the shift to streaming, and that the Company's 30% revenue growth was driven by

23   streaming allowing for sufficient funding to invest in streaming content. Hastings left out the fact

24   that streaming's profitability relative to DVD was minimal:

25        ***In terms of the economics of this evolution, our revenue in Q3 grew about 30% but
          our disc shipments only grew about 10%, which has allowed us to take up our***

26        ***streaming spend.*** We plan to continue to drive this trend with more streaming
          content spend, ***consistent with our operating margins goals***. Since we still spend

27        over $500m per year just on postage ***there is plenty of financial room for more
          investment in streaming content going forward***. . . . The virtuous cycle for us is:

28        acquire more streaming content which helps grow our subscriber base and lessen our

1   DVD-by-mail expense, which in turn provides us with greater financial resources to
2   acquire more streaming content, improve the user interface and continue to grow the
    subscriber base.

3   153.   On October 20, 2010, Defendants held an Earnings Call to discuss the 3Q10 results.

4   During the call Defendant Hastings misleadingly represented that the Company's transition to

5   streaming was phenomenal by any measure, omitting to disclose that streaming's profitability was

6   insufficient to support the cost of content without support from DVD revenues:

7       There is a lot to talk about this quarter, the year-over-year subscriber growth at 52%
        and accelerating, more content, more device partnerships, our entry into Canada. **By
8       any measure, our evolution to a streaming company has just been phenomenal.** I
        think you'll see that evolution even more clearly when we report our fourth quarter
9       results and look forward to talking with you then.

10  154.   On October 26, 2010, the Company filed a Form 10-Q for 3Q10 (the "3Q10 Form

11  10-Q") with the SEC, signed and certified by Defendants McCarthy and Hastings.

12  155.   Netflix did not separate out costs, revenues, subscriber numbers or any financial

13  metrics for its DVD and Streaming Businesses in the 3Q10 Form 10-Q, nor did it provide any

14  information that would inform the public that streaming's overall contribution to profits was minimal

15  as compared to DVDs.

16  156.   Defendants' statements and omissions set forth above in ¶¶153-155 were materially

17  false and misleading when made because they failed to disclose and/or misrepresented the following

18  adverse material facts, among others: (i) the shift to streaming presented significant financial

19  challenges to Netflix because it was far more expensive and far less profitable than DVD;

20  (ii) streaming's relative profitability as compared to DVD was minimal; and (iii) the soaring costs of

21  the Streaming Business were not offset by the decreased costs of mailing in the DVD Business.

22  157.   Analysts concerned about the rising content costs of streaming were comforted by

23  Defendants' misrepresentations about the benefits Netflix was reaping from its shift to streaming.

24  Analysts at Dougherty & Company LLC ("Dougherty & Co.") took comfort from Netflix's

25  statements to the effect that despite its massive shift to streaming, it was insulating margins,

26  reporting on October 20, 2010 that:

27      **The company now believes streaming has become the core driver** and is testing a
        streaming-only plan in the US . . . .
28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                    - 33 -

1                              *      *      *

2      *[T]he substitution of streaming for discs is freeing up dollars that we previously*
       *spent on physical discs and postage that can now be invested in additional*
3      *streaming content*, creating a virtuous circle.

4      158.     Similarly, on October 21, 2010, Credit Suisse commented that:

5      *We believe NFLX streaming offering is compelling* and should improve as NFLX
       acquires more content.  In turn, this is creating a virtuous cycle whereby NFLX sub
6      base grows, leading to greater financial resources to acquire more content to improve
       the user experience and grow the sub footprint.  We believe DVD costs may fall
7      quicker than expected, *insulating margins* from further content purchases.

8      159.     Had analysts been informed of the fact that DVD was far more profitable than

9      streaming, they would not have taken as much comfort in their belief that DVD's imminent

10     replacement by streaming was such a positive development.

11          **2.      The December 8, 2010 Barclays Capital Global Technology**
                       **Conference Call**
12
       160.     On December 8, 2010, Netflix participated in a Global Technology Conference Call
13
       at Barclays Capital.   During that call, Defendants were expressly asked about the impact of
14
       streaming content costs on margins.  Hastings responded, assuring the margins were secure:
15
16     *[T]here is no risk of [a] big negative thing happening to Netflix.  And, in general,*
       *investors ask us questions like, well, if the cost of content is X, won't that tank your*
17     *margins?  And we are always surprised when we get that question because we are*
       *like no, we manage the margins . . . the margins would be preserved . . . [s]o it is*
18     *not going to ever manifest itself as margin risk.*

19     During that call, Defendants were also expressly asked by Barclays Capital about the decline of

20     DVD and responded by assuring investors that the decline of DVD presented "***no material financial***

21     ***risk***" at all because the growth of streaming was "so fast":

22     [Barclays:] Okay.  ***Disc shipments***, which have sort of receded a little bit in terms of
       the focus here, but they ***are already declining*** here in the Bay Area.  We estimate in
23     our model that they will peak for the entire company in late 2011 or early 2012.  So
       when do you think you will start seeing overall discs decline, and ***what are you***
24     ***doing*** if anything now ***in terms of preparing for that*** in terms of distribution
       fulfillment, anything in terms of logistics?
25
                               *      *      *
26
       *[T]here is no material financial risk* in that because streaming is growing so fast.
27     And by the time that happens, it will not really matter.

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                              - 34 -

161.    Defendants' statements and omissions set forth above in ¶160 were materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse material facts, among others: (i) the shift to streaming presented significant financial challenges to Netflix because it was far less profitable than DVD; (ii) streaming's relative profitability as compared to DVD was minimal; and (iii) the soaring costs of the Streaming Business were not offset by the decreased costs of mailing in the DVD Business.

162.    The market relied on Netflix's representations to the effect that streaming had the immediate ability to drive subscriber growth and profit margins, when in fact, streaming contributed relatively little to Netflix's profit margins.  As Merriman Capital explained on December 8, 2010, investors and analysts were "***increasingly optimistic about the near-term dynamics of streaming and its ability to drive subscriber growth and profit margins***."

### 3.    The December 20, 2010 Response to a *Seeking Alpha* Article: "Netflix CEO Reed Hastings Responds to Whitney Tilson: Cover Your Short Position.  Now."

163.    On December 16, 2010, Whitney Tilson of T2 Partners LLC, an investment adviser ("T2"), published an article entitled "Why We're Short Netflix," in an online blog, *Seeking Alpha*. Noting that Netflix was T2's "largest bearish bet," Tilson explained his reasoning: Netflix's new business would not be profitable because of rising content costs and a new, more competitive streaming landscape.

164.    On December 20, 2010, in an uncommon move by a CEO, Hastings personally responded in a *Seeking Alpha* article entitled "Netflix CEO Reed Hastings Responds to Whitney Tilson: Cover Your Short Position.  Now."  On the subject of increasing costs for streaming content, Hastings assured Tilson, and the public, that Netflix could afford streaming content, even at increased costs and still report consistent margins:

> Moving on to the widely-discussed issue of increased content costs, it is true that we are paying more for any given piece of content than we were two years ago, and that in two years, we'll pay more than we pay today.  Part of our goal as a business is to make money for content producers and to become one of their largest and best revenue sources. ***Fortunately, our subscriber base is growing fast enough, and DVD shipments are growing slow enough, that we can afford to pay for the existing streaming content we have, and also get more content***

\*        \*        \*

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                    - 35 -

1    Investors sometimes see the content cost threat as an issue around our margins. **But**
     **we have no intention of overspending relative to our margin structure, and there is**
2    **no specific content that we "must have" at nearly any cost.** In our domestic
     business we spend 65-70% of revenue on COGS (which is mostly content and
3    postage). **So if content costs rose faster than we expected, then in practice we'd**
     **have less content than otherwise, rather than less margin. This would ultimately**
4    **show up in less subscriber growth than we wanted from a not-as-good-as-it-would-**
     **otherwise-be service; it would not likely show up as a sudden hit to margins.**
5    Management at Netflix largely controls margins, but not growth.

6        165.    Defendants' statements and omissions set forth above in ¶164 were materially false

7    and misleading when made because they failed to disclose and/or misrepresented the following

8    adverse material facts, among others: (i) the shift to streaming presented significant financial

9    challenges to Netflix because it was far more expensive and far less profitable than DVD;

10   (ii) streaming's relative profitability as compared to DVD was minimal; (iii) the soaring costs of the

11   Streaming Business were not offset by the decreased costs of mailing in the DVD Business; and

12   (iv) it gives the impression that streaming is consistent with a 30-35% contribution margin, when, as

13   later revealed, it was only at 8%.

14       166.    Hastings's misleading response achieved its desired effect, prompting T2 to write a

15   second *Seeking Alpha* article, this time entitled "Why We Covered Our Netflix Short," dated

16   February 11, 2011. In the article, Tilson explained that he had changed his mind and that T2 was

17   "no longer confident that [their] investment thesis [was] correct." In Tilson's article, he explained

18   that T2 had not accounted for Netflix's ability to control margins and purportedly low cost per

19   additional streaming subscriber in the initial analysis:

20       Netflix's Q4 earnings report underscored for us that there is a fourth possibility [as to
         how Netflix can support increased content costs] – one which is very pleasant for the
21       company: high subscriber growth leads to higher revenues and profits, which allows
         Netflix to license more/better **streaming** content (**without sacrificing margins**),
22       which leads to even more subscribers.

23                                    *        *        *

24       It's harder to estimate the incremental profitability these 9.6 million subscribers
         would generate, but we'd guess that it's a high number, given that **each additional**
25       **streaming user costs Netflix very little since its streaming licensing agreements are**
         **for fixed amounts.** Thus, robust subscriber growth would allow Netflix to spend
26       many hundreds of millions of additional dollars each year on streaming content –
         more than enough to renew the Starz deal and license much more content as well –
27       without impacting its profit margin.

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                            - 36 -

167.     In revising the thesis, Tilson did not (because he could not) account for the fact concealed by Netflix that streaming contributed minimally to Netflix's overall profits, thus the shift away from DVD and to streaming was in fact sacrificing margins.

**4.     The January 26, 2011 Form 8-K and Earnings Conference Call**

168.     On January 26, 2011, the Company filed with the SEC a Form 8-K, signed by Defendant Wells, attaching a Letter to Shareholders touting "pure streaming," domestically and internationally, while failing to reveal the disparate profitability between streaming and DVD:

> To summarize Q4, we would say that ***our huge subscriber growth, fueled by the excitement of watching instantly, impressed even us.*** More subscriber growth enables us to spend more on streaming content, making the Netflix service even better in 2011.
>
> *          *          *
>
> ***In November last year we introduced*** our $7.99 per month ***pure streaming plan***, and we increased the prices on our combination plans, which include streaming and unlimited DVD rentals. As you can see from our strong Q1 subscriber guidance, ***our pure streaming plan has a great deal of consumer appeal. More than one third of new subscribers are signing up for the pure streaming plan***, and we expect that percentage to grow over time. ***The balance of new subscribers primarily takes our $9.99 1-DVD combination plan***. Very few of our existing subscribers are downgrading to the pure streaming plan.

169.     In the Form 8-K, filed on the same date, Netflix continued to insist that rising Streaming Business costs would be offset by declining DVD Business costs:

> Coming into Q1, ***the trend in DVD shipments is lower*** than we expected even 2 months ago, and ***we've redirected the savings from this lower rate of shipments into more streaming content*** and marketing.

170.     Defendants' statements and omissions set forth above in ¶¶168-169 were materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse material facts, among others: (i) the shift to streaming presented significant financial challenges to Netflix because it was far more expensive and far less profitable than DVD; (ii) streaming's relative profitability as compared to DVD was minimal; and (iii) the soaring costs of the Streaming Business were not offset by the decreased costs of mailing in the DVD Business.

171.     Netflix's materially misleading comments continued to inspire confidence in analysts. On January 27, 2011, J.P. Morgan commented: "We expect Netflix to continue to boost its

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                          - 37 -

1  investments in content but think the leverage from higher subscriber levels, declining DVD shipment

2  and leverage in marketing will offset these investments."

3      172.    On January 27, 2011, Dougherty & Co. explained that analyst concerns over the

4  future of Netflix's new business were eased by Netflix's comments:

> Despite a rising wall of worry, Netflix delivered a powerful Q4 and set the stage for
> continued growth in 2011 and beyond, showing no signs of strain.  The company
> beat . . . both the top and bottom lines, delivered sub growth well ahead of
> expectations, paired with dramatically lower SAC and stable churn.

*      *      *

> ***The shift to streaming is delivering benefits in terms of lower disc shipments and
> increased customer satisfaction with accelerating sub growth enabling the
> company to spend even more to acquire content***.

173.    On the same date, Merriman Capital reported:

> Plenty of capital to spend on digital content.  With accelerating sub growth and
> ***reduced DVD acquisition costs (as subs utilize more streaming and more than 1/3
> of new subs are choosing the streaming-only plan)*** coupled with an estimated
> $250M in incremental profits stemming from the recent price increase, we believe
> Netflix remains well positioned to increase content spend in 2011/2012 and can
> afford to pay up (if necessary) to obtain content that will improve sub retention and
> attract new subs.

174.    Credit Suisse took the same positive view:

> We believe NFLX streaming offering is compelling and should improve as NFLX
> acquires more content.  In turn, this is creating a virtuous cycle whereby NFLX sub
> base grows, leading to greater financial resources to acquire more content to improve
> the user experience and grow the sub footprint.  We believe DVD costs may fall
> quicker than expected, ***insulating margins*** from further content purchases.

175.    In reality, the shift to streaming was not delivering the benefits expected or insulating

margins because streaming's profitability was so minimal as compared to DVD.

### 5.     The February 18, 2011 Disclosure of Fourth Quarter and Year-End Results for 2010

176.    On February 18, 2011, Netflix filed its 2010 Form 10-K, signed by Defendants

Hastings and Wells.  The 2010 Form 10-K reported:

> ***Our core strategy is to grow our streaming subscription business within the United
> States and globally.***

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                        - 38 -

177.    In the 2010 Form 10-K, Netflix also commented on its focus on the Streaming Business which it referred to as one "segment" of its business, saying that Netflix believed that its focus on that segment would enable it to grow profitably:

> We believe delivery of entertainment video over the Internet will be a very large global market opportunity, and that *our focus on one segment* of that market – consumer-paid, commercial-free *streaming* subscription of TV shows and movies – *will enable us to continue to grow* rapidly and *profitably.*

178.    Netflix did not list any costs, revenues or subscriber numbers for its DVD and Streaming Businesses separately in the 2010 Form 10-K, nor did it provide any information to inform the public of streaming's relatively minimal contribution to the Company's overall profits.

179.    Defendants' statements and omissions set forth above in ¶176, 177 were materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse material facts, among others: (i) the shift to streaming presented significant financial challenges to Netflix because it was far more expensive and far less profitable than DVD; (ii) streaming's relative profitability as compared to DVD was minimal; and (iii) the soaring costs of the Streaming Business were not offset by the decreased costs of mailing in the DVD Business.

### 6.    The April 25, 2011 Disclosure of First Quarter 2011 Results

180.    On April 25, 2011, the Company filed with the SEC a Form 8-K, signed by Defendant Wells.  The Form 8-K attached a Letter to Shareholders touting the ongoing shift to streaming and downplaying the risk of the necessary increases in content spending required for streaming without support from the DVD Business:

> We were thrilled to add 3.3 million domestic subscribers in Q1, nearly double the number added in Q1 of 2010.  The virtuous cycle we've mentioned previously of *increased investment in streaming content,* strong word of mouth and an expanding device ecosystem *truly worked for us in the quarter.*  In addition, we spent record amounts marketing Netflix, per the margin discussion below.
>
> *            *            *
>
> Our pure streaming plan and a price increase on our hybrid offerings were put into place in November 2010, and the price increase largely took effect in Q1.  As a result, *our average subscription price increased sequentially from Q4 to Q1. During the quarter, new subscribers embraced the pure streaming and hybrid plans in roughly equal numbers*.  Going forward, we believe the *ASP trend will revert back to slight Q/Q decline as pure streaming becomes a larger part of the overall subscriber mix*.

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                          - 39 -

1                                                   *        *        *

2    As streaming grows, TV shows and feature films are being enjoyed in nearly
     equivalent volume by our subscribers and our content acquisition team is focusing
3    their attention accordingly.  We've recently added lots of new TV episodes, and the
     profile and completeness of the shows continues to improve.  As for movies, we've
4    recently added a large number of core catalog titles from Paramount that are
     exclusive to Netflix against broadcast, cable and other over-the-top services and titles
5    from Lionsgate and MGM that are exclusive against other over-the-top services.

6    ***While the size of these deals and their impact on our P&L is often speculated about
     in the press, spending typically takes place over multiple years and the amortized***
7    ***cost of these deals is taken into consideration in our 14% target operating margin
     model***.

8                                                   *        *        *

9    ***<u>DVD was a Booster Rocket, but is not a Differentiator</u>***

10
     ***We believe that DVD will be a fading differentiator given the explosive growth of
11   streaming***, and that in order to prosper in streaming we must concentrate on having
     the best possible streaming service.  ***As a result, we are beginning to treat them
12   separately in many ways.  Already, if you look at our signup page for non-
     members, it is all about streaming***.  Having said this, DVD rental is still a great
13   business for us, and we are working on solutions to make sure ***DVD*** continues to be a
     profitable business for us in the years ahead, but it ***is not core to winning in
14   streaming at this point***.

15          181.    Defendants' representations that the DVD Business was a "fading differentiator" and

16   "not core to winning in streaming" were materially misleading because they failed to disclose that

17   the profitability of streaming was significantly lower than that of DVD, and that the ability to

18   purchase streaming content was completely dependent upon DVD revenue.  Moreover, it gives the

19   impression that the streaming business is consistent with "[Netflix's] 14% target operating margin

20   model" when in reality, that figure is significantly overstated for streaming which required DVD to

21   subsidize it.

22          182.    Given Defendants' admission that they were already "***beginning to treat [streaming***

23   ***and DVD] separately in many ways***," it is simply not credible that Defendants were unaware that

24   there was a staggering disparity in profitability between the two segments, and that the shift to the

25   significantly-lower-profit, substantially-higher-cost streaming segment presented far greater risk to

26   profit and loss than was disclosed.

27

28

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                              - 40 -

183.     Hastings also emphasized the shift to streaming in an Earnings Call later that day, noting that it was becoming easier to write bigger checks, but failing to note streaming's relative lack of profitability:

[Question:] Are there other notable DVD milestones?

[Hastings:] ***Our focus is really on streaming at this point, so I don't anticipate that we would have or would make those kind of announcements***.

\*     \*     \*

[Question:] Given the size of your subscriber base, is it getting easier to negotiate content deals or is there still a level of animosity with some content owners that must be worked through?

[Hastings:]: Well I don't think there's any animosity.  It's only a question of is our check big enough.  And so as we get a larger subscriber base, that becomes easier to write bigger checks and it's very respectful I would say across-the-board.

\*     \*     \*

[Question:] On the streaming side, are storage and encoding costs typically fixed or variable and are they significant relative to content delivery cost?

[Hastings:] They are not significant.

[Wells:] No, not significant.

184.     On April 27, 2011 the Company filed a Form 10-Q for the period ended March 31, 2011 (the "1Q11 Form 10-Q") with the SEC, signed by Defendants Wells and Hastings.  Therein, Netflix discussed the shift to streaming favorably, yet still failed to disclose that streaming's relative profitability was minimal:

***We believe that DVD will be a fading differentiator given the explosive growth of streaming***, and that in order to prosper in streaming we must concentrate on having the best possible streaming service.  ***As a result, we are beginning to treat them separately in many ways.***  For example, our signup page for non-members is focused on streaming.  While DVD rentals are still a great business for us, and we are working on solutions to make sure ***DVD*** continues to be a profitable business for us in the years ahead, ***we do not believe it is core to the success of our streaming business***.

185.     On June 2, 2011, Netflix participated in a Nomura Securities US Media Summit Conference Call.  During that call, Netflix, represented by Ted Sarandos, actually stated that it was willing to "***kill***" its DVD business to move on to the streaming business:

[Analyst:] What's changed over . . . time to increase the flow of content to Netflix?

[Sarandos:] Well, as you probably saw from the folks you had onstage today, Hollywood definitely is a relationship town, and it is a very – it's a closed – it's a very small business, and one kind of gets to know each over time, and they want to make good decisions.  And they have an asset sometimes that's a melting ice cube, and they want to make sure they're putting things in the right place, and every move is really thought through of saying, "How do I move it to here without killing my existing business?" So there's not a – they don't run the business with the mentality that we do, which has been *we're willing to kill our existing business to move to the next one.*

\*      \*      \*

[Analyst:] Okay, let me ask you this.  What are you seeing the greatest change in . . . physical rental? . . . [W]here are you seeing the biggest change or the biggest drop-off in terms of usage?

\*      \*      \*

[Sarandos:] It's pretty broad.  I mean, most of our subscribers will take a disk here and there, so it's hard to say.  And *people are mostly joining for streaming these days*.  So, and I think I would say *over the last two years we've been so focused on the streaming business,* and I would – I wouldn't go as far as saying *autopilot*, but *the DVD business has been kind of running calmly on its own,* so we really – and I think you'll see over the next couple of years us putting a little more focus on it.

The value proposition of the DVD business is going to be good for a very long time. *So, right now it's a couple of bucks more to get all the disks you want*.  So there's some room in there, I think, to right-size that and I think to put a little more focus on the DVD business.  So, right now where the move has been, in markets where the streaming business is doing really well *the DVD business is flattening out* more.

186.    Defendants' statements and omissions set forth above in ¶183-185 were materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse material facts, among others: (i) the shift to streaming presented significant financial challenges to Netflix because it was far more expensive and far less profitable than DVD; (ii) streaming's relative profitability as compared to DVD was minimal; and (iii) the soaring costs of the Streaming Business were not offset by the decreased costs of mailing in the DVD Business.

187.    Investors and analysts continued to be persuaded by Defendants' false statements but as Canaccord Genuity noted on April 25, 2011, they were growing anxious to learn about the "performance of [the] streaming-only plan in the US." On the same date, Morgan Stanley stated that one of its outstanding questions was: "How will the shift to digital streaming impact Netflix? Specifically, what impact will content deals have on gross margin?"  These were indeed the key questions, seeking material information which Defendants remained unwilling to reveal.

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                    - 42 -

7.      **The July 25, 2011 Disclosure of Second Quarter 2011 Results**

188.    On July 25, 2011, the Company filed with the SEC a Form 8-K, signed by Defendant Wells, attaching a Letter to Shareholders of the same date.  The letter, like the few before, spoke favorably about the Company's dramatic shift to streaming, while failing to reveal the streaming segment's relatively low profitability:

> *During the quarter, the streaming only plan continued to gain in popularity, with nearly 75% of our new subscribers signing up for it*. . . .
>
> *With the rapid adoption of streaming, DVD shipments for Netflix have likely peaked*. . . .
>
> *We've spoken frequently of how we are directing savings generated from declining DVD demand into additional streaming content and marketing*.  During the quarter, we substantially increased sequential spending on streaming content as titles from our new content deals (discussed below) became available for streaming.  At the same time, though, we maintained a disciplined approach to what content we license and at what price, spending somewhat less on streaming content than we budgeted for in the quarter.  Also, DVD shipments came in even lower than forecasted, in part due to the *popularity of our streaming only plan*.

189.    In an Earnings Call held on July 25, 2011, Defendants further touted the shift to streaming while failing to reveal the segment's relatively low contribution to overall profits:

> [Hastings:] And then *in terms of streaming, we've gained increasing confidence over the last two years about the viability and strength of a pure streaming plan. We gained some confidence when we launched in Canada, and that blew away our expectations with the response.  We gained some confidence when we led on our non-member home page with streaming only*, and as we put in our shareholder letter, in Q2, about *75% of subscribers chose streaming-only*.  In other words, even though DVD was only $2 more, *75% stuck with streaming only.  And again, with this pricing change, we're going to be able to strengthen that streaming plan with more content.  So that's why we feel good about it*.
>
> *                *                *
>
> [Question:] Why did you implement the recent pricing changes now, when subscriber growth is near the highest you've ever had? Why not wait until you are further into your penetration curve?
>
> [Hastings:] *Well, I think the reason we felt confident about doing it now, is the strength of streaming-only, really we got convinced that we can thrive on streaming-only and with the great new content we're going to be able to get with this pricing change, the timing, the best timing was now*.

190.    Notably, Defendant Hastings also states in the July 25, 2011 Earnings Call that the Company now has the capability of measuring the P&L for DVD while it was part of the hybrid plan, thus, Netflix necessarily also had the capability of measuring the P&L for streaming:

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                    - 43 -

[Hastings:]  [I]t is true that **we haven't marketed [DVD]** much in the last couple of years, **but by now**, **having it as a division within Netflix, we've got a way to measure the P&L,** and we think it will be a smart investment in its growth and sustainability. . . .

[Wells:] I think we've always talked about the DVD side of our business in a spectrum of emphasis and focus, and rather than being pushed to the extremes, **what we've said is that we focused on streaming.  We've proved it out.**  We've had two to three quarters of tremendous growth, and now it's the right time to go back and look at how easy is it to find the DVD service, how easy is it for those subscribers to find what interests them, and that's what I think, this is a step in that progression.

\*        \*        \*

[Question:] How does **separating your DVD and streaming business** impact your relationships with the studios?  Do you expect the content partnerships to be negotiated separately in the future?  **What kind of impact does that have?**

[Hastings:] **The content acquisition has mostly been separated for a while**.  That is, movie studios mostly have **different divisions between DVD and streaming**.  And then the television studios very much have been different for a while.  **So we don't see any significant effect coming out of the separation of the plans**.

\*        \*        \*

[Question:] Moving to the final topic, DVD.  **Overall, does DVD become more or less of a priority, now that the service has been decoupled from streaming?**  Will the DVD business start to decline faster than anticipated?  Any color here would be appreciated.

[Hastings:] **It will become less important to those people at Netflix working on streaming, and much more important to those people in the dedicated DVD division.  And that's the purpose of putting it in a separate group, so they can focus on that**.

191.    On July 27, 2011 the Company filed a Form 10-Q for the period ended June 30, 2011 (the "2Q11 Form 10-Q") with the SEC, signed by Defendants Wells and Hastings.  Netflix touted the shift to streaming while failing to itemize the discrete costs and revenues for the DVD and Streaming segments concealing from investors the relatively low profitability of streaming:

Our core strategy is to grow our streaming subscription business domestically and globally.  We are continuously improving the customer experience, with a focus on expanding our streaming content, enhancing our user interface and extending our streaming service to even more Internet-connected devices, while staying within the parameters of our operating margin targets.

\*        \*        \*

We are a pioneer in the Internet delivery of TV shows and movies, launching our streaming service in 2007.  Since this launch, we have developed an ecosystem of Internet-connected devices and have licensed increasing amounts of content that enable consumers to enjoy TV shows and movies directly on their television sets,

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                    - 44 -

computers and mobile devices. As a result of these efforts, we have experienced growing consumer acceptance of and interest in the delivery of TV shows and movies directly over the Internet. ***We believe that the DVD portion of our service will be a fading differentiator to our streaming success*** and that offering separate streaming and DVD by mail services will help us prosper in streaming while allowing us to also renew focus on DVD by mail.

\* \* \*

In addition, we are establishing a separate and distinct management team solely focused on DVDs by mail and will report the resulting DVD division as a separate operating segment in the fourth quarter of 2011, at which time we will have three operating segments: Domestic DVD, Domestic Streaming and International Streaming. ***We continue to focus on streaming, both domestically and internationally, and expect to continue to grow our subscribers, revenues, operating income and free cash flows***.

192.     Defendants' statements and omissions set forth above in ¶¶188-191 were materially false and misleading when made because despite the SEC's requests for additional break-out information for streaming and DVD (*see* §§IV.C., VI.C.), they failed to disclose and/or misrepresented the following adverse material facts, among others: (i) the shift to streaming presented significant financial challenges to Netflix because it was far more expensive and far less profitable than DVD; (ii) streaming's relative profitability as compared to DVD was minimal; and (iii) the soaring costs of the Streaming Business were not offset by the decreased costs of mailing in the DVD Business.

193.     Because Defendants fraudulently concealed the relatively minimal profitability of streaming, the market remained positive on Netflix's future, and Netflix's share price continued to trade at high levels. Analysts still believed that the profitability of the Streaming Business was high enough that it could "stand alone" and improve margins, when in fact, it was eroding them. On July 26, 2011, J.P. Morgan reported:

Netflix indicated that 75% of new subs in 2Q were streaming only. And ***after 3 quarters of strong streaming only growth it became clear that this business could stand alone*** and that incremental profit from higher DVD pricing could be used to increase the quality and volume of streaming content overall.

\* \* \*

***Margins continued to benefit from a shift toward streaming (nearly 75% of new subscribers signed up for the streaming only plan in 2Q)***, and fulfillment and postage costs continued to decline as a percentage of revenue.

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                          - 45 -

*We expect Netflix to continue to boost its investment in content but we think the leverage from the shift toward streaming, and declining DVD shipments will offset these investments*.

\*          \*          \*

[W]e continue to believe that *Netflix's ongoing subscriber migration from DVDs to streaming offers significant financial leverage that Netflix can use to acquire more content and expand overseas*.

**B.     As the Truth Begins to Emerge, Defendants Continue to Conceal Streaming's Low Profitability**

**1.     The September 1, 2011 Partial Disclosure**

194.    In September 2011, the concealed risks in Netflix's shift to streaming began to materialize.  In a September 1, 2011 press release, Starz announced that it had ceased streaming content license renewal negotiations with Netflix.  According to the announcement, Starz would cease providing any streaming content to Netflix at the time the Starz/Netflix contract expired in 1Q12:

> Starz Entertainment has ended contract renewal negotiations with Netflix.  When the agreement expires on February 28, 2012, *Starz will cease to distribute its content on the Netflix streaming platform*.

195.    Starz explained that it could not reach an agreement with Netflix on price for the content:

> *This decision is a result of our strategy to protect the premium nature of our brand by preserving the appropriate pricing and packaging of our exclusive and highly valuable content*.  With our current studio rights and growing original programming presence, the network is in an excellent position to evaluate new opportunities and expand its overall business.

196.    The loss of the Starz contract demonstrated that the shift to streaming presented far greater risk than Defendants had revealed – even having raised prices, even having grown its subscriber base, Netflix was so closely guarding its cash that it opted not to renew the Starz contract, which had previously been described as one of its most critical contracts.  Analysts and investors began to grow concerned about the ability of Netflix to successfully transform from a DVD company to a streaming company.  Without content, Netflix would not be able to grow its subscriber base, and without those revenues it could not continue to license streaming content.  On September 2, 2011 Wedbush reported:

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                      - 46 -

1   In the event that a deal is not reached, we think that ***Netflix runs the risk of seeing
    its subscriber growth sharply reduced, if not stalled completely***.  Netflix has become
2   a subscriber growth story, and has managed to maintain a delicate balance between
    its content quality, spending and subscriber acquisition in order to keep subscriber
3   growth high.  We think that today's announcement upsets that delicate balance, and
    reveals a chink in Netflix's armor.
4
    The same day Morgan Keegan issued an analyst report stating:
5
6   **Netflix Model Tested**  Netflix can either reallocate budget toward other content or
    pay up for Starz.
7                                    *         *         *

8   Netflix would argue that its diverse content library mitigates the risk of any
    departure, and trends have already been fine without Sony content.  ***Nevertheless,
9   this scenario creates questions and numerous modeling uncertainties.  If Netflix
    pays up, will other studios play hardball? If Netflix lets Starz walk, can it keep
10  subscribers engaged?***

11          197.   Still, analysts remained positive in part, viewing Netflix's walk-away as

12  demonstrating financial discipline and restraint in managing margins.  A Caris & Company analyst

13  report stated:

14  While the stock is certain to be under pressure at the outset of trading activity this
    morning, we believe investors should applaud NFLX for exercising a great deal of
15  financial discipline in refusing to bend to Starz' demands (assuming that's what
    actually happened, and assuming that yesterday's announcement wasn't a negotiating
16  tactic).  One of the core reasons for the enviable operating leverage which NFLX has
    exhibited over the past 3 years has been NFLX's unique ability to manage its
17  subscription COGS line to around 54% of sales.  With sales increasing exponentially
    as a result of 60%+ sub growth this year, domestic margins are sure to come in well
18  above guidance, which is 14%.

19  Similarly, Jefferies reported that:

20  ***NFLX move also shows that there is a limit to how much they'll spend on content***.
    We were placing a potential Netflix-Starz renewal in the $200-$350M/yr range, and
21  clearly  Starz was shooting for more.  At the very least, this latest development
    shows that Netflix can exercise financial restraint, and not pay for key content, no
22  matter what the cost, hurting its P&L in the process.

23          198.   Nevertheless, the market was jarred, exhibiting a loss of confidence in Netflix.  On

24  this news, Netflix stock dropped from $233.27 on September 1, 2011 to $213.11 on September 2,

25  2011, a decline of $20.16 per share (or 8.64%) on high volume of approximately 8 million shares.

26

27

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                        - 47 -

### 2. The September 15, 2011 Partial Disclosure with Third Quarter 2011 Results

199. On September 15, 2011, Netflix filed a Form 8-K with the SEC, signed by Defendant Wells. The Form 8-K attached a Letter to Shareholders revealing that Defendants expected to lose one million subscribers during the third quarter of 2011. This would mark the first time in years Netflix closed a quarter with a loss in subscribers.

200. The subscriber drop-off was due, in large part, to the Company's dramatic shift to the significantly-higher-cost streaming business which necessitated the 60% price increase announced in July 2011.

201. In response to this corrective information, Netflix's stock price dropped by $39.46 per share to close at $169.25 per share, a one-day decline of nearly 19%. For the first time, the falsity of Netflix's statements was coming into focus. Investors were beginning to realize that the increased costs of streaming had forced Netflix to raise prices, which, in turn, caused subscriber numbers to drop. Without subscribers, Netflix could not license content, and without additional content, Netflix could not grow its subscriber base. In other words, the concealed risk presented by the Company's dramatic shift to a significantly-higher-cost, lower-profit business model began to make itself known.

202. Notwithstanding this news, Netflix assured the market that it "remain[ed] convinced" that its long term strategy was the right choice. The strategy included, *inter alia*, "to enable [Netflix], with the growth in revenue, to license more streaming content and thereby improve [its] streaming service even more." This "strategy" was nothing more than a confirmation that the long-touted shift to streaming was working.

203. While these false assurances tempered the market's reaction, certain analysts remained "wary." For example, an analyst with Janney Capital Markets commented on September 15, 2011 that: "we continue to be wary of the insider selling, large increase in content obligations, and the risks to sub growth that could create a negative virtuous cycle whereby less content drives a loss of subs that leads to the loss of more content."

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                        - 48 -

3.     **The September 21, 2011 Goldman Sachs Communacopia Conference Call**

204.    On September 21, 2011, Netflix participated in the Goldman Sachs Communacopia Conference where Defendants again emphasized how strong the streaming side of the business was, while failing to reveal streaming's relatively minimal profit contribution:

> [Analyst:] So first off, let's just start off with a general overview question. Why should investors own Netflix shares now? What's the narrative? Two years ago, it was increased distribution and the introduction of streaming. A year ago, it was probably the new content that you were signing up. Six months ago, it was international. What's the narrative or the focus now?
>
> [Wells:] . . . *I think the core message I'll deliver is that we feel strongly that the core thesis is intact. The size and the opportunity of the domestic and the international streaming market or electronic, entertainment market is intact. And we're well positioned*. We're still well positioned to take advantage of that and to grow into a large share.

C.     **The October 24, 2011 Disclosures Finally Reveal the Disparate Profitability of Streaming and DVD**

205.    On October 24, 2011, after the close of the market, Defendants filed a Form 8-K with the SEC signed by Defendant Wells. The Form 8-K attached a Letter to Shareholders which was signed by Defendants Hastings and Wells. The Letter stunned the markets – as it finally became abundantly clear that in dismissing its DVD Business, Netflix was moving into an uncertain business with significantly-higher-cost-constraints and lower-contribution profit margin.

206.    Specifically, Netflix disclosed: "[t]he contribution margin for domestic streaming will be low in Q4, at around 8% . . . due to our increased streaming content spend." Indeed, the 4Q11 guidance for the contribution profit for domestic streaming presented a range from about 6.4% to 8.8%. By stark contrast – the DVD Business had a guided contribution profit range of 50% to as high as 52%. DVD revenues accounted for the vast majority of Netflix's profits.

207.    Moreover, Netflix had expanded so rapidly into international markets that the international streaming business had incurred significant costs – margins were deeply negative – and the losses were severely impacting margins. *It was reported that the international streaming sector had a contribution profit of -280% to -200%.*

208.    Netflix also announced the loss of 810,000 subscribers quarter over quarter.

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                     - 49 -

1    209.    The information Netflix had fraudulently concealed for so long suddenly became

2  glaringly apparent to the market: Netflix's shift to streaming presented far more financial risk than

3  had been disclosed.  The Streaming Business was drastically less profitable than the DVD segment,

4  and thus, the DVD segment was contributing disproportionately to operating results.

5    210.    Defendants admitted they had previously failed to explain the impact that streaming's

6  soaring cost was having on the Company.  In the October 24, 2011 Letter to Shareholders, discussing

7  the reasons for the membership price increases in July, Defendants stated:

8      We think that $7.99 for unlimited streaming and $7.99 for unlimited DVD are both
       very aggressive low prices, relative to competition and to the value of the services,
9      and they are the right place for Netflix to be in the long term.  What we misjudged
       was how quickly to move there.  ***We compounded the problem with our lack of
10     explanation about the rising cost of the expansion of streaming content, and steady
       DVD costs, so that absent that explanation, many perceived us as greedy***.  Finally,
11     we announced and then retracted a separate brand for DVD.  While this branding
       incident further dented our reputation, and caused a temporary cancellation surge,
12     compared to our price change, its impact was relatively minor.  ***Our primary issue is
       many of our long-term members felt shocked by the pricing changes, and more of
13     them have expressed that by cancelling Netflix than we expected***.

14     ***Because of this, our revenue and profits in Q4 will be lower than we had
       anticipated***, but we'll remain profitable on a global basis.
15
       211.    The financial risk posed by Netflix's new business model surprised the market, and
16
   following the release of the October 24, 2011 Form 8-K, Netflix's stock price fell $41.47 per share
17
   or nearly 35%, to close at $77.37 per share on October 25, 2011.  The market became suddenly
18
   aware that streaming's profits were not anywhere close to being able to offset the decline in DVD
19
   profits.  In the Letter to Shareholders attached to the Form 8-K filed with the SEC on January 25,
20
   2012, Defendants stated:
21
       ***While contribution profit from domestic streaming will grow sequentially, it will
22     not be sufficient to offset the sequential decline in DVD profits (~$50 million), and
       the sequential increase in our international losses (~$50 million), as well as cover
23     our global G&A and Technology & Development costs***.

24     212.    Analysts commented on the failing model, and downgraded their ratings of Netflix.

25 On October 25, 2011, Janney Capital Markets commented on the significantly lower profit margins

26 of the Streaming Business:

27     ***The new baseline of sub metrics is troubling, management credibility has
       crumbled, international adoption is weak (as we suspected), content costs are***
28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                    - 50 -

*mounting, and it[] is clearer that the DVD business accounts for the vast majority of profits*.

213.     Even analysts who had previously been bullish on Netflix stock were suddenly halted in their tracks.  For example, on October 25, 2011, J.P. Morgan noted that "U.S. streaming (including hybrid subs) [was] slowing at the same time as Netflix [was] breaking out contribution profit in the U.S. between streaming and DVDs."  J.P. Morgan was troubled that "streaming account[ed] for only 1/6 of U.S. contribution profit, and even less on a fully allocated basis."

214.     On the same day, Sterne Agee reported it was "surprise[d]" by the "disclosure that the DVD business currently generates 80%+ of the company's profits (even though it is only about 40% of revenue)."  A Morgan Keegan analyst report also noted the revelation, and explained how it had impacted "consumer trust":

> Netflix is in the tough spot of regaining consumer trust, which makes us skeptical that December will show "strongly positive" net adds.

> *             *             *

> [T]his was the first quarter in which Netflix provided financial details for the contribution margin (defined as revenue – cost of revenue – marketing) of streaming and DVD plans. *For Q4, streaming is expected to be ~7%-9% contribution margin while DVD is expected to be ~50%-52%*.

215.     The Morgan Keegan analyst report was not the only one to comment on the market's lost trust in Netflix.  On October 24, 2011, Morgan Stanley commented that "[t]he investment community does not have the same 'benefit of the doubt' respect it once had for management."

**D.     The False and Misleading Certifications During the Class Period**

216.     Throughout the Class Period, Defendants Hastings, McCarthy and Wells signed false and misleading certifications that assured investors about the integrity of Netflix's disclosure controls and procedures and its financial statements, ensuring that all material information was disclosed.

217.     In connection with the Company's Quarterly Report on Form 10-Q, filed with the SEC on October 26, 2010, Hastings and McCarthy both signed the following certification; in connection with the Form 10-K filed on February 18, 2011, and with the Quarterly Reports on Forms

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                              - 51 -

10-Q filed with the SEC on April 27, 2011 and July 27, 2011, Hastings and Wells signed the following certification:

I, [Reed Hastings/David Wells and/or Barry McCarthy], certify that:

1.      I have reviewed this [report] on Form [10-Q/10-K] of Netflix, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

a)      designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)      designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)      evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)      disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

a)      all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                                 - 52 -

b)      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ [Reed Hastings/David Wells/Barry McCarthy]

218.    The certifications identified in ¶217 above were materially false and misleading because, as set forth in ¶¶154-156, 176-179, 184, 186, 191-193, Defendants failed to disclose material facts necessary to make their public statements not misleading and failed to fairly present, in all material respects, the Company's financial condition, and specifically, the Company's financial condition with respect to the streaming side of its business.

219.    The Individual Defendants Hastings, Wells and McCarthy also signed certifications pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, stating:

I, [Reed Hastings/David Wells/Barry McCarthy], certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the [report] on Form [10-K/10-Q] of Netflix, Inc. for the [period] ended [date] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such report fairly presents, in all material respects, the financial condition and results of operations of Netflix, Inc.

/s/ [Reed Hastings/David Wells/Barry McCarthy]

220.    The certifications identified in ¶219 above were materially false and misleading because, as set forth in ¶¶154-156, 176-179, 184, 186, 191-193, Defendants failed to fairly present, in all material respects, Netflix's financial condition and results of operations, and specifically, the Company's financial condition with respect to the streaming side of its business.

VI.    **DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS WITH SCIENTER**

A.    **Confidential Witness Allegations Coupled with Defendants' Own Admissions Support that Defendants Were Tracking and Monitoring the Profitability of Streaming During the Class Period**

221.    As discussed in greater detail above, ¶¶103-117 *supra*, the CW allegations support a strong inference that Netflix knew that streaming's profitability was drastically less than that of the DVD business because the Company tracked the streaming business separately from the DVD business.  According to CW1, a former Director of Product Management from April 2008 to July

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                    - 53 -

1    2009, Netflix was tracking and reporting to executive management the amount of streaming business

2    at Netflix, and the streaming usage and rate of growth.

3    222.    Similarly, CW2, a former Manager of Content Acquisition for Netflix from March

4    2005 through November 2010, personally observed key streaming and DVD metrics being

5    discussed, including the number of hours viewed and the cost per hour for streaming.  CW2 stated

6    that Netflix generated weekly key metrics reports and circulated every Monday by email on Excel

7    spreadsheets to a range of employees, including Hastings.  According to CW2, *cost per hour* was

8    among the key metrics generated and circulated for streaming.

9    223.    CW2 further stated that the key metrics meetings provided information on the

10   pending streaming deals, their cost, and the dollar amounts that would have to be shifted from DVD

11   content to streaming, in order to execute the deals for streaming content.

12   224.    CW3, a former Manager of Content Planning and Analysis from June 2011 to July

13   2012, confirms that Netflix had the capability to:  (i) track the profitability of streaming; (ii)

14   determine a profit margin for the purposes of determining separate streaming pricing; and (iii)

15   calculate what the streaming profit margin needed to be.

16   225.    CW3 confirmed that the decision to split the streaming and DVD businesses was

17   made prior to June 2011 and streaming was a fixed cost business with profitability based almost

18   entirely on the fixed cost of content because functionality feature costs were negligible.

19   226.    Indeed, according to CW3, Netflix was even performing ROI analyses to determine

20   the profitability of packages of streaming content, and it was because of this analysis that Netflix

21   was able to determine that the dollar amount that Starz was demanding exceeded the Starz content's

22   profitability, and thus decided not to execute the Starz contract.

23   227.    The above CW allegations supporting that Defendants had information revealing the

24   relatively low profitability of the streaming business as compared to DVD are corroborated by

25   Defendants' own statements on September 21, 2011 to the effect that they were using not only hours

26   viewed but also regression and other math valuation models to determine the value of streaming

27   content:

28

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                          - 54 -

[Wells:] [W]e may have purchased a negotiation for a group of television or movie titles, and generally, *we use hours viewed, hours viewed by our streaming subscribers as a proxy for the value delivered to the service.* And to the extent that *we use regression and other math valuation models to predict what the relative value of this group of titles are, we come up with a sort of high number or a reservation price for that deal*.

To the extent that the content owner comes to the deal and says, I want $0.20 per month per sub from Netflix, but we have an intersection in price and we do the deal, they may walk away saying, Netflix paid $0.20 per month per sub, and we walk away saying, okay, but it was well within what we thought was the value for the deal.

228. Also in the September 21, 2011 conference call, Defendants admitted that they had operating profits segmented out for DVD (and thus would also necessarily have had operating profits segmented out for streaming), but nevertheless continued to hide the material segmented information from the public:

[Wells:] So 12 months to a substantial percentage of broadband household is going to break even, it's pretty encouraging to us in terms of our international opportunity. And I'd say beyond that, *it is the preservation in the long-term earnings stream from a DVD division*. *So looking at operating profit, and we will be continuing to segment that out.* So looking at that operating profit and what the trajectory on that might be long term.

**B.  Defendants Earned Huge Profits Through Massive Insider Sales While Simultaneously Causing Netflix to Suffer Huge Losses Through Massive Buy Backs**

229. Defendants earned tremendous profits by *selling* over $85 million of their Netflix stock while causing the Company to *buy back* massive amounts of the stock, approximately 900,000 shares during the Class Period. The buy back program resulted in huge company/investor losses, but allowed the Company's stock price to remain inflated while Hastings, for example, earned $1 to $1.5 million per week via aggressive stock sales. As noted by an analyst with Janney Capital Markets on November 22, 2011:

*[Netflix was] buying stock to offset the dilution from its large issuance of equity to its management team, which has aggressively sold the stock* with many options priced as low a[s] $1.50 per share.

230. As noted by *Reuters Business* and *Financial News* quoting *The Wall Street Journal*, Hastings' stock-sale profits ($41m) were about the same as investors' losses resulting from the Company's buy backs ($47m):

*Even as* the once-beloved red envelope that perfectly symbolized the convenience of *Netflix*'s video service *is reduced to tatters in its customers' eyes*, *Wall Street*

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                         - 55 -

*pundits have begun sounding alarms about CEO Reed Hastings' profit-taking windfall*.

As the Wall Street Journal pithily remarked about the service's now-shrinking consumer base, "*If the CEO of Netflix Inc. were in a movie, the townspeople would be chasing him with torches and pitchforks.*"

To adopt that metaphor to Wall Street's view of recent Netflix history, the most knowledgeable townspeople are holding a lantern close to Hastings' . . . *discouraging practice of regularly unloading chunks of his own Netflix holdings – and apparently finding some witchcraft afoot*. What was once just scuttlebutt – *complaints about the CEO's profit-taking when the company's share price was still elevated*, before the recent dismaying announcements – is now the stuff of articles in places like the Journal and the web site Seeking Alpha.

*. . . Shareholders who have been riding out the more recent tumble might wish they'd been part of the regular dumping plan*.

At the same time, *the company has been buying back its own stock in recent months*. Depending on underlying circumstances, *that could increase shareholder confidence or look like putting lipstick on a pig*.

The Wall Street Journal's Brett Arends wrote:

"*In the first two quarters of this year, Netflix spent $160 million of stockholders' cash buying in shares at an average price of $222. So far investors have lost $47 million on that deal. Who benefited? Anyone selling stock during that period. Prominent among them is Reed Hastings . . . according to an analysis of public filings by InsiderScore, he's cashed out about $41 million since, at an average price of $236. In other words, by curious coincidence, the profits he's made selling this stock are almost as much as the company has lost buying it.*"

Tony Wible, an analyst with Janney Montgomery Scott, framed it this way . . .: "*Reed is selling options on a weekly basis. You have to ask yourself, if these are the smartest guys in the room, why doesn't the co-founder own any shares?*"

### 1. The Timing of Defendants' Increased Personal Stock Sales, Coinciding with Their Causing the Company to Initiate Major Stock Buybacks Supports a Strong Inference of Scienter

231. The Defendants' high rate of selling during the Class Period, as detailed below, is particularly suspicious given that Netflix initiated a massive $300 million stock repurchase program on June 11, 2010. Pursuant to the program, *Netflix repurchased more than 900,000 shares during the Class Period*: 501,847 shares during 1Q11; 216,000 shares during 2Q11; and 182,000 shares during 3Q11.

232. By virtue of the corporate buyback programs coupled with subsequent aggressive insider sales, Defendants were essentially bleeding the Company dry of whatever meager profits the Streaming Business was producing. Indeed, *Netflix spent more than 100% of its earnings on stock*

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                    - 56 -

1   *buybacks*.[3]  The net effect of the expensive buyback program and aggressive insider sales was less

2   revenue for content at a time when content costs were on the rise.  Thus, Defendants knew that the

3   shift to streaming could not be effected without sacrificing margins for this added reason.

4   Defendants were certainly aware of the depletive effect their actions had on the Company, and

5   nevertheless, they chose to continue selling their stock while in possession of material, adverse

6   information that the rest of the investing public simply did not have.

7        233.    Announced with the release of 1Q11 results, Netflix's buyback program cost the

8   company almost ***$200 million*** to buy back its own stock at Class Period highs in the first nine

9   months of 2011.  Stock buybacks are widely recognized as boosting a company's share price.  As the

10  Daily News of Los Angeles noted in reference to buybacks,  "[c]ompanies typically buy back stock

11  when they think it is undervalued."  Gregory J. Wilcox, *Housing Slowdown Costs Jobs*, Daily News

12  of L.A., Oct. 25, 2006.  However, insiders usually sell their personal stock when they believe it is

13  overvalued.   Thus Defendants' actions in effecting simultaneous personal sales and company

14  purchases are incongruent and suspicious.

15       234.    While the June 11, 2010 stock repurchase program was announced immediately prior

16  to the beginning of the Class Period, the actual purchases of stock took place inside the Class Period.

17  Netflix's Forms 10-Q filed with the SEC indicate that Netflix purchased 502,000 shares in the first

18  quarter of 2011, 216,000 shares in the second quarter of 2011 and 182,000 shares in the third quarter

19  of 2011, for a total of 900,000 shares.  All of these stock repurchases occurred during the Class

20  Period.

21       235.    Here too, the buyback program was seen as having this effect for Netflix.  As reported

22  by Janney Capital Markets on November 22, 2011, "[Netflix] has been buying stock to ***offset the***

---

3        According to the Netflix 10-K filed on February 10, 2012 for the period ending on December 31, 2011, Netflix earned $226.13 million in 2011, $160.9 million in 2010, $115.9 million in 2009 and $83.0 million in 2008, for a total of $585.9 million in four years.  In contrast, Netflix initiated stock buyback programs totaling $850 million during the same time period.  Hence, the buyback programs attempted to spend $264 million more than Netflix earned.  Alternatively, the buyback programs amounted to 145% of Netflix' net income over the four years.

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                              - 57 -

1  *dilution* from its large issuance of equity to its management team, which has ***aggressively sold the***

2  ***stock with many options priced as low a[s] $1.50 per share***."

3      236.    Analysis of the four recent stock buyback programs show that Netflix's top

4  executives have been able to boost Netflix stock abnormally by a statistically significant cumulative

5  34% during the first five days of the announcement of the buyback program.  The abnormal stock

6  price reactions to recent Netflix stock buyback programs are shown in the following charts:

| Number | Date of announcement | Dollar Amount purchased (in millions) | 5-Day Abnormal Stock Price Reaction |
|--------|----------------------|----------------------------------------|--------------------------------------|
| 1 | Jan-31-2008 | $100.00 | **14.82%** |
| 2 | Mar-06-2008 | $150.00 | **8.25%** |
| 3 | Aug-06-2009 | $300.00 | **4.45%** |
| 4 | Jun-11-2010 | $300.00 | **3.10%** |
| | | **Cumulative Total:*** | **33.84%** |

* Statistically significant at the 5% level.

http://ir.netflix.com/releases.cfm?Year=&ReleasesType=&PageNum=2

**The Effect of Stock Buybacks in Netflix**



FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC

824461_1

237.    This evidence corroborates the finding that Defendants have benefitted from these stock buyback programs by being able to sell their shares at significantly higher prices during the Class Period than they would have been able to in the absence of these buyback programs.

238.    Thus, at the same time Defendants Hastings and Wells, and other corporate insiders were making millions of dollars from exercising the options priced as low as $1.50 per share in 2011, they were causing the Company to engage in a stock buyback program costing the Company millions of dollars to boost the price of the Company's stock.  The money lined Defendants' pockets, at a time when the Company had little money to spare due to its shift to streaming and the exorbitant costs of content associated therewith.

239.    In November 2011, after the close of the Class Period, the chickens came home to roost.  On November 21, 2011, Netflix was forced to raise $400 million in fresh capital for the Company (via a $200 million convertible debt deal and a $200 million secondary offering).  Netflix also agreed to restrictions on future stock buybacks as a result of this capital issuance.[4]  In other words, Defendants were forced to stop the Company buyback program from which they had so handsomely profited, in order to obtain the needed liquidity.  Analysts and financial reporters also questioned the timing and suspicious nature of such an expensive program and Hastings' continued sale of shares while investors were being financially pummeled:

- In a November 2011 article entitled "***Netflix CEO: Hit Pause On Your Stock Selling***,"[5] *Forbes* details a "bloodbath" for Netflix Investors during the Class Period. The article goes on to highlight ***Defendant Hastings' simultaneous sales*** throughout 2011, gains from which "***particularly rankle in light of the company's botched share repurchase program that helped ramp up the share price in the first place***."

---

[4]    Netflix noted in its 2011 10-K: "The indenture we entered into in connection with the issuance in November 2011 of our zero coupon senior convertible notes due 2018 contains a covenant restricting our ability to pay cash dividends or to repurchase shares of common stock, subject to certain exceptions."

[5]    http://www.forbes.com/sites/investor/2011/11/03/netflix-ceo-hit-pause-on-your-stock-selling/

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                                    - 59 -

The article adds that "Hastings can only stop exercising his options for cheap Netflix shares if he wants to permanently say goodbye to millions of dollars. *He's free, of course, to exercise the options and NOT SELL*."

- In an April 25, 2011 article entitled "*Netflix Earnings: Stock Buyback or Dividend?*" one CNBC Senior Stocks Commentator *questioned the "logic of spending $108.6 million to buy back shares while they're at or near the highest levels they've ever been" noting that "with prices th[is] high . . . purchases are unlikely to be accretive*."[6]

240.   The analyst reports and news media reports make clear that the immediate consequence of the buybacks was to support the Company's share price, and the ultimate effect was to secure large profits on Hastings' own sales during this period, while the Company, and through it the Class, suffered massive losses on the shares it repurchased.

241.   Analysis of the recent equity issues at Netflix shows that the Company's need to go to the capital markets to raise fresh equity resulted in lower stock prices and ultimately hurt Netflix shareholder wealth.  The following chart shows the stock price behavior during the two recent equity issues in Netflix.[7]   As can be seen from the chart, Netflix's stock price declined on the announcement of equity issues.  Negative Netflix stock price reactions are also consistent with the findings from the finance literature that attempting to raise fresh equity capital from equity markets hurts shareholder wealth.[8]

---

[6]      http://www.cnbc.com/id/42754971/Netflix_Earnings_Stock_Buyback_or_ Dividend

[7]      Recently, Netflix had two equity issues, $105 million announced on April 27, 2006 and $400 million announced on November 21, 2011.  This chart shows the abnormal stock returns around the two equity issues announced on April 27, 2006 and November 21, 2011, as discussed in the footnote above.

[8]      *See, e.g.*, Paul Asquith and David W. Mullins, Jr., *Signalling with Dividends, Stock Repurchases and Equity Issues*, Financial Management, Autumn 1986, 15-3, 27-44.

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                         - 60 -



242.    Overall, these facts and analyses support that Netflix's top executives engaged in a game of sham with their shareholders.  Netflix engaged in aggressive stock buyback programs costing hundreds of millions of dollars that it did not earn.  These stock buybacks enriched the top executives by allowing them to sell millions of dollars worth of their own shares at prices inflated by the buyback programs.  When the truth was revealed, Netflix shareholders paid the price by suffering more than a **_67% decline_** in the value of their shares and having to resort to a massive liquidity infusion to prop up the Company.

### 2.    Insider Stock Sales by Hastings, McCarthy, and Wells During the Class Period Were Highly Unusual and Suspicious

243.    The Class Period sales of Netflix stock by Defendants Hastings, McCarthy and Wells were highly unusual and suspicious, as measured by: (a) the dollar amount of shares sold and the profits generated therefrom; (b) the comparison with Defendants' own prior and subsequent trading history and those of other insiders; (c) the timing of stock buybacks and stock sales by Netflix; (d) the timing of the insider sales; (e) the likely changes in the 10b5-1 plans underlying these insider sales; and (f) the suspicious lack of sales or 10b5-1 plans during opportune times. Such opportune insider sales and lack of sales coupled with the Company buy backs therefore support a strong inference of scienter.

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                      - 61 -

244.   To evaluate Defendants' selling activity, Lead Plaintiffs used publicly available trading data required to be reported to the SEC on Forms 4 and 3.  Lead Plaintiffs worked with a university professor of finance with an expertise in insider trading, to analyze the trading by insiders, including, but not limited to, Defendants, that occurred during the Class Period and during a period immediately preceding and immediately following the Class Period.  The Pre-Class Period is defined as the two-year period from October 19, 2008 to October 19, 2010.  The Post-Class Period is defined as the period from October 25, 2011 to June 1, 2012.  Together, the Pre-Class and Post-Class Periods are referred to as the Control Period.  It is necessary to use both the Pre-Class and Post-Class Periods to obtain a good benchmark for usual insider trading activity since not all insiders are present during the entire time period.  The Netflix Forms 4 and 3 filed during the Class and Control Periods are hereby incorporated herein by reference.

245.   The following methodologies were used by Lead Plaintiffs in conjunction with a university professor of finance, in analyzing the Defendants' sales and finding them unusual and suspicious:

(a)   First, total sales were calculated for each of the Defendants, together with the cash proceeds from such sales, during the Control and Class Periods.

(b)   To compare Class Period sales with usual trading patterns, sales by the Defendants during the Class Period were then compared with their sales during the Control Period.

(c)   To determine whether the Defendants' sales of Netflix stock during the Class Period generated abnormal (above-normal) profits, an event-study methodology was employed.  The event study computes cumulative shareholder average abnormal profits not explained by market factors.  Under this approach, if an insider buys a share of stock which then increases in price from $100 to $120 (20%), and the benchmark index (*i.e.*, here, the value-weighted index of NYSE, NASDAQ and AMEX stocks) increases from 1000 to 1010 (1%) during the same period, then the abnormal profit would be 19%.  Under the same analysis, if a company's stock price declines subsequent to an insider sale by a greater amount than the relevant benchmark index, then the sale enabled the insider to generate an abnormal profit by avoiding the decline.  For example, if an

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                              - 62 -

1   insider sells a share of stock, which then declines from $100 to $80 (20%) while the relevant

2   benchmark decreases from 1000 to 990 (1%), then the abnormal profit would be 19%.

3           (d)     The event-study method is widely accepted among financial economists and

4   has been used extensively in academic literature studying the profitability of insider trading.[9] Here,

5   abnormal profits were calculated from 90 days before the insider trading day to 250 trading days

6   (approximately one calendar year) following the day of trade, measured against a value-weighted

7   index of NYSE, AMEX and NASDAQ stocks for 2008-2011.  During 2012, this index was not

8   available, therefore, the returns on SPY (a traded version of the S&P 500 index, which is also a

9   value-weighted index) were used.

10          (e)     After calculating abnormal profits for the Defendants' Class Period sales, the

11  probability (p-value) that such abnormal profits resulted from random chance was then calculated by

12  computing the trade-dollar-weighted residuals from the market-adjusted model for the 90 trading

13  days before and 250 trading days after the day of trade, and averaging these residuals across event

14  days for each insider.  This data was then used to compute a "t-statistic" (a statistical tool) to infer

15  the probability that the observed cumulative abnormal profits were due to random chance.

16

17  [9]     There is a vast body of literature that has examined the profitability of insider trading.  H.
    Nejat Seyhun's book on the topic provides a comprehensive coverage of the profitability of insider
18  trading using similar event studies.  *See* H. Nejat Seyhun, *Investor Intelligence from Insider Trading*
    (1998).  Other studies that have examined the profitability of insider trading include: J. Jaffe, *Special*
19  *Information and insider trading*, 47 The Journal of Business, 410-428 (1974); J.E. Finnerty, *Insiders*
    *and Market Efficiency*, 31 The Journal of Finance, 1141-1148 (1976); K. Nunn, G. Madden & M.
20  Gombola, *Are some insiders more 'inside' than others?*, 9 The Journal of Portfolio Management, 18-
    22 (1983); H. Nejat Seyhun, *Insiders' profits, costs of trading, and market efficiency*, 16 The Journal
21  of Financial Economics, 189-212 (1986); A. Gupta & L. Misra, *Illegal Insider Trading: Is It*
    *Rampant before Corporate Takeovers?*, 23 The Financial Review, 453-464 (1988); L. Meulbroek,
22  An Empirical Analysis of Illegal Insider Trading, 47 The Journal of Finance, 1661-1700 (1992); H.
    Leland, *Insider Trading: Should it be prohibited?*, 100 The Journal of Political Economy, 859-887;
23  and Alan D. Jagolinzer, *SEC Rule 10b5-1 and Insiders' Strategic Trade*, 55 Management Science,
    224-239 (Feb. 2009).  Event studies using the market-adjusted model are common in the finance
24  literature.  In their study, S. Brown & J. Warner, *Event Studies with Daily returns*, 41 The Journal of
    Financial Economics, 3-31 (1985), conclude that market-adjusted method is well behaved.  Other
25  examples of studies that have used market-adjusted method include J. Lin & J. Howe, *Insider*
    *Trading in the OTC Market*, 45 The Journal of Finance, 1273-1284 (1990); D. Denis & D. Denis,
26  *Performance Changes Following Top Management Dismissals*, 50 The Journal of Finance, 1029-
    1057 (1995); M. Cooper, O. Dimitrov & P.R. Rao, *A Rose.com by Any Other Name*, 50 The Journal
27  of Finance, 2371-2388 (2001); and Alan D. Jagolinzer, *SEC Rule 10b5-1 and Insiders Strategic*
    *Trade*, 55 Management Science, 224-239 (Feb. 2009).

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                    - 63 -

246.     By each analysis, the dollar value of Defendants' Class Period annualized sales was significantly higher than the dollar value of their Control Period annualized sales.  Thus, analysts following Netflix raised questions about management's "troubling" insider sales.  For example, in a September 15, 2011 analyst report entitled "***Things That Make You Go Hmmm*** . . ." Janney Capital Markets expressed its concern, "***we continue to be wary of the insider selling***," detailing the reasons for their suspicions:

> ***Sales Cast Doubt – Insiders have sold $67.6 million of stock over the past six months*** with much of this funded by options that were exercised at a $1.50 per share. ***The CEO has sold $1.0 to $1.5 million of stock on almost a weekly basis (total of $32 million) and continues to not own any direct shares.  The Chief Product Officer, Chief Content Office, Chief Marketing Officer, Chief Talent Officer, and various Directors have also sold.***  We believe this activity is tied to NFLX's unique compensation policy that minimizes the cost of options on the income statement but essentially allows NFLX to fund some compensation through the balance sheet ***at the expense of shareholders***.

247.     Similarly, in a September 19, 2011 report, analyst Janney Capital Markets further noted: "For the record (speaking as both an analyst and as a member of the NYSE Research Examination Committee), I believe churn, gross sub, additions, free sub, and SAC are all very important metrics, especially as the company's accounting seems aggressive and ***insider sales are troubling***."

### 3.     The Dollar Amount of Shares Sold by Defendants During the Class Period Was Suspiciously High

248.     As reflected in the following table, Defendants' sales during the Class Period were extraordinarily large, with Hastings' sales totaling more than ***$43 million;*** McCarthy's totaling more than ***$42 million***; and Wells' totaling more than ***$1.5 million***.

249.     In addition to being massive in absolute terms, Class Period sales by Hastings, McCarthy and Wells were suspiciously high when compared to their usual selling pattern during the Control Period.

250.     A comparison of the sales by Defendants Hastings, McCarthy and Wells combined, during the Pre-Class, Class, and Post-Class Periods is set forth in the following chart:

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                          - 64 -

1
2
3
4
5
6
7
8
9
10
11
12



13  251.  The chart demonstrates that Defendants Hastings, McCarthy and Wells' sales

14  escalated as the Company moved towards its transformation into primarily a streaming company

15  (which was announced in October 2010) and during the Class Period, all the while the Company was

16  concealing from the public the vastly disparate profitability between DVD and streaming.  By not

17  explicitly revealing the much lower profitability of the Streaming Business in comparison to the

18  DVD Business, Netflix executives maintained the artificial inflation of Netflix' stock price, while

19  selling hundreds of millions worth of their own personal stock.  By October 2011, once the truth was

20  fully revealed and the inflation in the stock price was gone, these insider sales dramatically

21  decreased.

22  252.  As is set forth in the following table, the dollar value of Defendants' sales as a group

23  during the Class Period almost doubled on an annualized basis as compared to the Pre-Class Period.

24  The Defendants' sales during the Class Period, again on an annualized basis, represent almost a four-

25  fold increase as compared to the post-Class Period.  Hence, Defendants' sales during the Class

26  Period are unusually high compared to their usual trading pattern.

27
28

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                    - 65 -

Dollar Volume of Annualized Trades

| Insider Name | Activity | Pre-Class Period: October 20, 2008 to October 19, 2010 (2 years)* | Class Period: October 20, 2010 to October 24, 2011 (1 year)** | Post-Class Period: After October 24, 2011*** |
|---|---|---|---|---|
| HASTINGS, REED | Dollar volume (annualized) | $(33,628,550.00) | $(42,668,105.41) | $(23,468,313.18) |
| MCCARTHY, WILLIAM BARRY | Dollar volume (annualized) | $(11,303,641.93) | $(41,711,405.88) | |
| WELLS, DAVID B | Dollar volume (annualized) | | $(1,528,166.97) | |
| ALL INSIDERS | Dollar volume (annualized) | $(44,932,191.93) | $(85,907,678.25) | $(23,468,313.18) |

\* There are 730 calendar days between October 20, 2008 and October 19, 2010 for annualization purpose.
\* There are 370 calendar days between October 20, 2010 and October 24, 2011 for annualization purpose.
\*\* There are 220 calendar days between October 25, 2011 and June 1, 2012 for annualization purpose.

253.     Defendants disclosed that their sales during the Class Period took place pursuant to 10b5-1 trading plans.  The fact that Defendants sold shares pursuant to 10b5-1 trading plans does not give them unlimited protection from liability if they were in possession of material, nonpublic information at the time the plans were made or if they were in possession of material, nonpublic information at the time the plans were amended or modified.  In fact, recently the SEC charged Angelo Mozilo of Countrywide with fraud and insider trading even though Mozilo's trades were pursuant to 10b5-1 plans.[10]  Similarly, the U.S. Department of Justice brought criminal insider trading charges against the former CEO of Qwest Communications, Joseph Nacchio, that included allegations of misconduct in connection with Nacchio's 10b5-1 trading plans.  In 2007, Mr. Nacchio was convicted of 19 counts of criminal charges and sentenced to a six-year prison term.[11]

a.     Hastings

254.     Defendant Hastings' individual sales during the Class Period are also suspicious.  The dollar value of his sales increased from $33 million (on an annualized basis) from the Pre-Class Period to $43 million (on an annualized basis) during the Class Period.  During the Post-Class

---

[10]     *See SEC v. Angelo Mozilo, et al.*, No. CV09-03994, Complaint (C.D. Cal.), filed June 4, 2009.

[11]     *See United States v. Nacchio*, No. 1:05-cr-00545-EWN, 2007 WL 2221437, at *1 (D. Colo. July 27, 2007).

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                              - 66 -

1  Period, the dollar value of his sales fell to $19 million (on an annualized basis). Hence, Defendant

2  Hastings's Class Period sales are the most unusual and suspicious.

3  255.    Even though Defendant Hastings sold Netflix shares before and during the Class

4  Period pursuant to a 10b5-1 trading plan, these sales were suspicious. Defendant Hastings' trading

5  pattern changed after October 14, 2010, raising a strong inference that he amended his plan during

6  the Class Period and is thus not entitled to rely on the plan to protect him from liability. In

7  particular, Hastings increased his sales of personally held shares from 4,500 shares a week (ending

8  on October 14, 2010) to 5,000 shares a week beginning January 20, 2011.[12] The increase in number

9  of shares sold and the three-month gap between the two adjacent sales dates creates a strong

10  inference that Hastings amended his 10b5-1 plan during the Class Period. Moreover, Hastings' net

11  shareholdings remained the same throughout the Class Period; in fact, he sold every single share he

12  acquired as compensation during that time.

13  256.    While Hastings' stock sales are highly suspicious, Hastings' later decision not to sell

14  is also suspicious. After Hastings continued to receive stock awards through the end of the Class

15  Period and into 2012, his last sale of 5,000 personally held shares pursuant to his 10b5-1 plan was

16  October 6, 2011. In fact, his SEC filings show that he was awarded options for an additional 67,640

17  shares between October 13, 2011 and February 1, 2012.[13] All of these options were immediately

18  exercisable. However, Hastings did not exercise the options and sell these award shares in

19  accordance with a pattern of weekly sales of 5,000 shares a week. Instead, Hastings initiates a new

20  10b5-1 plan, culminating in a single sale of 76,500 shares on February 23, 2012.

---

22  [12]    Hastings also sold shares pursuant to a 10b5-1 plan prior to the Class Period on behalf of the
23  Hastings-Quillin Family Trust. As the Trust documents are not public and the Forms 4 filed with the
SEC do not provide details about Hastings' relationship to the trust, Hastings' personal benefit from
24  the sales on behalf of the trust cannot be determined without discovery. These sales of 5,500 shares
a week ended on October 14, 2010.

25  [13]    Hastings was awarded 11,038 options at an exercise price of $113.25 on October 13, 2011.
26  These options were immediately exercisable. In addition, he was awarded 15,607 options on
November 1, 2011 at an exercise price of $80.09; 18,609 options on December 1, 2011 at an exercise
27  price of $67.17; 17,303 options on January 3, 2012 at an exercise price of $72.24; and 5,083 options
on February 1, 2012 at an exercise price of $122.97. All of these options were also exercisable on
their respective grant dates. By February 2012, most of these options were also in the money.

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                              - 67 -

257. Hastings' changing trading patterns – especially increasing his personal sales during the Class Period while stock prices were highest and enacting a plan to exercise a single sale – support a strong inference of scienter. Further, the expiration or cancellation of existing 10b5-1 plans and the lack of a regular 10b5-1 plan as Netflix's stock prices recovered during the post-Class Period further corroborate and strengthen the inference of scienter. Hastings' 10b5-1 plans cannot provide him with a safe harbor under such circumstances.

258. In summary, Hastings' so-called 10b5-1 plans are undermined by the numerous changes and irregular trading patterns during and after the Class Period. First, he discloses a 10b5-1 plan authorizing sales of 4,500 shares per week prior to the Class Period. Second, immediately into the Class Period, this plan ends and his sales stop. Third, three months into the Class Period, Hastings has a new plan authorizing sales at 5,000 shares a week. Fourth, at the end of the Class Period, this plan ends and the periodic sales stop. Fifth, three months into the post-Class Period, there is yet another plan authorizing selling of 76,500 shares. Sixth, immediately thereafter, this plan also disappears, and there are no further planned sales as Netflix's stock prices climb.

### b. McCarthy

259. Defendant McCarthy's individual sales during the Class Period are also unusual and suspicious. Defendant McCarthy sold Netflix shares on four dates, November 4 (118,848 shares), November 5 (12,500 shares), November 29 (8,819 shares) and November 30, 2010 (91,181 shares), pursuant to a 10b5-1 trading plan. Despite purportedly trading pursuant to a 10b5-1 plan, McCarthy's November 4 and 5 trades were especially well-timed, following closely on the heels of the Company's October 20, 2010 announcement that it was shifting to become "primarily a streaming company" and the stock price increase that followed. McCarthy's November 29, and 30 trades were also curiously well timed after the Company's November 22, 2010 announcement that it was offering a domestic streaming-only plan and a stock price increase of $10.60 from $188.32 to $198.92, nearly 10%, between November 22 and November 29. On November 30, the stock price climbed even higher to close at $205.90.

260. During the Class Period, McCarthy's sales increased from approximately $11 million (on an annualized basis) from the Pre-Class Period to $42 million (on an annualized basis) during the

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                    - 68 -

1  Class Period.  In December 2010, McCarthy abruptly resigned from Netflix after being at the

2  Company for over ten years, causing a stir amongst analysts.  Prior to leaving Netflix, McCarthy

3  exercised all of his remaining options despite the options in most cases not being due to expire for

4  *years*.

5      261.  Despite McCarthy's resignation early in the Class Period, the timing of his trades and

6  his decision to cash out his holdings support a strong inference of scienter.  As detailed in Netflix's

7  Proxy Statements for 2010, 2011 and 2012, Company policy is such that vested stock options

8  granted on or after January 1, 2007 could be exercised up to ten years following grant regardless of

9  employment status.  By early exercising his options in November 2010, McCarthy cut the life of

10  50,391 options by more than eight years, thereby sacrificing millions of dollars in market value.  In

11  addition, he cut the life of 155,213 options by about one year and 25,744 options by about three

12  months.  This supports a strong inference that McCarthy expected significant stock price declines in

13  the immediate future and cashed out his stock options early.

14                        **c.**    **Wells**

15      262.  Defendant Wells' individual sales during the Class Period are also suspicious.  Wells

16  sold Netflix shares on three different dates during the Class Period, May 2 (3,264 shares), May 24

17  (1,646 shares) and July 5, 2011 (1,281 shares), purportedly pursuant to a 10b5-1 plan.  Despite

18  trading pursuant to a 10b5-1 plan, all of Wells' Class Period sales pre-dated the Company's July 12,

19  2011 announcement that it was increasing subscription prices, which resulted in an initial jump in

20  share price from $291.27 to $298.73 on July 13, 2011, followed by a flurry of customer complaints

21  and a rapid share price decline to $276.58 on July 22, 2011.  Indeed, Wells' July 5, 2011 sale was

22  just before the July 12 announcement, taking advantage of a $289.63 share price before the backlash

23  from the price increase.

24      263.  Although Wells' pre-Class Period sales are not public record because he was not an

25  officer subject to reporting requirements of §16(a) at the time, his sales during the Class Period

26  amounted to $1.5 million (on an annualized basis), whereas they fell to $0 during the Post-Class

27  Period.  Moreover, Wells sold every share he acquired during the Class Period, resulting in no net

28

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC        - 69 -

1    increase in his shareholdings during that time.  Hence, for Defendant Wells, Class Period sales are

2    again quite unusual and suspicious in light of the Post-Class Period activity.

3        264.    Just like Hastings, Wells' later decision not to sell is also very suspicious.  Between

4    July 5, 2011 and February 2013, Wells was awarded 43,240 options at exercise prices ranging from a

5    high of $263.38 (August 1, 2011) to a low of $54.50 (August 1, 2012).  All of these options were

6    exercisable on their grant dates.  By February 2012, Netflix's stock price recovered to above $120,

7    and many of these options moved into the money; however, Wells did not sell a single share out of

8    the awards, nor did he institute a new 10b5-1 plan.  Wells either cancelled or let expire his 10b5-1

9    plan by July 5, 2011.  He did not institute a new 10b5-1 plan for the remainder of the Class Period or

10   the post-Class Period even though he received tens of thousands of option awards.  The reason for

11   this is simple.  Just like Hastings, Wells expected Netflix's stock price to appreciate from the very

12   low levels to which it fell in the post-Class Period.  Instituting a new 10b5-1 plan in the face of

13   sharply rising stock prices would have been very costly.  Moreover, the short duration of Wells'

14   Class Period 10b5-1 should be carefully scrutinized.  Just like Hastings, Wells also should not be

15   allowed to claim safe harbor.

16                          **d.      10b5-1 Plans Under Scrutiny**

17       265.    Indeed, although the Individual Defendants executed sales during the Class Period

18   pursuant to 10b5-1 plans, such plans are under heavy scrutiny from the SEC in light of a recent Wall

19   Street Journal investigation that found that insiders trading pursuant to 10b5-1 plans were still

20   trading at opportune times and reaping better-than-expected results.  According to the November 27,

21   2012 *Wall Street Journal* article entitled "Executives' Good Luck in Trading Own Stock,"

22   executives trading pursuant to 10b5-1 plans are still able to time their trades to avoid losses and

23   increase earnings because trading plans are not public and can be canceled or amended at any time

24   without disclosure.

25       266.    With regard to such trading plans, a December 13, 2012 *Wall Street Journal* article

26   entitled "SEC Draws Fire Over Executive Trading Plans," notes "[i]n building this 'safe harbor' for

27   executives, the SEC has unwittingly given them a defense for unethical behavior."  According to one

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                    - 70 -

1    source cited in the article, "[c]ompanies are using these plans as a tool . . . that allows executives to

2    do insider trading."

3         267.    According to a March 18, 2007 *Bloomberg* article, "The SEC Is Eyeing Insider Stock

4    Sales," an academic study of such plans revealed that executives "do substantially better" making

5    trades purportedly insulated from trading on insider information pursuant to 10b5-1 plans "than

6    would be expected if trading were truly automatic."  According to the study, trades made based on

7    plans "beat the market by 6% over six months, while those at the same firms who traded outside of

8    plans only topped it by 1.9%."  Hence, while protected by the so-called safe-harbor of 10b5-1 plans,

9    insiders earned abnormal profits almost three times higher than those trades without a plan.  These

10   results prompted the SEC to initiate a detailed analysis of 10b5-1 plans in 2007, and the latest Wall

11   Street Journal coverage has led to renewed scrutiny.

12        268.    Indeed, according to a report issued by Wilson Sonsini – Netflix's counsel here – in

13   March 2013, "[t]he floodlights now aimed at such plans are the result of recent *Wall Street Journal*

14   articles showing that corporate insiders, even those executing trades pursuant to Rule 10b5-1 plans,

15   have generated significant profits – or avoided significant losses – by trading company stock in the

16   days just before their companies issued market-moving news."

17        269.    The report recommends that clients avoid multiple trading plans, ***as well as frequent***

18   ***modifications***, and suggests clients adopt "[s]imple plans with a prescribed, regular pattern of stock

19   sales (*e.g.*, 1,000 shares a month on the 15th day of the month)."  Defendants Wells' and McCarthy's

20   sporadic trades and plans – irregular in timing and amount – hardly fit this profile.  As mentioned

21   above, during the Class Period Wells sold Netflix shares on May 2 (3,264 shares), May 24 (1,646

22   shares) and July 5, 2011 (1,281 shares).  These trades are reported pursuant to a 10b5-1 plan.  It is

23   most likely that any such plan was created immediately prior to or during the Class Period and

24   therefore should not be entitled to a safe-harbor consideration.  Similarly, McCarthy's sales are

25   irregular in both timing and amount throwing doubt on the nature of the underlying 10b5-1 plan, as

26   McCarthy sold shares on November 4 (118,848 shares), November 5 (12,500 shares), November 29

27   (8,819 shares) and November 30, 2010 (91,181 shares).

28

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                    - 71 -

270.     And Hastings, as discussed previously, appears to have amended his plan just before or during the Class Period.  In particular, on October 14, 2010, he ended his weekly sales of 4,500 personally held shares, as well as weekly sales of 5,500 shares held by the Hastings-Quillin Family Trust.  He then ceased selling for three months.  On January 20, 2011, Hastings resumed selling 5,000 personally held shares a week.  Then late in or after the Class Period, Hastings enacted a new "plan" to execute a single sale in February 2011 – hardly a plan at all.

271.     Further, though the Individual Defendants filed Forms 4 disclosing their trades and indicating that they were made pursuant to 10b5-1 plans, no further information is available on the plans.  Without discovery, investors cannot tell when the plans were created, when they were last amended, whether any trades pursuant to the plans were canceled, or what criteria, such as share price, triggered sales pursuant to the plans.

### 4.     Defendants Generated Unusual and Suspicious Abnormal Profits on their Sales of Netflix Stock

272.     Using the event-study methodology described above, ¶247, Hastings, McCarthy, and Wells each generated abnormally high profits on their transactions of Netflix stock during the Class Period, as reflected in the following table:

#### Abnormal Profits

| Insider Name | Activity | Pre-Class Period: October 20, 2008 to October 19, 2010 (2 years) | Class Period: October 20, 2010 to October 24, 2011 (1 year)* | Post-Class Period: After October 24, 2011** |
|---|---|---|---|---|
| HASTINGS, REED | Abnormal profitability | -71.4% | 88.1% | 51.8% |
| | Probability that such an abnormal profit could be observed due to random chance | <0.0001 | <0.0001 | 21.25% |
| MCCARTHY, WILLIAM BARRY | Abnormal profitability | -94.1% | 72.8% | |
| | Probability that such an abnormal profit could be observed due to random chance | <0.0001 | 5.87% | - |
| WELLS, DAVID B | Abnormal profitability | | 98.2% | |
| | Probability that such an abnormal profit could be observed due to random chance | - | 2.20% | 0 |
| ALL INSIDERS | Abnormal profitability | -77.1% | 87.3% | 51.8% |
| | Probability that such an abnormal profit could be observed due to random chance | <0.0001 | <0.0001 | 21.25% |

273.     As reflected in this table, based on the timing of their Class Period trades, Hastings generated average annual returns that exceeded the benchmark index by more than 88%, McCarthy's profits exceeded the benchmark by more than 72%, and Wells' profits exceeded the benchmark by more than 98%.

274.     The probability that such an abnormal profit could be observed due to random chance is small to remote.  As indicated in the table above, the calculated probability (p-value) of these abnormal profits occurring randomly at between 5.9% to less than 0.0001, and the results are therefore collectively statistically significant.

275.     In contrast, Defendants' transactions during the Control Period resulted either in insignificant profits or abnormal losses for these insiders.  Hastings' trading during the Pre-Class Period resulted in 71% abnormal loss.  For McCarthy, Pre-Class trading resulted in 94% abnormal loss.  Collectively, Defendants' trading during the Pre-Class Period resulted in an abnormal loss of 77%.  Thus, ultimately the Defendants' profitable trading during the Class Period, and unprofitable trading during the Pre-Class Period is unusual and suspicious.

276.     Neither McCarthy (who left the Company in December 2010), nor Wells, traded at all during the Post-Class Period.  During the Post-Class Period, Hastings made a single trade only.  On February 23, 2012, Hastings exercised 76,500 options at a price of $1.50 and sold these shares immediately at a price of $111.44.  Since there is only a single observation, there are a lot of large day-to-day fluctuations in subsequent daily returns.  Consequently, in comparison with these large daily fluctuations, his one-year abnormal profit of 52% does not attain statistical significance.  Thus, ultimately the Defendants' profitable trading during the Class period, and unprofitable trading during the Post-Class Period is unusual and suspicious.

277.     The timing and extent of the abnormal profits – and the contrast between the Control Period and Class Period trades – are also reflected graphically in the charts set forth below.  These charts compare trades for the Control and Class Periods for Hastings, McCarthy and Wells, individually, as well as collectively, and depict cumulative abnormal profit (or loss) on all trades occurring during each period, calculated daily for one to 250 days following the day of trade:

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                                      - 73 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14



15

16

17

18

19

20

21

22

23

24

25

26



27

28

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                    - 74 -

1
2
3
4
5
6
7
8
9
10
11
12



13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                    - 75 -

278.    As reflected in the charts above, trades during the Pre-Class Period yielded negative abnormal profits (abnormal losses) for most periods in the 250 trading days following the day of trade.   Hastings' trades during the Post-Class Period are profitable but as noted above, not statistically significant.   By contrast, trades during the Class Period generated abnormal profits, demonstrating them to be unusual and suspicious.

279.    Comparison of other Netflix insiders' transactions with the Defendants' transactions indicate that the named Defendants' transactions are correlated with those of other insiders. However, the named Defendants sold shares to a much greater extent than other insiders during the Class Period.  The trading activity by five Netflix insiders Neil Hunt (Chief Product Officer), Leslie Kilgore (Chief Marketing Officer), Ted Sarandos (Chief Content Officer), Jay Hoag (Independent Director), and Richard Barton (Independent Director) are shown in the chart below.  As this chart indicates these five other insiders sold an aggregate, annualized $30 million during the Class Period compared with aggregate, annualized sales of $21 million during the Control Period.  This finding corroborates the conclusion that all Netflix insiders expected significant stock price declines during the Class Period.  Nevertheless, the three named Defendants took much greater advantage of their expectations of price declines by selling $85 million rather than $30 million during the Class Period.



**Stock Trading by Netflix Insiders**
**Hunt, Kilgore, Sarandos, Hoag, and Barton**
*(in Millions)*

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                        - 76 -

**C.**  **Defendants' Refusals to Comply with SEC Regulation S-K Item 303 and the SEC's Express Requests for Streaming Disclosures Required by Item 303 Support a Strong Inference of Scienter**

280.     Item 303(a)(3)(ii) of Regulation S-K requires registrants to "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on sales or revenues or income from continuing operations."

281.     By the start of the Class Period, Netflix had announced a significant shift in the Company, namely that it had become "primarily a streaming company," that the Company's "core strategy" was to grow its Streaming Business, and that it was making an increased investment, quarter over quarter, into the Streaming Business.

282.     However, throughout the Class Period, Netflix failed to disclose the trend that its transformation into primarily a streaming company would materially and negatively impact gross profit, operating income and net income because Netflix's Streaming Business was significantly less profitable than Netflix's primary business for the preceding decade – its DVD-by-mail business.

283.     In addition, Netflix failed to disclose that the impact of this trend was such that Netflix could no longer afford streaming costs (for the valuable content such as included in the Starz contract) and it would have to pass those costs on to subscribers, causing Netflix to lose subscribers and thus revenue, resulting in, as one analyst put it, a "negative virtuous cycle."

284.     Defendants knew at least as early as April 2011 that their disclosures in the 2010 Form 10-K were noncompliant with Item 303.  On April 28, 2011, upon reviewing Netflix's Form 10-K, the SEC issued an SEC Comment Letter addressed to Defendant Wells, requesting  segment level disclosures.  The April 28, 2011 SEC Comment Letter to Netflix provided:

> We have reviewed your [2010 Form 10-K] and have the following comments.  ***Our comments ask you to provide us with information so we may better understand your disclosures.***
>
> ***Please respond to this letter within ten business days by confirming that you will revise your document in future filings and providing the requested information.***  If you do not believe our comments applies to your facts and circumstances, please tell us why in your response.

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                                      - 77 -

285.    In the SEC Comment Letter, the SEC asked Netflix to provide more detailed segment-related operating metric information about its various plans:

> We note from page 1, Business, that your business evolves rapidly and you passed a significant milestone with the majority of your subscribers viewing more of their TV shows and movies via streaming than by DVD and that going forward you expect to be primarily a global streaming business. ***We believe you should provide operating statistics, such as the number of subscription streaming only plans, streaming and DVD by mail plans, and DVD by mail only plans to your disclosure of selected financial data so that investors can observe and analyze such data for your most recent five years of operations.***  In addition, we believe you should consider adding to MD&A and selected financial data any other operating statistics that you believe would be useful to investors, which may include rates of churn or any other statistics that would better enable investors to understand your business.  Please revise accordingly.

286.    In response, Netflix refused to provide any additional metrics to supplement the 2010 Form 10-K.  Notably, Wells' response did not indicate the Company was without the critical metrics requested, just that Netflix would not provide them.  Netflix agreed to provide – for future filings – the number of subscribers to each plan, but failed to provide any segment-specific financial metrics which would allow investors to discern streaming's minimal profitability.[14]

287.    The SEC then noted the "significant change in direction of the company," and sought information related to known trends and/or uncertainties that might impact Netflix's operating results:

> In the Overview section, we note your core strategy to grow the streaming subscription business within the United States and globally with a focus on expanding your streaming content. ***We also note the significant change in direction of the company that occurred in fiscal 2010 through the highly material increase in investment of streaming content library assets with a corresponding decrease in investment of DVD content library assets.***  In addition, we note the new fourth quarter introduction of an unlimited streaming plan without DVD's.  It is unclear if this significant change in direction and core strategy in your business model was precipitated by a change in business trends or presumed differences in operating results between these two different business models. ***Please expand your disclosure to completely and clearly discuss the reasons, including any known uncertainties***

---

[14]    By publicly-filed letter dated May 20, 2011, Netflix listed the SEC's questions and responded to them. Defendant Wells signed the May 20, 2011 letter and acknowledged that: (i) The Company [Netflix] is responsible for the adequacy and accuracy of the disclosure in the filing; (ii) Staff comments or changes to disclosure in response to Staff comments do not foreclose the Commission from taking any action with respect to the filing; and (iii) The Company may not assert Staff comments as a defense in any proceeding initiated by the Commission or any person under the federal securities laws of the United States.

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                    - 78 -

*or trends, for this change in business model strategy as well as how you reasonably expect this change in direction will specifically impact future operating results (i.e. revenues, direct costs and gross profit) and cash flows.* Please revise accordingly.

288.     Netflix replied on May 20, 2011, advising the SEC that it would add a disclosure that the "evolution" of its "business model" did ***not*** change its expectations with respect to trends or impact to its operating results:

> We respectfully advise the staff that while we believe we have reflected the evolution of our business in our current filings, in future filings we will expand our disclosures to further explain the reasons we have chosen to focus on streaming, as well as any known uncertainties or trends resulting from our focus on streaming.
>
> In this regard, ***we intend to add the following paragraph to the end of the overview section in the MD&A:***
>
> . . . We believe that the DVD portion of our service will be a fading differentiator given the rapid growth of streaming, and that in order to prosper in streaming we must concentrate on having the best possible streaming service. As a result, we are beginning to treat them separately in many ways. ***Nonetheless, we believe that the evolution of our business model in this manner does not change, except as otherwise disclosed in this MD&A, our expectations in terms of impact or trend to our operating results. As we continue to focus on streaming, we expect to continue to grow our number of subscribers, revenues, operating income and free cash flows.*** Specifically in fiscal 2011, we expect our domestic operating margin to increase as compared to fiscal 2010.

289.     The failure to provide the information requested by the SEC in April and May 2011 allowed Defendants to hide the true state of Company affairs and demonstrates deliberate recklessness in reporting financial results, and thus, scienter.

### D.     Imputed Knowledge of Facts Critical to Core Operations

290.     Each of the Individual Defendants was a top executive involved in Netflix's daily operations and with access to all material information regarding the Company's core operations (¶¶27, 29, 31). Therefore, each of the Individual Defendants is presumed to have had knowledge of all material facts regarding Netflix's core streaming business.

291.     As stated in the Company's 2010 Form 10-K and its press release issued on October 20, 2010, at the start of the Class Period, the Defendants announced a key shift in its core operations by informing the investing public that Netflix "by every measure" was now "primarily a streaming company" and its "core strategy [was] to grow [its] streaming subscription business." The Company

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                                  - 79 -

1  also announced that in "2010, [Netflix] passed a significant milestone with the majority of [its]

2  subscribers viewing more of their TV shows and movies via streaming than by DVD."

3       292.    Following this shift in the Company's core business, Defendant Hastings made clear

4  that the Streaming Business was management's focus.  On December 8, 2010 at the Barclays

5  Conference, Defendant Hastings responded to an analyst question focused on DVD competition by

6  disclosing that "**98% of our management time is on streaming and growing streaming and 2% on**

7  **DVD**."

8       293.    Throughout the Class Period, the Individual Defendants knew that, because streaming

9  was Netflix's core business and the sustainability of this business depended on the "virtuous cycles,"

10  accurate streaming-specific operating metrics were fundamental and necessary financial measures

11  needed to gauge the Company's business and future prospects.  Given the centrality of the Streaming

12  Business to Netflix's success and the fact that management was spending 98% of its time on

13  streaming and growing streaming, the Individual Defendants knew and should have known that

14  throughout the Class Period the Streaming Business was not able to generate the profits needed to

15  sustain the virtuous cycle Defendants were so fond of touting.

16  **VII.  POST-CLASS PERIOD REVELATIONS FURTHER DEMONSTRATE**
17         **FINANCIAL RISK PRESENTED BY SHIFT FROM HIGH-PROFIT DVD**
       **TO LOW-PROFIT STREAMING**

18       294.    By the end of November 2011, Netflix required a liquidity-infusion.  On November

19  21, 2011, Netflix announced that it was infusing, in the aggregate, $400 million into the Company:

20  $200 million through a convertible debt deal, and $200 million through a secondary offering.  A

21  Janney Capital Markets analyst speculated on November 22, 2011 that this cash infusion was needed

22  in part because of the newly clarified issue of "the disparity between DVD and streaming

23  profitability."

24       295.    On January 25, 2012, Erick Schonfeld of TechCrunch.com published an online article

25  discussing the disparate profitability between the Streaming and DVD Businesses.  After breaking

26  down the contribution margins for both Streaming and DVD, as reported in Netflix's 4Q11 earnings,

27  Schonfeld emphasized that Netflix had transformed itself from a "very lucrative" business to one far

28  less so:

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC              - 80 -

Out of Netflix's total $847 million in revenues last quarter, $476 million came from streaming and $370 million came from DVD rentals (the remainder came from international).  The streaming business also [sic] twice as many subscribers: 21.7 million versus 1.2 million.  But the DVD business contributed the vast majority of Netflix's profits: $194 million versus $52 million.

*If you break that down, each streaming subscriber is worth only $2.40 in profit each quarter to Netflix, compared to $17.32 for each DVD subscriber.  The old business was very lucrative.  The new business kind of sucks*.

296.    On January 26, 2012, Bill Maurer, a contributor to *Seeking Alpha* posted an article about Netflix's year-end results entitled "Netflix Report Not As Rosy As It Seems," commenting, in part, about the disparity between the DVD and streaming profitability:

*[Netflix is] still losing DVD customers*, and that is the most profitable part of their business.  While subscription guidance was up, the revenue guidance wasn't up as much on a percentage basis. *They are going to be losing money starting in Q1 of 2012, and content costs are still rising.  Gross margins are at a six quarter low.  Content costs are increasing*, and the company also increased marketing and administrative costs in Q4.

297.    He closed the article with:

*Remember, this is a company whose DVD margins are above 50%, and streaming margins are around 10% . . . . Just remember which of those segments is growing, and which one is declining*.

298.    Three months later, on April 24, 2012, a *Los Angeles Times* article entitled "Netflix posts first net loss since 2005" reported that investors were still shaken by Netflix's move into the less profitable Streaming Business: "The fact that DVDs are more profitable but losing subscribers to the less profitable streaming business has concerned some investors."

## VIII.   LOSS CAUSATION/ECONOMIC LOSS

299.    During the Class Period, as detailed herein and in §V, Defendants made false and misleading statements and omissions of material facts concerning the disparate profitability of the Company's DVD and streaming businesses.  Defendants fraudulently concealed from investors that the transformational shift from DVD to streaming was actually having a negative effect.  The significantly less profitable nature of streaming was unable to offset soaring content costs, necessitating significant plan price increases and/or reduced content, and resulting in a lower subscriber base.  Nevertheless, Defendants touted the transformation, repeatedly assuring investors it was positioning the Company for significant subscriber and EPS growth without sacrificing margins.

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                    - 81 -

1   These materially false representations and omissions of material fact caused Netflix's stock to trade

2   at an inflated level and operated as a fraud and deceit on the Class.

3       300.    Later, when the relevant truth regarding the vastly disparate profitability of the

4   Company's DVD and Streaming Businesses was disclosed, including that the Company had not been

5   in a position to absorb the attendant costs of the shift from DVD to streaming without substantial

6   content loss, price hikes, resulting subscriber loss and eroding margins, Netflix stock fell

7   precipitously as the prior artificial inflation came out of the stock price.  As a result, Lead Plaintiffs

8   and other members of the Class suffered economic loss, *i.e.,* damages, under the federal securities

9   laws.

10      301.    On September 1, 2011, following the market close, Starz announced it was ending its

11  discussions with Netflix for the renewal of its streaming content deal and, as a result of the failed

12  negotiations, that it would be pulling its content from Netflix.  Starz had represented some of

13  Netflix's most valuable content including first run movies from Disney and Sony.

14      302.    This disclosure prompted an analyst from Wedbush to comment on September 2,

15  2011 that:

16      In the event a deal is not reached, we think that Netflix runs the risk of seeing its
        subscriber growth sharply reduced, if not stalled completely.  Netflix has become a

17      subscriber growth story, and has managed to maintain a delicate balance between its
        content quality, spending and subscriber acquisition in order to keep subscriber

18      growth high.  We think that *today's announcement* upsets that delicate balance, and
        *reveals a chink in Netflix's armor*.

19

20      303.    On September 2, 2011, Morgan Stanley reflected on the shift from investors' initial

21  "unbridled enthusiasm" for streaming to its present demonstrated weakness and the clear and present

22  need for more information:

23      Netflix has experienced *2+ years of accelerating growth, a transition to a new +
        exciting business model, and unbridled enthusiasm* by a growing set of investors.

24      We believe Netflix is now going through a new phase in which the company is
        1) seeing rising content costs, 2) increasing spend on international expansion,

25      3) approaching law of large numbers in US, and 4) the effects of a price increase.

                              *       *       *
26

27      *NFLX most likely remains weak until the company speaks again*.  With the recent
        price increase combined with the Starz saga, *investors may stay on the sidelines
28      until Netflix provides more information*.

1    304.    Morgan Keegan also noted on September 2, 2011 the revelation of "modeling

2    uncertainties" arising from the loss of the Starz Contract: "Netflix can either reallocate budget

3    toward other content or pay up for Starz.  Either scenario creates questions and numerous *modeling*

4    *uncertainties*."

5    305.    In other words, the September 1, 2011 announcement revealed that the Company's

6    transformation to streaming was in trouble.  Defendants tried to offset the impact of this news but

7    still failed to disclose that it was the disparate profitability of the Streaming Business in comparison

8    to the DVD Business, which was preventing Netflix from securing and maintaining valuable

9    streaming content.

10    306.    Upon the disclosure of this new material information, Netflix stock immediately

11    declined, ultimately falling from $233.27 on September 1, 2011 to $213.11 on September 2, 2011, a

12    decline of $20.16 per share (or 8.64%) on high volume of approximately 8 million shares.

13    307.    On September 15, 2011, Netflix issued a press release announcing an update to its

14    third quarter 2011 guidance.  While Defendants did not disclose the disparate profitability of the

15    Streaming Business in comparison to the DVD Business, they did reveal that Netflix was lowering

16    its third quarter 2011 domestic subscriber estimates, expecting to end the third quarter with 21.8

17    million domestic streaming subscribers and 14.2 million U.S. DVD subscribers, down from its prior

18    forecast of 22 million and 15 million, respectively.

19    308.    Reacting to this announcement, a September 15, 2011 analyst report from Wedbush

20    stated that it believed "that the lowered expectations *reflect a degree of customer disinterest in*

21    *streaming only* (which features improving content that is far from spectacular) and DVD only (for

22    low volume renters, Coinstar's Redbox still presents a better value option), *as well as displeasure*

23    *with Netflix's subscription plan changes, which became effective beginning on September 1*."  A

24    Dougherty & Co. analyst report from the same date also attributed the recent defections to the price

25    hikes: "The recent price hikes have led to defections in both the streaming-only and DVD customer

26    bases."

27

28

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                      - 83 -

309.     Also on September 15, 2011, Credit Suisse expressed relief that the miss was not in streaming-only, clearly still relying on prior false representations that the shift to streaming was not sacrificing operating margins:

> On 9/15, Netflix announced that it is lowering its 3Q11 domestic subscriber forecast to 24M from 25M prior, while it is maintaining its domestic and int'l financial guidance for 3Q11.
>
> . . . The lower domestic sub forecast is mainly driven by lower DVD-only subs, with streaming-only sub guidance largely intact. ***We would be more concerned if the miss was in streaming-only***, as the sub growth over the long-term will be fueled by streaming-only sub growth.
>
> *     *     *
>
> We do believe longerterm oriented investors could find good value at current levels, as we would expect domestic sub growth to return in 4Q11, ***operating margins to continue to improve*** and int'l exp'n to drive upside longer-term.

310.     Similarly, William Blair expressed continued reliance on the false premise that streaming was carrying a higher margin, when, in fact, and as was revealed just weeks later, it carried a significantly lower margin:

> ***It is clear that customers are quickly gravitating toward digital.***  The largest decrease in subscriber guidance was for DVD-only customers.  Ironically, these customers experienced a price decrease from $9.99 a month to $7.99 a month when Netflix changed its pricing structure.  Netflix only decreased its guidance of digital subscribers by 0.2 million, less than 1%. ***Because digital carries a higher margin, these are some of Netflix's better customers***, and this customer base will likely lose Starz content going forward.

311.     Defendants failed to disclose that the price hike and resulting loss in subscribers occurred largely because the contribution profit from domestic streaming was not sufficient to offset the sequential decline in DVD profits and increasing content costs.  Moreover, digital did not carry a higher margin, but rather a far lower one.  In short, the Company needed an influx of cash given the lack of profitability of its new core Streaming Business.  Defendants fraudulently concealed this from investors and to mitigate the market's reaction to this news, again assured investors that its shift to streaming would continue "growth in revenue, to license more streaming content and thereby improve our streaming service even more."  Omitted was the fact that the rapid shift to streaming resulted in ***substantially*** lower margins and ***less profit***, resulting in higher prices, less content and loss in subscribers.

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                                - 84 -

312.     Upon the disclosure of this new material information on September 15, 2011, Netflix stock collapsed $39.46 per share to close at $169.25 per share, a one-day decline of nearly 19% on extremely high volume of over 21 million shares.

313.     On October 24, 2011, after the close of the market, Netflix issued its third quarter 2011 shareholder letter in which it revealed for the first time its anticipated contribution profit broken down by segment, shocking investors who saw that the Streaming Business carried a very low contribution margin of approximately 8%, particularly compared to that of the DVD which was approximately 50%.  Also on October 24, 2011, the Company reported a net loss of 810,000 U.S. subscribers.

314.     These disclosures caused shares to decline $41.47 per share or nearly 35%, to close at $77.37 per share on October 25, 2011, *on volume that was over 45 million shares, the second highest recorded daily trading volume in Netflix history*.

315.     On October 25, 2011, analysts at Sterne Agee expressly called out investors' surprise over the disparate profitability of the DVD and streaming businesses and the "deteriorat[ing]" visibility of the Company's earnings: "*the other surprise was the disclosure that the DVD business currently generates 80%+ of the company's profits (even though it is only about 40% of revenue). Overall, visibility on the company's earnings has further deteriorated*."   An analyst at Janney Capital Markets reiterated these concerns on October 25, 2011: "The new baseline of sub metrics is troubling, *management credibility has crumbled* . . .*it[] is clearer that the DVD business accounts for the vast majority of profits*."  The Janney Capital Markets analyst added "*[w]e believe the NFLX model is unsustainable*, as the company faces rising costs that it hoped it could pass onto its subs, which appear unwilling to do so."

316.     Individually and collectively, these drops removed the inflation from Netflix's stock price, causing it to come down 74% from its Class Period high, thus resulting in significant economic loss to investors who purchased the stock during the Class Period.

## IX.    CLASS ACTION ALLEGATIONS

317.     Lead Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), consisting of all persons and entities who

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                      - 85 -

1   purchased or acquired Netflix common stock between October 20, 2010 and October 24, 2011,

2   inclusive, and who were damaged thereby (the "Class").   Excluded from the Class are:

3   (a) Defendants; (b) members of the immediate families of the Individual Defendants; (c) the

4   subsidiaries and affiliates of Defendants; (d) any person who is an officer, director or controlling

5   person of Netflix; (e) any entity in which any Defendant has a controlling interest; (f) Defendants'

6   directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and

7   (g) the legal representatives, heirs, successors or assigns of any such excluded party.

8       318.   The members of the Class are so numerous that joinder of all members is

9   impracticable.  Throughout the Class Period, Netflix stock was actively traded on the NASDAQ.

10  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be

11  ascertained through appropriate discovery, Lead Plaintiffs believe that there are thousands of

12  members in the proposed Class.  Record owners and other members of the Class may be identified

13  from records maintained by Netflix or its transfer agent and may be notified of the pendency of this

14  action by mail, using a form of notice similar to that customarily used in securities class actions.

15      319.   Lead Plaintiffs' claims are typical of the claims of the members of the Class as all

16  members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal

17  law complained of herein.

18      320.   Lead Plaintiffs will fairly and adequately protect the interests of the members of the

19  Class and have retained counsel competent and experienced in class and securities litigation.  Lead

20  Plaintiffs have no interests that are adverse or antagonistic to the Class.

21      321.   Common questions of law and fact exist as to all members of the Class and

22  predominate over any questions solely affecting individual members of the Class.  Among the

23  questions of law and fact common to the Class are:

24          (a)     Whether the federal securities laws were violated by Defendants' acts as

25  alleged herein;

26          (b)     Whether the SEC filings, press releases, reports and other public statements

27  disseminated to Netflix's investors during the Class Period contained material misstatements or

28  omitted to state material information;

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                      - 86 -

1    (c)  Whether and to what extent the market price of the Company's common stock

2 was artificially inflated during the Class Period due to the non-disclosures and/or misrepresentations

3 complained of herein;

4    (d)  Whether Defendants acted with scienter;

5    (e)  Whether reliance may be presumed pursuant to the fraud-on-the-market

6 doctrine; and

7    (f)  Whether the members of the Class have sustained damages as a result of the

8 misconduct complained of herein, and, if so, the proper measure thereof.

9  322.  A class action is superior to all other available methods for the fair and efficient

10 adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

11 damages suffered by individual Class members may be relatively small, the expense and burden of

12 individual litigation make it impossible for members of the Class to individually redress the wrongs

13 done to them.  There will be no difficulty in the management of this case as a class action.

14 **X. LEAD PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE**

15

16  323.  Lead Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute v. United*

17 *States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are primarily

18 predicated upon omissions of material fact which there was a duty to disclose.

19  324.  In the alternative, Lead Plaintiffs are entitled to a presumption of reliance under the

20 fraud on the market doctrine on Defendants' material misrepresentations and omissions for the

21 following reasons:

22  •  Netflix's common stock was actively traded in an efficient market on NASDAQ during the Class Period;

23  •  As a regulated issuer, Netflix filed periodic public reports with the SEC;

24  •  Netflix regularly communicated with public investors via established market
25    communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public
26    disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

27  •  The market reacted promptly to public information disseminated by Netflix;

28

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC    - 87 -

1
2
3
4
5

- Netflix was covered by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace; and

- Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased Netflix stock between the time Defendants misrepresented or failed to disclose material facts and the time true facts were disclosed.

6      325.    In addition to the foregoing, Lead Plaintiffs are entitled to a presumption of reliance

7  because, as more fully alleged above, Defendants failed to disclose material information regarding

8  Netflix's segment and subscription information throughout the Class Period.

9  **XI.     THE SAFE HARBOR PROVISION IS INAPPLICABLE**

10      326.    The statutory safe harbor provided for forward-looking statements under certain

11  circumstances does not apply to the allegedly false statements pled in this Complaint.  The

12  statements alleged to be false and misleading herein all relate to then-existing facts and

13  circumstances.  To the extent certain of the statements alleged to be false and misleading may be

14  characterized as forward-looking, they were not adequately identified as "forward-looking"

15  statements when made, and were not accompanied by meaningful cautionary statements identifying

16  important factors that could cause actual results to differ materially from those in the purportedly

17  forward-looking statements.  Alternatively, to the extent that the statutory safe harbor is intended to

18  apply to any forward-looking statements pled herein, Defendants are liable for those false and

19  misleading forward-looking statements because at the time each of those forward-looking statements

20  was made, the particular speaker knew that the particular forward-looking statement was false and

21  misleading, and/or the forward-looking statement was authorized and/or approved by an executive

22  officer of Netflix who knew that those statements were false and misleading when made.

23      327.    In particular, Netflix is not entitled to safe harbor based on its warning that loss

24  of/insufficient growth of subscribers would adversely affect its business.  Netflix warned in its 2010

25  Form 10-K:

26          We must continually add new subscribers both to replace subscribers who cancel and
           to grow our business beyond our current subscriber base.  If too many of our
27          subscribers cancel our service, or if we are unable to attract new subscribers in
           numbers sufficient to grow our business, our operating results will be adversely
28          affected.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                                     - 88 -

1   This warning is insufficiently specific in that it fails to mention specifically streaming or the

2   Company's reliance on its DVD business for profitability, and is not meaningful in light of

3   Defendants' contemporaneous knowledge of the disparate profitability of streaming and the

4   Company's reliance on continued DVD subscribership for profitability.

5       328.    The following warning regarding fixed content licensing costs is likewise insufficient:

6       We believe that any failure to secure content will manifest in lower subscriber
        acquisition and retention and not in materially reduced margins. Nonetheless, given

7       the multiple-year duration and largely fixed nature of content licenses, if we do not
        experience subscriber acquisition and retention as forecasted, our margins may be

8       impacted by these fixed content licensing costs.

9   Not only does this warning fail to address specifically the Company's reliance on DVD profitability

10  because of streaming's lack of profitability, but also is not meaningful in light of Defendants'

11  contemporaneous knowledge of the disparate profitability of streaming and the Company's reliance

12  on continued DVD subscribership for profitability.  Further, when Netflix revealed on October 24,

13  2011 that streaming was projected to have an 8% contribution margin in Q4 2011, Netflix attributed

14  streaming's low profitability to "increased streaming content spend," not "fixed content licensing

15  costs."

16      329.    Hastings' statement during the December 8, 2010 Barclays Conference that it was

17  "unclear" the growth of streaming subscribership would saturate was not meaningful in light of

18  Defendants' contemporaneous knowledge of the disparate profitability of streaming and the

19  Company's reliance on continued DVD subscribership for profitability.  Hastings' statement was

20  also insufficiently specific in that it does not address the disparate profitability of steaming compared

21  to the DVD business.

22  **XII.    CAUSES OF ACTION**

23              **FIRST CAUSE OF ACTION**

24      **For Violation of Section 10(b) of the Exchange Act and
        Rule 10b-5(a), (b) and (c) Promulgated Thereunder**

25              **Against All Defendants**

26      330.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if

27  fully set forth herein.

28

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                    - 89 -

331.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Netflix common stock; and (iii) cause Lead Plaintiffs and other Class members to purchase Netflix common stock at artificially inflated prices.

332.    In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.  Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Netflix's common stock in violation of §10(b) of the Exchange Act and SEC Rule 10b-5.  All of the Individual Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

333.    Defendants, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's segment and subscriber information, and Netflix's reporting and accounting thereof.

334.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Netflix's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Netflix and its segment and subscriber information in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Netflix common stock during the Class Period.

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                        - 90 -

335.     Defendants Hastings, Wells and McCarthy's primary liability, and controlling person liability, arises from the following facts: (i) they were each senior executives and/or directors during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a high-level executive and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's segment and subscriber information, finances and operations at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

336.     Hastings signed and certified Netflix's false and misleading Form 10-K for fiscal 2010, as well as its false and misleading Forms 10-Q for the quarterly periods ending September 30, 2010, March 31, 2011 and June 30, 2011.  Hastings also made false and misleading statements on Netflix Earnings Calls on October 20, 2010, January 26, 2011, April 25, 2011, July 25, 2011 and during an investor conference on December 8, 2010.  Further, Hastings made false and misleading statements in the July 25, 2011 Earnings Call and in the October 20, 2010 Form 8-K and in a December 20, 2010 article appearing in an online blog, *Seeking Alpha*.

337.     McCarthy signed and certified Netflix's false and misleading Form 10-Q for the quarterly period ending September 30, 2010.  McCarthy also signed Netflix's false and misleading Form 8-K dated October 20, 2010.  McCarthy also made false and misleading statements and material omissions on an Earnings Call on October 20, 2010 and during an investor conference on December 8, 2010.

338.     Wells signed and certified Netflix's false and misleading Form 10-K for fiscal 2010, as well as its false and misleading Forms 10-Q for the quarterly periods ending March 31, 2011 and June 30, 2011.  In addition, Wells signed Netflix's materially false and misleading Forms 8-K dated January 26, 2011, April 25, 2011, July 25, 2011, September 15, 2011 and October 24, 2011.  Wells

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                      - 91 -

1   also made false and misleading statements on the September 11, 2011 Goldman Sachs

2   Communicopia Conference Call.

3        339.   In addition to the duties of full disclosure imposed on Defendants as a result of

4   making affirmative statements and reports, or participation in the making of affirmative statements

5   and reports to the investing public, they had a duty to promptly disseminate truthful information that

6   would be material to investors, including truthful, complete and accurate information with respect to

7   the Company's operations and performance so that the market prices of the common stock would be

8   based on truthful, complete and accurate information.

9        340.   Defendants had actual knowledge of the misrepresentations and omissions of material

10  facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and

11  to disclose such facts, even though such facts were available to them.   Defendants' material

12  misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and

13  effect of concealing Netflix's true financial condition from the investing public, hiring and retaining

14  key personnel, and supporting the artificially inflated price of its common stock.   As demonstrated

15  by Defendants' misstatements and omissions about the likely profitability of the streaming business,

16  Netflix and the Individual Defendants, if they did not have actual knowledge of the

17  misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by

18  deliberately refraining from taking those steps necessary to discover whether those statements were

19  false or misleading.

20       341.   As a result of the dissemination of the materially false and misleading information

21  and failure to disclose material facts, as set forth above, the market price of Netflix's common stock

22  was artificially inflated during the Class Period.   Unaware that the market prices of Netflix's

23  common stock were artificially inflated, and relying directly or indirectly on the false and misleading

24  statements made by Defendants, or upon the integrity of the market in which the common stock

25  trades, and/or on the absence of material adverse information that was known to or recklessly

26  disregarded by Defendants but not disclosed in public statements by Netflix during the Class Period,

27  Lead Plaintiffs and the other members of the Class purchased or otherwise acquired Netflix common

28  stock during the Class Period at artificially high prices and were damaged thereby.

342.   At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class were unaware of their falsity, and believed them to be true.  Had Lead Plaintiffs and the other members of the Class and the marketplace known the truth regarding Netflix's Streaming and DVD Business and related profitability information, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their common stock, or, if they had acquired such stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

343.   By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5(a), (b) and (c) promulgated thereunder.

344.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## SECOND CAUSE OF ACTION

### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

345.   Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

346.   Defendants Hastings, Wells and McCarthy acted as controlling persons of Netflix within the meaning of §20(a) of the Exchange Act as alleged herein.[15]  By virtue of their high-level positions, and their ownership and contractual rights, substantial participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, these Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which

---

[15]   With respect to Defendant McCarthy, Lead Plaintiffs allege that he was a controlling person from the start of the Class Period through his resignation on December 10, 2010.  With respect to Defendant Wells, Lead Plaintiffs allege that he was controlling person from the time he was appointed as CFO, December 10, 2010, through the end of the Class Period.  Defendant Hastings was a controlling person at all times throughout the Class Period.

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                         - 93 -

1   Lead Plaintiffs contend are false and misleading.  These Individual Defendants were provided with

2   or had unlimited access to copies of the Company's reports, press releases, public filings and other

3   statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements

4   were issued and had the ability to prevent the issuance of the statements or cause the statements to be

5   corrected.

6        347.   In particular, Hastings, Wells and McCarthy each had direct and supervisory

7   involvement in the day-to-day operations of the Company, particularly with respect to its Streaming

8   and DVD Businesses and related profitability information, and, therefore, are presumed to have had

9   the power to control or influence the particular transactions giving rise to the securities violations

10   alleged herein, and exercised the same.

11        348.   As set forth above, Netflix and the Individual Defendants each violated §10(b) and

12   Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as

13   controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As

14   a direct and proximate result of Netflix's wrongful conduct, Lead Plaintiffs and other members of

15   the Class suffered damages in connection with their purchases of the Company's common stock

16   during the Class Period.

17                  **THIRD CAUSE OF ACTION**

18          **For Violation of Section 20A of the Exchange Act**
              **on Behalf of Lead Plaintiffs**

19               **Against Defendant Hastings**

20        349.   Lead Plaintiffs repeat and reallege each and every allegation contained above as if

21   fully set forth herein.

22        350.   This claim is asserted against Defendant Hastings and is brought on behalf of Lead

23   Plaintiffs and members of the Class who purchased Netflix common stock contemporaneously with

24   when Defendant Hastings sold Netflix common stock at inflated prices during the Class Period.

25        351.   On March 10, 2011 and August 25, 2011, Arkansas Teacher purchased 1,440 shares

26   and 2,510 shares of Netflix common stock.  On each of those same dates, while in possession of

27   material, adverse nonpublic information, Defendant Hastings sold 5,000 shares of Netflix common

28   stock.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC         

352.   On March 24, 2011, September 15, 2011, and September 22, 2011, State-Boston purchased 500 shares, 900 shares, and 2,300 shares, respectively.   On each of those same dates, while in possession of material, adverse nonpublic information, Defendant Hastings sold 5,000 shares of Netflix common stock.

353.   On other dates contemporaneous with those specified in the attached Certifications for Lead Plaintiffs, while in possession of material, adverse nonpublic information, Defendant Hastings sold shares of Netflix common stock.

354.   Defendant Hastings violated §10(b) of the Exchange Act, as described herein.

355.   As a result of the foregoing, Defendant Hastings violated §20A of the Exchange Act and is liable to Lead Plaintiffs and other Class members who purchased shares of Netflix common stock contemporaneously with Defendant Hastings's insider sales, who seek disgorgement of Hastings' profits (or losses avoided) from his transactions in Netflix securities on the dates referenced above.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A.   Determining that this action is a proper class action and certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.   Awarding compensatory damages in favor of Lead Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.   Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.   Such other and further relief as the Court may deem just and proper.

824461_1

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                          - 95 -

1

## JURY TRIAL DEMAND

2     Lead Plaintiffs hereby demand a trial by jury of all issues so triable.

3  DATED: March 22, 2013

4  LABATON SUCHAROW LLP                    ROBBINS GELLER RUDMAN
   JONATHAN M. PLASSE                          & DOWD LLP
5  STEPHEN W. TOUNTAS                       SHAWN A. WILLIAMS
   SERENA HALLOWELL                         AELISH M. BAIG
6                                           EKATERINI M. POLYCHRONOPOULOS

7
         s/ Stephen W. Tountas                        s/ Aelish M. Baig
8        STEPHEN W. TOUNTAS                            AELISH M. BAIG

9  140 Broadway, 34th Floor                Post Montgomery Center
   New York, NY  10005                     One Montgomery Street, Suite 1800
10 Telephone: 212/907-0700                 San Francisco, CA  94104
   212/818-0477 (fax)                      Telephone: 415/288-4545
11                                         415/288-4534 (fax)

12 Lead Counsel for Lead Plaintiffs and the    Of Counsel for Lead Plaintiffs and the Class
   Class
13
                                           ROBBINS GELLER RUDMAN
14                                             & DOWD LLP
                                           JONAH H. GOLDSTEIN
15                                         ERIC I. NIEHAUS
                                           MATTHEW I. ALPERT
16                                         655 West Broadway, Suite 1900
                                           San Diego, CA  92101
17                                         Telephone: 619/231-1058
                                           619/231-7423 (fax)
18
                                           Of Counsel for Lead Plaintiffs and the Class
19
                                           ZELLE HOFMANN VOELBEL
20                                             & MASON LLP
                                           JIANGXIAO ATHENA HOU
21                                         44 Montgomery Street, Suite 3400
                                           San Francisco, CA  94104
22                                         Telephone: 415/693-0700
                                           415/693-0770 (fax)
23
                                           Local Counsel for Lead Plaintiffs and the
24                                         Class

25

26

27

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS - 3:12-cv-00225-SC                                    - 96 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 22, 2013, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 22, 2013.

_____
s/ Aelish M. Baig
AELISH M. BAIG

ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail: abaig@rgrdlaw.com

## Mailing Information for a Case 3:12-cv-00225-SC

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Aelish Marie Baig**
  abaig@rgrdlaw.com,AelishB@rgrdlaw.com,khuang@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Stephen R. Basser**
  sbasser@barrack.com,lnapoleon@barrack.com,cfessia@barrack.com

- **Eric J. Belfi**
  ebelfi@labaton.com,ElectronicCaseFiling@labaton.com

- **Keith E. Eggleton**
  keggleton@wsgr.com

- **Frank J. Fish**
  jpikler@schubertlawfirm.com

- **Lionel Z. Glancy**
  info@glancylaw.com,lboyarsky@glancylaw.com,lglancy@glancylaw.com

- **Michael M. Goldberg**
  mmgoldberg@glancylaw.com,csadler@glancylaw.com,info@glancylaw.com,rprongay@glancylaw.com

- **Serena Hallowell**
  shallowell@labaton.com

- **Robert I. Harwood**
  rharwood@hfesq.com

- **Jiangxiao Athena Hou**
  ahou@zelle.com,rnewman@zelle.com

- **Matthew M. Houston**
  mhouston@hfesq.com

- **Willem F. Jonckheer**
  wjonckheer@schubertlawfirm.com,jzaneri@schubertlawfirm.com

- **Kimberly Kalmanson**
  kkalmanson@labaton.com,electroniccasefiling@labaton.com

- **Christopher J. Keller**
  ckeller@labaton.com

- **Mark P. Kindall**
  firm@izardnobel.com,mkindall@izardnobel.com

- **Mark I. Labaton**
  mlabaton@motleyrice.com,pgioittazimmer@motleyrice.com,kmontenegro@motleyrice.com

- **Luke Anthony Liss**
  lliss@wsgr.com

- **Jeffrey M. Norton**
  jnorton@nfllp.com

- **Brian O. O'Mara**
  bo'mara@csgrr.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Vincent Ian Parrett**
  vparrett@motleyrice.com,kweil@pacernotice.com,MRECF@motleyrice.com

- **Jason A. Pikler**
  jpikler@schubertlawfirm.com

- **Jonathan M. Plasse**
  jplasse@labaton.com,electroniccasefiling@labaton.com

- **Ekaterini Maria Polychronopoulos**
  kpolychronopoulos@rgrdlaw.com

- **Rosemary M. Rivas**
  rrivas@finkelsteinthompson.com,tgottschlich@zlk.com,nporritt@zlk.com,dstoumbos@finkelsteinthompson.com,arivas@finkelsteinthompson.com,cfinley@

- **Darren Jay Robbins**

e_file_sd@rgrdlaw.com

- **Robert C. Schubert**
  rschubert@schubertlawfirm.com

- **Michael Walter Stocker**
  mstocker@labaton.com,ElectronicCaseFiling@labaton.com

- **Rodney Grant Strickland , Jr**
  rstrickland@wsgr.com,llow@wsgr.com,lkoontz@wsgr.com

- **Stephen W. Tountas**
  stountas@labaton.com,ElectronicCaseFiling@labaton.com

- **David Conrad Walton**
  davew@rgrdlaw.com

- **Samuel M. Ward**
  sward@barrack.com,lxlamb@barrack.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,khuang@rgrdlaw.com,e_file_sd@rgrdlaw.com,tcraig@rgrdlaw.com,e_file_sf@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Matthew         I. Alpert
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

Boris           Feldman
Wilson Sonsini Goodrich & Rosati
A  Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050

Jonah           H. Goldstein
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 292101

Eric            I. Niehaus
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

Jonathan        M. Plasse
Labaton Sucharow LLP
140 Broadway
New York, NY 10005
```