United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

In re NETFLIX, INC., SECURITIES          )  Case No. 12-00225 SC
LITIGATION                               )
                                         )  ORDER GRANTING MOTION TO
                                         )  <u>DISMISS</u>
                                         )

## I.  <u>INTRODUCTION</u>

Plaintiffs Arkansas Teacher Retirement System and State-Boston Retirement System ("Plaintiffs") bring this putative securities class action against Netflix, Inc. ("Netflix"); Netflix Co-Founder, Chairman of the Board, and CEO Reed Hastings ("Hastings"); current Netflix CFO David Wells ("Wells"); and Barry McCarthy ("McCarthy"), Netflix's CFO until December 10, 2010 (collectively "Defendants").

Now before the Court is Defendants' Motion to Dismiss Plaintiffs' First Amended Consolidated Class Action Complaint. ECF Nos. 105 ("FAC"), 108 ("Mot"). The motion is fully briefed, ECF Nos. 110 ("Opp'n"), 111 ("Reply"), and is suitable for determination without oral argument, Civ. L.R. 7-1(b). For the reasons set forth below, the Court GRANTS Defendants' Motion to Dismiss and DISMISSES the CCAC with prejudice.

///

///

**II.   BACKGROUND**

    **A.   Factual Overview**

    Netflix is a public corporation that purports to be the leading Internet subscription service for viewing movies and television shows (collectively "movies").  FAC ¶ 3.  Netflix currently allows consumers to watch movies either by streaming them over the Internet directly to their televisions, computers, or mobile devices, or by receiving DVDs sent to their homes.  Id.

    Netflix provided no streaming services -- only DVDs by mail -- from 1999 to 2007.  Id. ¶¶ 38-49.  In 2007 Netflix began to allow its subscribers to stream movies via the "hybrid plan," the only plan it offered at the time, which allowed subscribers both to stream movies and to receive DVDs.  Id. ¶ 41.

    In November 2010, as part of its plan to develop its streaming services further, Netflix decided to offer its subscribers a standalone streaming plan in addition to the hybrid plan.  Id. ¶ 57.  The hybrid plan cost $9.99 per month, and the new streaming-only plan cost $7.99 per month.  Id.  Shortly before this change, in October 2010, Defendants explained that the expansion of Netflix's streaming business would depend partly on its continually adding customers who wanted streaming content.  Id. ¶¶ 51-52.  Those customers' subscription payments would fuel the acquisition of more streaming content, attracting still more streaming-focused customers.  Id.  Netflix also planned to offset some of the increasing content costs by decreasing DVD-related expenditures.  See id. ¶¶ 51-53.  Netflix's increasing focus on streaming was partly driven by its conclusion that more people were joining Netflix and subscribing to the hybrid plan to use streaming, but

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    not renting any DVDs.  Id.

2         During the Class Period, Netflix's subscriber count steadily

3    increased each quarter.  Id. ¶ 54; cf. 199-200.  Its stock price

4    followed suit, rising from a closing price of $153.15 on October

5    20, 2010 to a high of $298.73 on July 13, 2011.  Id. ¶¶ 12, 55, 64.

6    On July 12, 2011, however, Netflix announced that effective

7    September 1, 2011 for existing subscribers and immediately for new

8    ones, it would no longer offer its hybrid plan.  Id. ¶ 122.

9    Instead, it would offer separate DVD-only and streaming-only plans,

10   both for $7.99 per month.  Id.  Subscribers who previously had

11   access to both DVD and streaming services for $9.99 per month under

12   the hybrid plan would now have to pay $15.98 to subscribe to the

13   new, separate plans.  Id.  Netflix's subscribers were unhappy, and

14   Netflix experienced a net loss in customers for the first time in

15   years.  See id. ¶ 143.

16        Netflix's fortunes fell further in September 2011.  First, on

17   September 2, the cable channel Starz announced that it would not

18   renew its streaming contract with Netflix effective February 28,

19   2012.  Id. ¶ 129.

20        Second, on September 15, Netflix reported that it expected to

21   lose one million subscribers during the third quarter of 2011 --

22   the first quarter in years that would close with a net loss in

23   subscribers.  Id. ¶¶ 136, 199-200.  After the announcement,

24   Netflix's stock price dropped by $39.46 to close at $169.25.  Id.

25   ¶¶ 136-37.  Nevertheless, Netflix stood behind its decision as "the

26   right choice."  Id. ¶ 380.

27        Third, on September 19, 2011, Netflix announced that it

28   planned to spin off its DVD services into a new subsidiary called

3

United States District Court
For the Northern District of California

1   "Qwikster."  Id. ¶ 125.  Netflix planned to continue to provide

2   streaming services via its own subscription plans and website,

3   separately from the Qwikster subsidiary.  Id.  Netflix's customers

4   again recoiled from this change, and Netflix lost still more

5   subscribers.  See id. ¶¶ 136-37; see also Def.'s RJN Ex. 3, at 15.[1]

6   Netflix soon abandoned the Qwikster idea, but continued its planned

7   separation of the DVD-only and streaming-only plans, thereby doing

8   away with the hybrid plan altogether.  See FAC ¶¶ 122, 127.

9       Shortly thereafter, on October 24, 2011, in documents related

10  to the fourth quarter of 2011 ("4Q11"), Netflix began to report

11  discrete financial information for the now-entirely-separate DVD-

12  only and streaming-only plans -- information that had previously

13  been unavailable.  Id. ¶ 141.  In its 4Q11 reports, Netflix

14  announced that its "contribution margin for domestic streaming

15  [would] be low in 4Q11 at around 8% . . . due to [its] increasing

16  content spend," whereas Netflix's DVD business had a contribution

17  profit of 50-52%.  Id. ¶ 142.  Netflix continued to stand by its

18  decision to offer the DVD and streaming subscription plans as

19  separate services with separate prices, but admitted that it had

20  made the change too quickly, compounding the problem "with [a] lack

21  of explanation about the rising cost of the expansion of streaming

22

23  _____

24  [1] When ruling on a motion to dismiss, a court may consider documents
    whose contents are incorporated by reference in a complaint or upon

25  which a complaint necessarily relies when authenticity is not
    contested, and matters subject to judicial notice.  Metzler Inv.

26  GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1061 (9th Cir.
    2008) (citing Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551

27  U.S. 308, 322 (2007)).  The Court grants the parties' requests for
    judicial notice since the relevant documents are incorporated by

28  reference into Plaintiffs' FAC.  ECF No. 92 ("Def.'s RJN").

content, and steady DVD costs." Id. ¶ 210.  Netflix also stated that more long-term members canceled their subscriptions in response to the pricing changes than expected, thereby making Netflix's 4Q11 profits and revenues lower than predicted, though Netflix would remain profitable overall.  Id.  After this announcement, Netflix's stock price fell $41.47 per share to close at $77.37 per share on October 25, 2011.  Id. ¶ 211.

Plaintiffs, Netflix shareholders, now sue Defendants for alleged violations of the federal securities laws.  Their claims are all based on the theory that, between October 20, 2010 and October 24, 2011 (the "Class Period"), Defendants misled investors about the prospects of the new streaming-focused model, thereby artificially inflating Netflix's stock price and leading to a stock drop of almost 67 percent after the alleged falsity of those statements was revealed.

Plaintiffs allege that all Defendants violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities Exchange Commission ("SEC") Rule 10b-5; that the individual Defendants violated Section 20(a) of the Act; and that Hastings violated Section 20A of the Act.  Id. ¶¶ 330-55.

**B.   Procedural Summary**

The previous pleading in this case, Plaintiffs' Consolidated Class Action Complaint, was the subject of a motion to dismiss decided on February 13, 2013.  ECF Nos. 89 ("CCAC"), 102 ("Order").  The CCAC asserted the same causes of action as the FAC, though Plaintiffs' underlying theories then were based on their allegations that Defendants made false and misleading statements about: (1) Netflix's accounting practices, which Plaintiffs

asserted were in violation of Generally Accepted Accounting Principles ("GAAP") and SEC disclosure rules; (2) the virtuous cycle, which was Netflix's name for its business model of acquiring streaming content and consequently increasing and retaining streaming-focused customers; (3) streaming's profitability relative to that of the DVD business; (4) Netflix's pricing changes; and (5) disclosures to the SEC.

The Court dismissed Plaintiffs' CCAC because it found that (1) Plaintiffs' accounting arguments were not plausible; (2) Defendants' statements about the virtuous cycle were not false or misleading; (3) Defendants did not mislead their customers about streaming's profitability; (4) none of Defendants' statements about the pricing changes were false or misleading; and (5) Defendants' correspondence with the SEC was not actionable. The Court gave Plaintiffs leave to amend their complaint to plead new facts supporting their allegation that Defendants made false or misleading statements during the Class Period. Plaintiffs filed the FAC on March 22, 2013, and the motion at bar ensued.

**III.    LEGAL STANDARDS**

    **A.    Motion to Dismiss**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988). "When there are well-pleaded factual allegations, a court

should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  A court's review is generally "limited to the complaint, materials incorporated into the complaint by reference, and matters of which the court may take judicial notice." Metzler, 540 F.3d at 1061 (citing Tellabs, 551 U.S. at 322).

### B.   Section 10(b)

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe . . . ." 15 U.S.C. § 78j(b).  One such rule prescribed by the Commission is Rule 10b-5, which states that "[i]t shall be unlawful for any person . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(c).  Plaintiffs must plead five elements to establish a violation of Rule 10b-5: "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction

United States District Court
For the Northern District of California

1  and loss causation, and (5) economic loss."[2]  <u>In re Daou Sys.</u>, 411

2  F.3d 1006, 1014 (9th Cir. 2005).

3      Plaintiffs must also meet the heightened pleading standards of

4  Federal Rule of Civil Procedure 9(b) and the Private Securities

5  Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4.  The

6  PSLRA requires plaintiffs to "specify each statement alleged to

7  have been misleading [and] the reason or reasons why the statement

8  is misleading."  15 U.S.C. § 78u-4(b)(1).  Additionally, the

9  complaint must "state with particularity facts giving rise to a

10 strong inference that the defendant acted with the required state

11 of mind."  <u>Id.</u> § 78u-4(b)(2).  The "required state of mind" for

12 establishing securities fraud is the knowing, intentional, or

13 deliberately reckless disclosure of false or misleading statements.

14 <u>See</u> <u>Daou</u>, 411 F.3d at 1014-15.  "The stricter standard for pleading

15 scienter naturally results in a stricter standard for pleading

16 falsity, because falsity and scienter in private securities fraud

17 cases are generally strongly inferred from the same set of facts,

18 and the two requirements may be combined into a unitary inquiry

19 under the PSLRA."  <u>Id.</u> at 1015 (internal quotation marks omitted).

20

21 **IV.   <u>DISCUSSION</u>**

22     **A.   <u>Plaintiffs' Section 10(b) Claim</u>**

23     Plaintiffs' theory of Defendants' liability is essentially

24 that Defendants knew streaming would be relatively less profitable

25 than DVD offerings, but decided to tell the public that Netflix's

26

27 ───────────────
   [2]   The Court need not reach the issue of scienter, because the
28 Court finds Plaintiffs' claims about false or misleading statements
   to be implausible.

shift to streaming would be a good thing for the company.  <u>See</u>
Opp'n at 11-17.  Plaintiffs allege that throughout the Class
Period, Defendants sold stock at prices their own statements
artificially inflated, despite knowing that the truth would sink
the company's stock price.  <u>Id.</u>  According to Plaintiffs,
Defendants' statements and omissions led to Netflix's stock crash
after the disparate contribution margins of DVD and streaming
became public in October 2011.  <u>See</u> Opp'n at 6.

Defendants argue that they were never required to disclose any
information about streaming's profitability before they actually
did so; that they never made any affirmative statements about the
profitability of streaming; that they disclosed the risks of their
business's focus on streaming; and that Defendants had no knowledge
that contradicted what they told the public.  <u>See</u> MTD at 1-3.

The same cases the Court discussed in its previous Order,
namely <u>Matrixx Initiatives, Inc. v. Siricusano</u>, 131 S. Ct. 1309,
1321-22 (2011), and <u>Brody v. Transitional Hospitals Corp.</u>, 280 F.3d
997, 1006 (9th Cir. 2002), control here.  <u>Matrixx</u> and <u>Brody</u>
establish the rules that companies can control what they disclose
publicly, and that Section 10(b) and Rule 10b-5(b) do not create
affirmative duties to disclose "any and all material information":
they need only disclose what is necessary to render statements, in
the light of the circumstances under which they were made, not
misleading.  <u>Matrixx</u>, 131 S. Ct. at 1321-22.  This is a context-
sensitive rule, and the additional case Plaintiffs now cite, <u>Berson</u>
<u>v. Applied Signal Technology, Inc.</u>, 527 F.3d 982, 986-87 (9th Cir.
2008), did not change that.

Berson concerned a defendant company that had specifically

United States District Court
For the Northern District of California

touted its backlog of anticipated revenues from uncompleted but
still-extant contracts.  See id.  The company did not disclose that
some of those backlogged contracts were, at the time defendant made
its disclosures, subject to stop-work orders that would not result
in any value for the company.  Id.  The truth was therefore very
different from what the defendant had led its investors to believe:
the defendant touted its backlogged contracts as a source of value,
when in fact those contracts were valueless.  Id.  Since the
defendant touted those contracts anyway, it had a duty to disclose
the truth about the stop-work orders even though it could have
avoided such a duty by refusing to mention either the backlogs or
the stop-work orders.  Id. at 987.

Berson is inapposite.  Plaintiffs' argument is essentially
that as soon as Netflix began to discuss its focus on streaming, it
had a duty to disclose all manner of information about streaming's
margins relative to DVD's, even if that information simply did not
exist.  See Opp'n at 14-15.  But this takes Berson too far.  Berson
concerned a discrete statement that hid the truth behind what the
defendants had said.  See 527 F.3d at 987.

In this case, as explained more fully below, Plaintiffs fail
to plead that Defendants made such a statement.  The closest they
come is to allege that Defendants discussed the risks of their
shift to streaming in context of many other factors, including
overall margins, and Berson specifically treats these kinds of
candid statements of risk differently from companies' boasts about
certainties.  527 F.3d at 987 ("[One type of statement] indicates a
risk, the other a certainty.  It goes without saying that investors
would treat the two differently.").  Moreover, Berson's rule on

discrete statements does not map to a factual situation in which plaintiffs have not shown -- as discussed below -- that defendants possess actual knowledge that a statement was false.  Berson accordingly does not change the general rules the Court must apply in cases like this one.

To prove that Defendants' statements were false and misleading, Plaintiffs have to show that Defendants both knew of streaming's disparate profitability as compared to DVD's and had a duty to disclose that in tandem with the public statements that Plaintiffs cite.  See Matrixx, 131 S. Ct. at 1321.  Plaintiffs must also plausibly allege that Defendants' statements would have been misleading to a reasonable investor, either on their own or as a result of an omission.  See id. at 1322-23.  The Court addresses Plaintiffs' new pleadings first, then considers the pleadings that are essentially unchanged from the CCAC.

All of Plaintiffs' substantive allegations of falsity are based on their contentions that Defendants misrepresented or failed to disclose these general facts: "(i) the shift to streaming presented significant financial challenges to Netflix because it was far more expensive and far less profitable than DVD; (ii) streaming's relative profitability as compared to DVD was minimal; [] (iii) the soaring costs of the Streaming Business were not offset by the decreased costs of mailing in the DVD Business"; and (iv) giving "the impression that streaming is consistent with a 30-35% contribution margin, when, as later revealed, it was only at 8%."  FAC ¶¶ 153-56, 160-61, 164-65, 168-70, 176-79, 183-86, 188-92.
///

**United States District Court**
For the Northern District of California

1        **1.   Plaintiffs' New Allegations**

2        As noted above, Plaintiffs' FAC is almost the same as their

3   CCAC.  Plaintiffs cite three new statements from Defendants or

4   their agents, and expand on several more statements.  All of these

5   statements concern Defendants' alleged knowledge of the truth about

6   Netflix's streaming component's profitability and effect on

7   Netflix's margins.  Plaintiffs also add a new Confidential Witness,

8   "CW3," who discusses the same matter.

9        June 2, 2011 Statement: Plaintiffs quote part of a Nomura

10  Securities US Media Summit Call, on which Netflix was allegedly

11  represented by non-defendant Ted Sarandos.  FAC ¶ 185.  Mr.

12  Sarandos answered an analyst's questions about what has changed to

13  increase Netflix's flow of content, what the biggest changes in

14  physical rental were, and what the biggest changes or drop-offs in

15  terms of usage were.  Id.  Mr. Sarandos said that (1) Hollywood did

16  not run its business with Netflix's mentality, which is "willing to

17  kill our existing business to move on to the next one"; (2) people

18  were mostly joining Netflix for streaming, so Netflix had been

19  focusing on streaming while DVD ran "calmly on its own"; and (3)

20  while DVD was still profitable and would be for a long time, "in

21  markets where the streaming business is doing really well the DVD

22  business is flattening out more."  Id.

23       The June 2, 2011 statements from Mr. Sarandos do not support

24  Plaintiffs' allegations.  Plaintiffs cited Mr. Sarandos's

25  quotations somewhat selectively to make it seem as if he was

26  actually saying that Netflix was prepared and willing to kill their

27  DVD business to move on to the next one, i.e., streaming, thereby

28  suggesting that the streaming component had completely supplanted

United States District Court
For the Northern District of California

the DVD component.  See Opp'n at 2, 5, 12, 14.  The Court finds
that this is not the case.  Mr. Sarandos was talking about the
philosophy of Hollywood versus Silicon Valley, characterizing the
former as a "relationship town" that focuses on preserving the
status quo and the latter as a place philosophically more prepared
to make drastic business shifts.  See FAC ¶ 185.  Moreover, all of
Defendants' other statements make clear that, while they were
planning to shift the business's focus to streaming, DVD would
remain part of Netflix's business plan.  See id. ¶ 180.  Mr.
Sarandos himself said, during the same conversation Plaintiffs
cite, "The value proposition of the DVD business is going to be
very good for a very long time."  Id. ¶ 185.  The Court finds that
these statements are not plausibly false or misleading.  They are
therefore insufficient to support Plaintiffs' claims.

July 25, 2011 Statement: Plaintiffs refer to a shareholder
letter filed on July 26, 2011, and an earnings call held on the
same day.  Id. ¶¶ 188-89.  The letter indicated that Netflix's
streaming-only plan gained in popularity during Second Quarter
2011, that DVD shipments had "likely peaked" with the "rapid
adoption of streaming," and that Defendants had "spoken frequently"
of how they were "directing savings generated from declining DVD
demand into additional streaming content and marketing."  Id. ¶
188.

Defendants Hastings and Wells said during the July 25 earnings
call that they were gaining confidence over the last two years
about "the viability and strength of a pure streaming plan,"
especially since 75 percent of subscribers had chosen streaming-
only plans even though DVD plans were only two dollars more

**United States District Court**
For the Northern District of California

expensive.  Id. ¶ 189.  Defendant Hastings stated that with the
pricing change, Netflix could strengthen its streaming plan with
more content.  Id.  Defendant Hastings added that investing in its
DVD business would continue to be a smart choice, and that even if
it did not grow it would at least shrink slowly instead of rapidly.
ECF No. 112-1 ("Decl. ISO Reply") Ex. E ("July 25 Tr.") at 3.
Defendant Hastings said that Netflix would "figure out" these
growth prospects over "the next couple of quarters."  Id.  The
Court finds these statements insufficient to support Plaintiffs'
claim: they are, in context, optimistic statements about streaming
among candid statements of risk.

Plaintiffs also point to Defendant Hastings' response to an
analyst's question about how separating the DVD and streaming
components of its business would impact its content partnerships.
FAC ¶¶ 190-91; July 25 Tr. at 3.  Defendant Hastings stated that
movie studios have had different DVD and streaming divisions "for a
while," leading Defendants not to see "any significant effect
coming out of the separation of the plans."  July 25 Tr. at 3.  And
in response to separate question about whether DVD would become
more or less of a priority after being decoupled from streaming,
Defendant Hastings stated that the DVD business would be "less
important to those people at Netflix working on streaming, and much
more important to those people in the dedicated DVD division.  And
that's the purpose of putting it in a separate group, so they can
focus on that."  Id.  The Court finds that none of these statements
are false or misleading.  The questions concerned content
partnerships, not profitability or financial information.

Plaintiffs then point to Defendant Hastings' statement that,

14

United States District Court
For the Northern District of California

by having DVD "as a division within Netflix, [Netflix had] a way to measure the P&L [profit and loss]." Id. ¶ 191.  Plaintiffs state that this reflects Defendants' capability of measuring the P&L for Netflix's DVD component while it was part of the hybrid plan, leading Plaintiffs to conclude that Netflix "necessarily also had the capability of measuring the P&L for streaming." Id. ¶ 190. (At this point, Netflix had separate streaming and DVD plans for new users, but existing users' hybrid plans would not be phased out until September 2011.)  These statements are implausible as bases for Plaintiffs' allegations of securities fraud.  In context, it is clear that Defendant Hastings was stating that Defendants would have P&L information for the DVD component in the future -- he said nothing about the streaming component and, as noted above, did not have to, either as a matter of duty or in response to the analyst's question about Netflix's DVD-only business alone.  See July 25 Tr. at 3.; see also supra Section IV.A.1.  The Court does not find that Defendant Hastings' statement, taken alone or alongside Plaintiffs' other allegations, suggests that Defendants knew it was false or misleading, or that it rendered other statements actionable.  The Court finds that these statements are not plausible bases for Defendants' claims.

September 21, 2011 Statement: Plaintiffs add a quotation from a Goldman Sachs Communacopia Conference Call in which Netflix participated.  Id. ¶ 204.  In response to an analyst's request for a "narrative" of Netflix's focus and a query about why investors should own Netflix shares, Defendant Wells said this: "I think the core message I'll deliver is that we feel strongly that the core thesis is intact.  The size and the opportunity of the domestic and

1   the international streaming market or electronic, entertainment

2   market is intact.  And we're well positioned.  We're still well

3   positioned to take advantage of that and to grow into a large

4   share."  Id.  Defendant Wells also stated that Netflix used

5   mathematical models to predict streaming content's value in

6   negotiations.  FAC ¶ 94.  Finally, he added that Netflix would

7   continue to analyze the now-separate DVD division's revenue

8   streams.  Id. ¶ 95.

9       Defendant Wells's September 21, 2011 statements do not provide

10  plausible support for Plaintiffs' claims.  They are too vague and

11  general to plausibly show that Defendants had knowledge of the

12  disparities in DVD's and streaming's contribution margins.  They

13  also do not make false or misleading representations about such

14  margins.  The Court also finds that these statements do not support

15  Plaintiffs' contention that Defendants were analyzing streaming's

16  profitability.

17      Expansion of December 8, 2010 Statement: Plaintiffs expand on

18  December 8, 2010 statements referenced in the CCAC.  These

19  statements were made on a Barclays Capital Global Technology

20  Conference Call.  Id. ¶ 160.  Plaintiffs quote sections of this

21  call rather selectively.  Compare id. with ECF No. 109 ("Liss

22  Decl.") Ex. A ("Barclays Tr.") at 5.  Plaintiffs characterize the

23  analyst's question as being about "the impact of streaming content

24  costs on margins."  Id.  But the actual question concerned studios

25  and pay-TV networks with whom Netflix was negotiating for content.

26  The analyst asked about those parties' future plans; whether, in

27  the long term, it was "the right thing" for them to license content

28  to Netflix; and "whether [doing so] potentially hurts their seat at

the table a few years down the line." Id.

Plaintiffs quote Defendant Hastings as responding to that question by saying:

> [T]here is no risk of a big negative thing happening to Netflix.   And, in general, investors ask us questions like, well, if the cost of content is X, won't that tank your margins?   And we are always surprised when we get that question because we are like no, we manage the margins . . . the margins would be preserved . . . [s]o it is not going to ever manifest itself as margin risk.

FAC ¶ 160.

However, having carefully read the transcript, the Court finds that Defendant Hastings is referring to the risk of having a majority of its streaming content tied to a single provider, which he calls a "concentration risk."  Barclays Tr. at 5.  Defendant Hastings states that because Netflix had "added a lot of content," even since the prior year's statement that "no content provider was more than 20% of [Netflix's] viewing."  Id.  The "big negative thing" refers to the risk of a single content provider pulling content, and Defendants' disclosure and explanation of such a risk is to be treated differently from statements about certainties. See Berson, 527 F.3d at 987.

Further, Defendant Hastings' statement that "[Netflix's] margins would be preserved" as it continued to invest in content is tucked between two ellipses in Plaintiffs' FAC, but in context on the call's full transcript, the Court finds that Defendant Hastings was referring to Netflix's management of margins in terms of its not overspending in its content purchases.  This is not a statement about specific streaming margins, nor is it actionable in general.

Similarly, the statement that purchasing content for streaming was "not going to ever manifest itself as margin risk" comes several sentences after Defendant Hastings hedges his statements on the benefits of content spending and the importance of management discipline.  Before he refers to "margin risk," he says that if content were ever more expensive than Netflix thought, they would not purchase it, a decision that could lead to Netflix's having less total content, being less exciting to consumers, and resulting in less growth, but preserving Netflix's margins.  Id.  The Court finds that this statement, like those above, is a statement about risk, not certainty -- it is not actionable.  Berson, 527 F.3d at 987.

Expansion of December 20, 2010 Statement: Plaintiffs add more quotations from an article by Defendant Hastings.  In the article, Defendant Hastings responded to an investment advisor's suggestion that investors should short Netflix because of rising content costs and a more competitive streaming landscape.  FAC ¶ 163.  Defendant Hastings stated that Netflix's subscriber base was growing fast enough, with DVD shipments slowing down enough, for Netflix both to pay for existing streaming content and to add more content to its library.  Id. ¶ 164.  He added that Netflix had "no intention of overspending relative to [its] margin structure, and there is no specific content that [Netflix] 'must have' at nearly any cost."  Id.  He concluded by saying that Netflix spends 65-70 percent of revenue on Cost of Goods Sold (which is mostly content and postage) in its domestic business,  and that "if content costs rose faster than we expected, then in practice we'd have less content than otherwise, rather than less margin.  This would ultimately show up

in less subscriber growth than we wanted from a not-as-good-as-it-would-otherwise-be service; it would not likely show up as a sudden hit to margins." Id.

The Court finds that Plaintiffs' expanded discussions of Defendants' December 8 and 20, 2010, statements do not render Plaintiffs' claims plausible. Plaintiffs attempt to argue both that these statements were "specific representations concerning Netflix's streaming profit margins" and that the statements did not refer "explicitly to streaming's profitability." Opp'n at 15, 17 n.14. In context, the Court finds it clear that the statements refer to Netflix's overall margins, just as the Court found in its previous Order. See Order at 15-16. The statements issued several months before Defendants could have evaluated different components' profit margins, according to Plaintiffs' measurements. See Ex. A at 5; see also FAC ¶¶ 157, 160-62, 164-65. Moreover, Defendant Hastings' statements both make clear that Netflix planned to be cautious in its content investments, and that presenting less content to its subscribers could result in less subscriber growth. See FAC ¶¶ 160, 64. The Court finds that these statements are not plausible bases for Plaintiffs' claims.

CW3: CW3 was a Manager of Content Planning and Analysis at Netflix from June 2011 to July 2012. Id. ¶ 224. Plaintiffs state that CW3 "confirms that Netflix had the capability to: (i) track the profitability of streaming; (ii) determine a profit margin for the purposes of determining separate streaming pricing; and (iii) calculate what the streaming profit margin needed to be." Id. Plaintiffs allege that CW3 confirmed that Netflix's decision to split streaming and DVD was made before June 2011, and that

19

**United States District Court**
For the Northern District of California

1    streaming was a fixed-cost business with profit based almost

2    entirely on the fixed cost of content.  Id. ¶ 224.  Plaintiffs also

3    assert that according to CW3, Netflix was performing ROI analyses

4    to determine different streaming packages' profitability, and that

5    these analyses helped them to determine that Starz's requested

6    dollar amount for its content exceeded that content's

7    profitability.  Id. ¶ 226.

8        Plaintiffs claim that on a September 21, 2011 conference call,

9    Defendants corroborated CW3's allegations.  Id. ¶ 227.  On that

10   call, Defendant Wells stated that in negotiations for groups of

11   television or movie titles, Netflix would use hours viewed by its

12   streaming subscribers as a proxy for value, and "to the extent that

13   [Netflix uses] regression and other math valuation models" to

14   predict a group of titles' relative value, Netflix could estimate a

15   reservation price for its deals.  Id.  Plaintiffs also state that

16   during the same call, Defendants revealed that they had segmented

17   operating profits for its DVD division, pointing to another of

18   Defendant Wells' statements -- devoid of context here and not

19   explained elsewhere -- about "the long-term earnings stream from a

20   DVD division" and the notion that Netflix would continue to

21   "segment that out" while "looking at operating profit."  Id. ¶ 228.

22       The parties dispute the relevance of CW3's statements to

23   Plaintiff's theory that Defendants knew of actual profit

24   information about streaming.  Plaintiffs say that they recently

25   learned that CW3 had signed a declaration prepared by Netflix's

26   counsel, clarifying that "[t]erms like 'profitability' or 'return

27   on investment,' to the extent used by [CW3] or in [CW3's] group,

28   referred to whether the cost of content would be justified by the

20

anticipated consumption (viewing hours) of that content" and did not mean "financial profitability," i.e., revenue minus costs. Opp'n at 1 n.2.

Plaintiffs apparently wanted to stipulate to amend their FAC to add this clarifying statement, but the parties never agreed to do so.  Id.  The parties engage in some footnoted back-and-forth about the procedural aspects of this declaration at this point in litigation, see id.; Reply at 4 n.4.  However, the important point is that Plaintiffs concede that CW3's statements refer not to financial profitability (revenue minus costs) but to estimates of anticipated content consumption.  Opp'n at 1 n.1.  Thus, CW3's statements do not indicate that Defendants had actual knowledge of streaming's relative profitability at any point before they actually declared it.

None of Plaintiffs' CWs, even CW3, make Plaintiffs' claims any more plausible than they were last time.  As noted in Section II.B, supra, Plaintiffs clarify that CW3 actually uses the word "profitability" to mean "cost efficiency," which is not the same as profitability.  Opp'n at 1 n.2.  Moreover, CW3's statements do not show that Defendants hid the real state of their business affairs from their investors.  Conclusory assertions that Defendants could have extrapolated complicated financial data from estimated values derived for purposes of negotiation do not render that claim any more plausible: forecasting and estimating are not the same as knowing the present value of an interrelated business component. Further, the fact that Defendants later began tracking information about DVDs still does not indicate that they knew the same information about streaming until that product was separated from

1  Defendants' other plans.

2      CW1 and CW2, as discussed in the Court's previous Order, also
3  do not support Plaintiffs' claims or render them plausible, because
4  those CWs did not possess discrete profitability data and were not
5  employed by Netflix at a relevant time.  Order at 16.  The Court
6  therefore finds that Plaintiffs' CWs' statements do not plausibly
7  support Plaintiffs' claims.

8      In general, all of Plaintiffs' allegations -- new and old --
9  depend on the tenuous theory that Defendants withheld discrete and
10 accurate financial information about streaming while also touting
11 streaming's profitability.  The Court has not found this to be the
12 case for any statement Plaintiffs cite.  Plaintiffs supply an array
13 of vague, sometimes conclusory, statements to support a theory that
14 requires much more by virtue of its being narrow and fact-
15 sensitive.  This is not enough to state a claim under the PSLRA.

16              **1.   Plaintiffs' Re-pled Claims**

17     Plaintiffs allege numerous facts that mirror what they pled
18 about profitability in their CCAC.  As for the statements the Court
19 addressed in its prior Order, and to the application of Plaintiffs'
20 newly cited cases more generally, Plaintiffs have not shown that
21 Defendants touted the independent profitability of streaming such
22 that they would have a duty to disclose any of the negative aspects
23 of their streaming business.  Indeed, Defendants explicitly refused
24 to discuss the independent profitability of streaming.  See Def.'s
25 RJN Ex. 7 ("Q3 Earnings Call") (in which Defendant Hastings says,
26 in response to a question about what Netflix's US streaming margins
27 would be, that Defendants did not know what the margins were or
28 would be in the future).

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    The Court finds that Plaintiffs' claims based on Defendants'

2  statements and other facts that Plaintiffs also pled in their CCAC

3  are implausible now for the same reasons they were when the Court

4  dismissed Plaintiffs' CCAC.  See Order at 11-18 (considering the

5  parts of Plaintiffs' CCAC that remain essentially unchanged in the

6  FAC).  The Court will not rewrite its previous Order here, so the

7  following paragraph briefly summarizes the factual problems with

8  Plaintiffs' restated pleadings.

9    Plaintiffs do not plead plausible facts indicating that

10  Defendants touted the streaming business's profitability as opposed

11  to the projected or hoped-for strength of the interrelated DVD and

12  streaming business.  Moreover, Defendants made clear throughout the

13  Class Period that the success of a streaming-focused business model

14  was contingent on other factors, primarily the growth and retention

15  of Netflix's subscriber base, suggesting that Defendants did not

16  omit any information or warnings in a way that would be misleading

17  under Rule 10b-5.  None of what Plaintiffs plead therefore shows

18  that Defendants made any false or misleading statements about the

19  profitability of the streaming business.

20    **B.   Plaintiffs' Remaining Claims**

21    Absent an underlying violation of the Exchange Act, there can

22  be no control person liability under Section 20(a).  Paracor Fin.,

23  Inc. v. Gen. Elec. Capital Corp., 96 F.3d 1151, 1161 (9th Cir.

24  1996).  Because Plaintiffs have not pled a violation of Section

25  10(b), their control person claim is also DISMISSED.  See Shurkin

26  v. Golden State Vintners, Inc., 471 F. Supp. 2d 998, 1027 (N.D.

27  Cal. 2006).  Likewise, there can be no insider trading liability

28  under Section 20A without an underlying violation of Section 10(b).

See <u>In re VeriFone</u>, 11 F.3d at 872.  Plaintiffs' Section 20A claim
is therefore DISMISSED.

    **C.**    **<u>Leave to Amend</u>**

    The Court is aware that the heightened pleading standards of
the PSLRA serve as a higher bar for plaintiffs in securities fraud
class actions.  Granting leave to amend -- already liberally given
in the Ninth Circuit -- is often viewed favorably in many PSLRA
cases.  However, in this case, the Court dismisses Plaintiffs'
claims based on their failure to plead false or misleading
statements.  Falsity, unlike scienter, generally does not require
the same depth of investigation.  In this case, Plaintiffs have had
two opportunities to plead false statements, but in both cases they
have failed to do so.  Therefore the Court declines to grant
Plaintiffs leave to amend their FAC.

**V.**    **<u>CONCLUSION</u>**

    For the foregoing reasons, the Court GRANTS Defendants Reed
Hastings, David Wells, Barry McCarthy, and Netflix, Inc.'s Motion
to Dismiss.  Plaintiffs Arkansas Teacher Retirement System and
State-Boston Retirement System's First Amended Consolidated Class
Action Complaint is DISMISSED WITH PREJUDICE.


    IT IS SO ORDERED.


Dated: August 20, 2013

_____
UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California